1     DUANE S. HORNING (Bar No. 174995)
      CYNTHIA G. ILIFF (Bar No. 149347)
2     CALIFORNIA BUSINESS LAW GROUP, PC
      Symphony Towers
3     750 B Street, Suite 1620
      San Diego, CA 92101
4     Tel: 619-325-1555
      Fax: 619-325-1559
5     E-mail: dhorning@cblg.biz

6     Attorneys for Petitioner ZENVEST LLC

7

8

9                  UNITED STATES DISTRICT COURT

10               SOUTHERN DISTRICT OF CALIFORNIA

11

12   In the Matter of the Arbitration Between,    CASE NO. '09 CV 2670 WQH JMA

13   Zenvest LLC,                      PETITION FOR ORDER COMPELLING

14            Petitioner,                ARBITRATION

15        and,

16   BNC Frances Villas, L.P.
    BNC Frances L.P.; BNC Investments, LLC;
17   BNC Frances Oaks LLC; BNC Frances
    Trails LLC; Barry S. Nussbaum; Richard
18   Gelbart; Suzanne Stubblefield; and Roger
    Artz as Trustee of Plaza Del Sol Real Estate
19   Trust,

20           Respondents.

21

22        Claimant ZENVEST LLC, a Michigan limited liability company with its principal place

23   of business in Nevada ("Zenvest"), makes this demand for arbitration on each of the respondents

24   on behalf of itself and derivatively on behalf of BNC FRANCES VILLAS, L.P., a Delaware

25   limited partnership, based on the following:

26       1.       Respondents are:

27             BNC FRANCES VILLAS, L.P., a Delaware limited partnership with its principal

28             place of business in San Diego, California ("Frances Villas");

FILED
2009 NOV 25 PM 4:22
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____DEPUTY

1   BNC FRANCES, L.P., a Delaware limited partnership with its principal place of

2   business in San Diego, California ("Frances");

3   BNC INVESTMENTS, LLC, a Delaware limited liability company with its

4   principal place of business in San Diego, California ("Investments");

5   BNC FRANCES OAKS, LLC, a Delaware limited liability company with its

6   principal place of business in San Diego, California ("Oaks");

7   BNC FRANCES TRAILS, LLC, a Delaware limited liability company with its

8   principal place of business in San Diego, California ("Trails");

9   BARRY S. NUSSBAUM, an individual and a citizen of San Diego, California;

10   RICHARD GELBART, an individual and a citizen of San Diego, California;

11   SUZANNE STUBBLEFIELD, an individual and a citizen of Texas.

12   (the above respondents are collectively referred to as the "BNC Respondents");

13   and

14   ROGER ARTZ, Trustee of the Plaza Del Sol Real Estate Trust and a citizen of

15   San Diego, California ("Artz");

16   (all of the above respondents are collectively referred to as "Respondents").

17   2.   Petitioners filed a Demand for Arbitration with the American Arbitration

18   Association ("AAA") on or about October 29, 2009, and served it on Respondents ("AAA

19   Demand"). A true and correct copy of the AAA Demand is attached as Exhibit A to this Petition.

20   Respondents did not file an answering statement within the time set forth by the AAA to do so,

21   November 20, 2009. A true and correct copy of the AAA letter setting forth the deadline to file

22   an answering statement is attached as Exhibit B to this Petition.

23   **NATURE OF THE DISPUTE**

24   3.   In or about July 2005, the BNC Respondents solicited a loan from Zenvest for

25   $300,000 for the purpose of refurbishing an apartment complex owned by Frances Villas. The

26   loan was evidenced by a Promissory Note dated July 7, 2005 (the "Note"). The Note was signed

27   by Zenvest, by Frances Villas, by Frances as the sole general partner for Frances Villas, by

28   Investments as the sole general partner of Frances, by Oaks, by Trails, and by Barry Nussbaum as

CALIFORNIA BUSINESS
LAW GROUP, PC

1   the sole manager of Investments, Oaks and Trails. Thus, all of the BNC Entities signed the Note.

2   The Note provided for, among other things, simple interest at 18% annually with a 10% exit fee

3   upon payoff of the Note.  The Note was due and payable in full on December 30, 2006, or upon

4   sale of the real property securing the Note.

5         4.      Before making the loan, Zenvest emphasized that it was only making this loan for

6   a short term, and that it had other needs for the money.  Respondent Nussbaum assured Zenvest

7   that the Note would be paid off early in approximately six to twelve months.

8         5.      At or about the same time that Zenvest made the loan, two other lenders also made

9   loans to Frances Villas:  respondent Artz in the amount of $1,000,000 and Jerry Ruyan in the

10  amount of $600,000, the latter of whom is not a respondent to this Arbitration.

11        6.      Beginning in March 2006, Zenvest made numerous inquiries to the BNC

12  Respondents or some of them to determine when the Note would be paid off.  The BNC

13  Respondents or some of them made representations indicating that replacement financing for the

14  property was imminent and the Note would soon be paid off.  These representations were false at

15  the time they were made and were known by the BNC Respondents or some of them to be false.

16  The true status of the property, which was being threatened with foreclose by the senior lender,

17  was concealed from Zenvest by the BNC Respondents or some of them.

18        7.      In or about late June 2006, the BNC Respondents or some of them made a number

19  of representations to induce Zenvest into converting its Note to equity.  These representations

20  included, among others, that the other two lenders, Artz and Mr. Ruyan, would also be converting

21  their loans to equity on the same terms as Zenvest, and that each lender would become a Class A

22  Limited Partner of Frances Villas.  Nussbaum and the other BNC Respondents urged Zenvest to

23  immediately sign an agreement to convert the Note to equity, or else a pending refinancing would

24  fail and the Frances Villas property would be lost to foreclosure.  Zenvest again emphasized that

25  it never intended to become a long term lender or investor, that the funds that it had loaned were

26  for a short term, and that the money needed to be promptly repaid.  Nussbaum assured Zenvest

27  that it and the other BNC Respondents would either sell the Frances Villas property or find a

28



1    replacement investor to buyout Zenvest's position in full within six months, or by November

2    2006.

3        8.    Based on these representations and others made by the BNC Respondents, Zenvest

4    signed a Debt Conversion Agreement on or about June 18, 2006 ("Zenvest Debt Conversion

5    Agreement"), purportedly converting its loan to equity as a Class A Limited Partner in Frances

6    Villas under the Frances Villas Limited Partnership Agreement, as amended ("Partnership

7    Agreement"). The Debt Conversion Agreement expressly provides that all three note holders,

8    Zenvest, Artz and Mr. Ruyan, will become Class A Limited Partners under the Partnership

9    Agreement on the same terms. The Zenvest Debt Conversion Agreement was signed by Zenvest,

10   by Frances Villas, by Frances as the General Partner of Frances Villas, by Investments as the

11   General Partner of Frances, and by Nussbaum as the Manager of Investments. Zenvest is

12   informed and believes and on that basis alleges that Artz signed an identical debt conversion

13   agreement (the "Plaza Debt Conversion Agreement").

14       9.    The Partnership Agreement, provides that distributions will be made to each Class

15   A Limited Partner "on a pro-rata basis until each Class A Limited Partner has received an amount

16   equal to its Principal plus its Premium (i.e., its principal plus accrued and unpaid interest and exit

17   fee) . . . ." By entering into the Debt Conversion Agreements, the BNC Respondents, Zenvest,

18   and Artz agreed to be bound by "all of the rights and obligations of a Class A limited partner of

19   the Company, as set forth in the Limited Partnership Agreement, as amended by the Second

20   Amendment," which was attached as an exhibit to the respective Debt Conversion Agreements.

21       10.    Before Zenvest agreed to or signed the Debt Conversion Agreement, the

22   Respondents or some of them entered into a secret "side agreement" whereby Artz would secretly

23   receive regular preferential payments from Frances Villas or a related entity in exchange for Artz'

24   agreement to enter into the Plaza Debt Conversion Agreement. The side agreement and the secret

25   payments were concealed from Zenvest before Zenvest agreed to the Debt Conversion Agreement

26   and were continually concealed by the Respondents up until recently when it was discovered by

27   Zenvest.

28

CALIFORNIA BUSINESS
LAW GROUP, PC



11.    The Respondents actively concealed the side agreement and, once it was discovered, continued to make affirmative misrepresentations to Zenvest about the terms of the side agreement and the source of the funds used to make the preferential payments to Artz. The Respondents mischaracterized the secret payments as an "accounting error."

12.    If Zenvest had known about the side agreement and the secret payments to Artz, Zenvest would not have entered into the Zenvest Debt Conversion Agreement and would have enforced its rights under the Note.

13.    The secret preferential payments to Artz under the side agreement were paid from the assets of Frances Villas in violation of the Zenvest Debt Conversion Agreement, the Plaza Debt Conversion Agreement, and the Partnership Agreement.

14.    On or about August 31, 2009, Zenvest sent to the BNC Respondents notice of rescission of the Zenvest Debt Conversion Agreement due to fraud and tendering the original Note as controlling the obligations between the parties. As such the loan evidenced by the Note is now due and owing and Zenvest made demand for payment under the Note in the principal amount of $300,000, plus simple interest on this amount at 18% annually since July 7, 2005, through August 31, 2009, for a total of $224,294.93, and an exit fee of $30,000. These sums total $554,284.93.

15.    Respondents did not pay or otherwise respond to the Notice of Rescission.

## CLAIMS AND RELEIF SOUGHT

16.    Zenvest seeks arbitration of its claims for fraud, rescission of the Debt Conversion Agreement, breach of applicable federal and state securities laws, enforcement of the Note, breach of the Debt Conversion Agreement, breach of the Partnership Agreement, breach of fiduciary duty, and constructive trust over and disgorgement of the preferential payments made to Artz. Zenvest brings these claims on behalf of itself and derivatively on behalf of BNC Frances Villas L.P.

17.    Zenvest seeks compensatory damages, prejudgment interest, punitive damages, expert witness fees and costs, attorney's fees and costs, a constructive trust over the money wrongfully received by Artz, and disgorgement of those funds.

CALIFORNIA BUSINESS
LAW GROUP, PC

18.     Zenvest reserves the right to assert other claims and seek other relief as supported by the evidence.

19.     Nussbaum is liable for the actions and liabilities of the entity BNC Respondents because the separateness of the entity BNC Respondents has not been respected, they have commingled funds, and they have not been adequately capitalized such that a grave inequity and injustice would result if Nussbaum is not held liable for the liabilities of the entity BNC Respondents.

20.     The individual respondents, Nussbaum, Richard Gelbart and Suzanne Stubblefield are each personally and directly liable for their own acts of breach of fiduciary duty, fraud and concealment.

21.     BNC Frances L.P. is the sole general partner of Francis Villas, and is therefore liable for the debts of Frances Villas.  BNC Investments, LLC is the sole general partner of BNC Frances L.P., and is therefore liable for the debts of BNC Frances L.P., and thus further liable for the debts of Frances Villas.

22.     Each of the Respondents are jointly and severally liable for all of the acts and liabilities of each of the other Respondents because each Respondent is the agent of the others, and all of the Respondents have acted in conspiracy and in concert with one another to defraud Zenvest and deprive Zenvest of its rights.

### THE ARBITRATION AGREEMENTS

23.     The Zenvest Debt Conversion Agreement, the Partnership Agreement, and the Note all include broad agreements to arbitrate.

24.     The Zenvest Debt Conversion Agreement states:

> **Section 5.9**: Any controversy or claim arising out of or related to this Agreement shall be submitted to arbitration in the City of San Diego, State of California in accordance with the Commercial Rules of the American Arbitration Association, as in effect from time to time.  There shall be a single arbitrator, and if the parties are unable to agree on a single arbitrator, the single arbitrator shall be selected in accordance with the rules of the American Arbitration Association.  The parties agree to abide by all awards rendered by the arbitrator, and such awards shall be final, non-appealable and binding on all parties.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

1    The provisions of this Section 5.9 shall be specifically enforceable.

2    Zenvest Debt Conversion Agreement, at page 6, a true and correct copy of which, together with

3    the Partnership Agreement that is Exhibit A thereto, is attached as Exhibit 1 to the AAA Demand,

4    which is attached as Exhibit A to this Petition.  Tax identification numbers have been redacted.

5        25.    The Partnership Agreement states:

6            **Section 14.21**: Any dispute or controversy arising out of, under, or
             in connection with, or in relation to this Agreement, and any

7            amendments hereof, or the breach hereof, shall be determined and
             settled by arbitration to be held before one impartial arbitrator in

8            San Diego, California, in accordance with then applicable
             commercial arbitration rules of the American Arbitration

9            Association.  In the event the parties cannot agree to the
             appointment of an arbitrator, an arbitrator shall be appointed in

10           accordance with section 1281.6 of the California Code of Civil
             Procedure.  Any arbitration shall allow for the production of

11           relevant documents and depositions, and sanctions, at the discretion
             of the arbitrator, for failure to comply with any such discovery

12           request.

13   Partnership Agreement at page 29, which is incorporated as Exhibit A to the Zenvest Debt

14   Conversion Agreement.  The Zenvest Debt Conversion Agreement is, in turn, attached as Exhibit

15   1 to the AAA Demand, which is attached as Exhibit A to this Petition.

16       26.    The Note states:

17           Any dispute or controversy arising out of, under, or in connection
             with, or in relation to this Note, or the breach hereof, shall be

18           determined and settled by arbitration to be held before one impartial
             arbitrator in Dallas, Texas, in accordance with then applicable

19           commercial arbitration rules of the American Arbitration
             Association.  In the event the parties cannot agree to the

20           appointment of an arbitrator, an arbitrator shall be appointed in
             accordance with the Texas Rules of Civil Procedure.  Any

21           arbitration shall allow for production of relevant documents and
             depositions, and sanctions, at the discretion of the arbitrator, for

22           failure to comply with any such discovery requests.

23   Note at page 2, a true and correct copy of which is attached as Exhibit 2 to the AAA Demand, ,

24   which is attached as Exhibit A to this Petition.

25       27.    The Note also provides for reasonable attorney's fees and court and other costs for

26   enforcement of the Note after breach.  Exhibit 2 to AAA Demand, at page 1.

27

28

28.     Zenvest is informed and believes, and on that basis alleges, that Artz signed a debt conversion agreement with essentially the same terms as Zenvest, making Artz a party to the Partnership Agreement.

29.     This Court has subject matter jurisdiction over this action because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.  Petitioner, on the one hand is a citizen of Michigan and Nevada and the Respondents, on the other hand who are all citizens of California or Texas.

30.     Venue in San Diego, California, is proper because both the Debt Conversion Agreements and Partnership Agreement specify venue shall be in San Diego, California, Nussbaum resides in San Diego County, California, the principal executive offices of the entity BNC Respondents are in San Diego County, California, Roger Artz resides in San Diego County, California, and Plaza Del Sol is administered in San Diego County, California.  The Note states arbitration shall be in Dallas, Texas, however, only one of the parties is located in Dallas, Texas.  Furthermore, the facts and claims involving the Note are so intertwined with those involving the Debt Conversion Agreement and the Partnership Agreement that, in the interests of justice and judicial economy and to avoid inconsistent results and multiplicity of proceedings, there should be only one arbitration proceeding covering all claims and all three instruments, and that proceeding should be in San Diego, California.

31.     Petitioners have not waived their right to compel arbitration, and do not know of any ground that would permit the revocation of any or all of the above-referenced agreements to arbitrate.

32.     Despite their contractual obligations to do so, Respondents have refused to participate in the arbitration of this dispute.

WHEREFORE, Petitioner requests that:

1.     The Court issue an order compelling the arbitration of this dispute in San Diego;

2.     Petitioners be awarded legal fees and costs in the amount of $8,872.50 for bringing this Petition for which Respondents are jointly and severally liable;



3.    Petitioners be awarded any other and further relief the Court deems just and proper.

Dated:  November 24, 2009

CALIFORNIA BUSINESS LAW GROUP, PC

By _____

DUANE S. HORNING
Attorneys for Petitioner,
Zenvest LLC

CALIFORNIA BUSINESS
LAW GROUP, PC

**EXHIBIT  A**

1   DUANE S. HORNING (Bar No. 174995)
    CYNTHIA G. ILIFF (Bar No. 149347)
2   CALIFORNIA BUSINESS LAW GROUP, PC
    Symphony Towers
3   750 B Street, Suite 1620
    San Diego, CA 92101
4   Tel: 619-325-1555
    Fax: 619-325-1559
5
    Attorneys for Claimant ZENVEST, LLC
6

7

8

9                  AMERICAN ARBITRATION ASSOCIATION

10                 WESTERN CASE MANAGEMENT CENTER

11                    SAN DIEGO, CALIFORNIA LOCALE

12

13   ZENVEST, LLC, on behalf of itself and       CASE NO.
     derivatively on behalf of BNC FRANCES
14   VILLAS, L.P.,                                DEMAND FOR ARBITRATION

15              Claimant,

16         v.

17

18   BNC FRANCES VILLAS, L.P.; BNC
     FRANCES, L.P.; BNC INVESTMENTS,
19   LLC; BNC FRANCES OAKS LLC; BNC
     FRANCES TRAILS LLC; BARRY S.
20   NUSSBAUM; RICHARD GELBART;
     SUZANNE STUBBLEFIELD; and
21   ROGER ARTZ, TRUSTEE OF THE
     PLAZA DEL SOL REAL ESTATE
22   TRUST,

23              Respondents.

24

25         Respondents are hereby notified that copies of the arbitration agreements between the

26   parties and this Demand for Arbitration are being filed with the American Arbitration

27   Association's Case Management Center located in Fresno, California with a request that it

28

                                            1

commence administration of the arbitration under its Commercial Rules.  Under the rules, you
may file an answering statement within fifteen days after notice from the AAA.

## PARTIES

Claimant ZENVEST LLC is a Michigan limited liability company ("Zenvest") with its
address at 825 Donna Drive, Incline Village, Nevada, 89451 and makes this demand for
arbitration on each of the respondents on behalf of itself and derivatively on behalf of BNC
FRANCES VILLAS, L.P., a Delaware limited partnership, based on the following:

1.      Respondents are:

      BNC Frances Villas, L.P. , a Delaware limited partnership ("Frances Villas");

      BNC Frances, L.P., a Delaware limited partnership;

      BNC Investments, LLC, a Delaware limited liability company;

      BNC Frances Oaks LLC, a Delaware limited liability company;

      BNC Frances Trails LLC, a Delaware limited liability company;

      Barry S. Nussbaum, individually ("Nussbaum");

      Richard Gelbart, individually;

      Suzanne Stubblefield, individually;

      (the above respondents are collectively referred to as the "BNC Respondents");

      and

      Roger Artz, Trustee of the Plaza Del Sol Real Estate Trust ("Plaza Del Sol");

      (all of the above respondents are collectively referred to as "Respondents").

2.      The BNC Respondents are located at 990 Highland Drive, Suite 207, Solana
Beach, California, 92075.  The Claimant is informed and believes that the BNC
Respondents are or will be represented in this matter by attorney Daniel S.
Levinson, 990 Highland Drive, Suite 206, Solana Beach, California, 92075.

3.      Roger Artz, Trustee of Plaza Del Sol, is located at 3545 Aero Court, San Diego,
CA 92123.

## NATURE OF THE DISPUTE

4.    In or about July 2005, the BNC Respondents solicited a loan from Zenvest for $300,000 to Frances Villas, BNC Frances Oaks LLC, and BNC Frances Trails LLC, for the purpose of refurbishing an apartment complex owned by Frances Villas.

5.    At or about the same time, two other lenders also made loans to Frances Villas: respondent Plaza Del Sol in the amount of $1,000,000 and Jerry Ruyan in the amount of $600,000, the latter of whom is not a respondent to this Arbitration.

6.    Zenvest's loan was evidenced by a Promissory Note dated July 7, 2005 (the "Note"). The Note provided for, among other things, simple interest at 18% annually with a 10% exit fee upon payoff of the Note. The Note was due and payable in full on December 30, 2006, or upon sale of the real property securing the Note.

7.    Before making the loan, Zenvest emphasized that it was only making this loan for a short term, and that it had other needs for the money. Respondent Nussbaum assured Zenvest that the Note would be paid off early in approximately six to twelve months.

8.    Beginning in March 2006, Zenvest made numerous inquiries to the BNC Respondents or some of them to determine when the Note would be paid off. The BNC Respondents or some of them made representations indicating that replacement financing for the property was imminent and the Note would soon be paid off. These representations were false at the time they were made and were known by the BNC Respondents or some of them to be false. The true status of the property, which was being threatened with foreclose by the senior lender, was concealed from Zenvest by the BNC Respondents or some of them.

9.    In or about late June 2006, the BNC Respondents or some of them made a number of representations to induce Zenvest into converting its Note to equity. Among these representations were that the other two lenders, Plaza Del Sol and Mr. Ruyan, would also be converting their loans to equity on the same terms as Zenvest, and that each lender would become a Class A Limited Partner of Frances Villas. Nussbaum and the other BNC Respondents urged Zenvest to immediately sign an agreement to convert the Note to equity, or else a pending refinancing would fail and the Frances Villas property would be lost to foreclosure. Zenvest

again emphasized that it never intended to become a long term lender or investor, that the funds that it had loaned were for a short term, and that the money needed to be promptly repaid. Nussbaum assured Zenvest that it and the other BNC Respondents would either sell the Frances Villas property or find a replacement investor to buyout Zenvest's position in full within six months, or by November 2006.

10.     Based on these representations and others made by the BNC Respondents, Zenvest signed a Debt Conversion Agreement on or about June 18, 2006 ("Debt Conversion Agreement"), purportedly converting its loan to equity as a Class A Limited Partner in Frances Villas under the Frances Villas Limited Partnership Agreement, as amended ("Partnership Agreement"). The Debt Conversion Agreement expressly provides that all three Note holders, Zenvest, Plaza Del Sol and Mr. Ruyan, will become Class A Limited Partners under the Partnership Agreement on the same terms.

11.     The Debt Conversion Agreement, mirroring the Partnership Agreement, provides that distributions will be made to each Class A Limited Partner "on a pro-rata basis until each Class A Limited Partner has received an amount equal to its Principal plus its Premium (i.e., its principal plus accrued and unpaid interest and exit fee) . . . ."

12.     Before Zenvest agreed or signed the Debt Conversion Agreement, the Respondents or some of them entered into a secret "side agreement" whereby Plaza Del Sol would secretly receive regular preferential payments from Frances Villas or a related entity in exchange for Plaza Del Sol's agreement to enter into its Debt Conversion Agreement. The side agreement and the secret payments were concealed from Zenvest before Zenvest agreed to the Debt Conversion Agreement and were continually concealed by the Respondents up until recently when it was discovered by Zenvest.

13.     The Respondents actively concealed the side agreement and, once it was discovered, continued to make affirmative misrepresentations to Zenvest about the terms of the side agreement and the source of the funds used to make the preferential payments to Plaza Del Sol. The Respondents mischaracterized the secret payments as an "accounting error."

14.     If Zenvest had known about the side agreement and the secret payments to Plaza Del Sol, Zenvest would not have entered into the Debt Conversion Agreement and would have enforced its rights under the Note.

15.     The secret preferential payments to Plaza Del Sol under the side agreement were paid from the assets of Frances Villas in violation of the Debt Conversion Agreement and the Partnership Agreement.

16.     On or about August 31, 2009, Zenvest sent to the BNC Respondents notice of rescission of the Debt Conversion Agreement due to fraud and tendering the original Note as controlling the obligations between the parties.  As such the loan evidenced by the Note is now due and owing and Zenvest made demand for payment under the Note in the principal amount of $300,000, plus simple interest on this amount at 18% annually since July 7, 2005, through August 31, 2009, for a total of $224,294.93, and an exit fee of $30,000.  These sums total $554,284.93.

17.     Respondents did not pay or otherwise respond to the Notice of Rescission.

## AMOUNT INVOLVED AND REMEDY SOUGHT

18.     Zenvest brings this arbitration of its claims for fraud, rescission of the Debt Conversion Agreement, breach of applicable federal and state securities laws, enforcement of the Note, breach of the Debt Conversion Agreement, breach of the Partnership Agreement, breach of fiduciary duty, and constructive trust over and disgorgement of the preferential payments made to Plaza Del Sol.  Zenvest brings these claims on behalf of itself and derivatively on behalf of BNC Frances Villas L.P.

19.     Zenvest seeks compensatory damages, prejudgment interest, punitive damages, expert witness fees and costs, attorney's fees and arbitration costs, a constructive trust over the money wrongfully received by Plaza Del Sol, and disgorgement of those funds.   This amounts to over $554,284.93 in compensatory damages plus additional interest under the Note from August 31, 2009.

20.     Zenvest reserves the right to assert other claims and seek other relief as supported by the evidence.

CALIFORNIA BUSINESS
LAW GROUP, PC

5

Demand for Arbitration

21.     Nussbaum is liable for the actions and liabilities of the entity BNC Respondents because the separateness of the entity BNC Respondents has not been respected, they have commingled funds, and they have not been adequately capitalized such that a grave inequity and injustice would result if Nussbaum is not held liable for the liabilities of the entity BNC Respondents.

22.     The individual respondents, Nussbaum, Richard Gelbart and Suzanne Stubblefield are each personally and directly liable for their own acts of breach of fiduciary duty, fraud and concealment.

23.     BNC Frances L.P. is the sole general partner of Francis Villas, and is therefore liable for the debts of Frances Villas.  BNC Investments, LLC is the sole general partner of BNC Frances L.P., and is therefore liable for the debts of BNC Frances L.P., and thus further liable for the debts of Frances Villas.

24.     Each of the Respondents are jointly and severally liable for all of the acts and liabilities of each of the other Respondents because each Respondent is the agent of the others, and all of the Respondents have acted in conspiracy and in concert with one another to defraud Zenvest and deprive Zenvest of its rights.

### ARBITRATION AGREEMENT AND APPLICABLE RULES

25.     This demand is made pursuant to the arbitration agreement contained in the Debt Conversion Agreement at Section 5.9, which provides:

> "Any controversy or claim arising out of or related to this Agreement shall be submitted to arbitration in the City of San Diego, State of California in accordance with the Commercial Rules of the American Arbitration Association, as in effect from time to time.  There shall be a single arbitrator, and if the parties are unable to agree on a single arbitrator, the single arbitrator shall be selected in accordance with the rules of the American Arbitration Association.  The parties agree to abide by all awards rendered by the arbitrator, and such awards shall be final, non-appealable and binding on all parties.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The provisions of this <u>Section 5.9</u> shall be specifically enforceable."

1    A copy of the Debt Conversion Agreement is attached hereto as Exhibit 1.

2         26.    The Partnership Agreement also provides for arbitration of disputes at Section

3    14.21 as follows:

4              "Any dispute of controversy arising out of, under, or in connection with, or in

5         relation to this Agreement, and any amendments hereof, or the breach hereof, shall be

6         determined and settled by arbitration to be held before one impartial arbitrator in San

7         Diego, California, in accordance with then applicable commercial arbitration rules of the

8         American Arbitration Association.  In the event the parties cannot agree to the

9         appointment of an arbitrator, an arbitrator shall be appointed in accordance with section

10        1281.6 of the California Code of Civil Procedure.  Any arbitration shall allow for the

11        production of relevant documents and depositions, and sanctions, at the discretion of the

12        arbitrator, for failure to comply with any such discovery request."

13   A copy of the Partnership Agreement is attached as Exhibit B to the Debt Consolidation

14   Agreement, which is attached as Exhibit 1 hereto.

15        27.    The Note also provide for arbitration, as follows:

16        "Any dispute or controversy arising out of, under, or in connection with, or in relation to

17   this Note, or the breach hereof, shall be determined and settled by arbitration to be held before

18   one impartial arbitrator in Dallas, Texas, in accordance with then applicable commercial

19   arbitration rules of the American Arbitration Association.  In the event the parties cannot agree to

20   the appointment of an arbitrator, an arbitrator shall be appointed in accordance with the Texas

21   Rules of Civil Procedure.  Any arbitration shall allow for production of relevant documents and

22   depositions, and sanctions, at the discretion of the arbitrator, for failure to comply with any such

23   discovery requests."

24   A copy of the Note is attached hereto as Exhibit 2.

25        28.    Locale is requested in San Diego, California, because both the Debt Conversion

26   Agreement and Partnership Agreement specify venue shall be in San Diego, California.

27   Furthermore, Nussbaum resides in San Diego County, California, the principle executive offices

28   of the entity BNC Respondents are in San Diego County, California, Roger Artz resides in San

1    Diego County, California, and Plaza Del Sol is administered in San Diego County, California.

2    The Note states arbitration shall be in Dallas, Texas, however, none of the parties to the Note are

3    located in Dallas, Texas.  Furthermore, the facts and claims involving the Note are so intertwined

4    with those involving the Debt Conversion Agreement and the Partnership Agreement that in the

5    interests of justice and judicial economy and to avoid inconsistent results and multiplicity of

6    proceedings, there should be only one arbitration proceeding covering all claims and all three

7    instruments, and that proceeding should be in San Diego, California.

8    DATED:  10/29/09                    CALIFORNIA BUSINESS LAW GROUP, PC

9

10                                       By
11                                          CYNTHIA G. ILIFF
                                            Attorneys for Claimant ZENVEST LLC
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT   I**

## DEBT CONVERSION AGREEMENT

THIS DEBT CONVERSION AGREEMENT (this "Agreement"), dated effective as of June 18, 2006 (the "Effective Date"), is made and entered into by and between BNC FRANCES VILLAS, L.P., a Delaware limited partnership (the "Company"), and Zenvest LLC (the "Note Holder"), with reference to the following facts:

A.    The Company, as of the Effective Date, is obligated to pay to the Note Holder total principal in the amount of $300,000 (the "Debt") plus accrued and unpaid interest in the amount of $51,900 (the "Interest") (together, the "Total Debt Plus Interest") and exit fees in the amount of $30,000, for a total of $381,900 (the "Total Amount Due") under that certain Promissory Note, dated as of July 7, 2005 (the "Note"), issued by the Company to the Note Holder.

B.    The Company desires to issue to the Note Holder a Class A limited partnership interest in the Company (the "Class A Interest") in exchange for the cancellation of the Note in accordance with the terms and conditions set forth in this Agreement.

C.    The Class A Interest, when issued by the Company, will have the relative rights, preferences, privileges, restrictions and obligations set forth in that certain Second Amendment to Limited Partnership Agreement of the Company, effective as of June 18, 2006 (the "Second Amendment"), a summary of which is attached hereto as Exhibit A (the "Summary of Debt Conversion Terms").

D.    The Second Amendment further amends that certain Limited Partnership Agreement of the Company, effective as of October 20, 2000 (the "Original Agreement"), as amended by that certain First Amendment to Limited Partnership Agreement, effective as of June 14, 2006 (the "First Amendment"). The Original Agreement, as amended by the First Amendment, is referred to herein as the "Limited Partnership Agreement" and a copy thereof, together with the Second Amendment, is attached hereto as Exhibit B.

E.    The Note Holder desires to accept the Class A Interest to be issued by the Company and, in consideration thereof, to cancel its Note and convert its Total Amount Due in its entirety, in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    Issuance of Class A Interest; Admission of Note Holder.

1.1    Issuance of Class A Interest.   Subject to the terms and conditions of this Agreement, the Company shall issue the Class A Interest to the Note Holder and admit the Note Holder as a Class A limited partner of the Company effective as of the Effective Date.

101685.000090/615615.01

     1.2    <u>Admission of Note Holder</u>.  The Note Holder hereby agrees that, by its execution and delivery of this Agreement, it is agreeing to be bound by all of the terms and conditions of the Limited Partnership Agreement, as amended by the Second Amendment, and it is representing and warranting to the Company with respect to each of the matters set forth in Section 13.1 (Representations and Warranties by Limited Partners) of the Limited Partnership Agreement.  The Note Holder hereby acknowledges and agrees that, upon its admission as a Class A limited partner of the Company, it shall have all of the rights and obligations of a Class A limited partner of the Company, as set forth in the Limited Partnership Agreement, as amended by the Second Amendment.

     1.3    <u>Rights of Class A Limited Partners</u>.   The Note Holder hereby acknowledges and agrees that the issuance of a Class A Interest to the Note Holder and the Note Holder's admission to the Company as a Class A limited partner will not entitle the Note Holder to any rights other than the right to receive priority distributions in accordance with the provisions of the Second Amendment.  Without in any way limiting the generality of the immediately preceding sentence, the Note Holder also acknowledges and agrees that the issuance of a Class A Interest to the Note Holder and the Note Holder's admission to the Company as a Class A limited partner will not entitle the Note Holder to any voting rights or rights to participate in the management or governance of the Company.

     1.4    <u>Initial Capital Contribution and Capital Account</u>.  Upon the Note Holder's admission as a Class A limited partner of the Company, the Note Holder shall be credited with an initial capital account and capital contribution balance equal to the dollar amount of the Debt. It shall have distribution rights, prorated with other holders of Class A Interests, equal to its Total Amount Due, <u>plus</u> a 10% Preferred Return on its Total Debt Plus Interest with such return accruing as of the Effective Date.

     2.    <u>Cancellation of Debt</u>.  In consideration of the issuance of the Class A Interest to the Note Holder and the Note Holder's admission as a Class A limited partner of the Company, in exchange for conversion of the Total Amount Due, the Note Holder hereby agrees that the Note and all Company obligations thereunder shall be deemed contributed to the Company and simultaneously deemed cancelled in its entirety, effective as of the Effective Date, and the Note Holder shall deliver to the Company the original Note for cancellation promptly following the Effective Date.  The Note Holder hereby agrees that, from time to time after the Effective Date, it shall execute and deliver to the Company all such documents, instruments and certificates as may be required or reasonably requested by the Company to evidence the cancellation of the Note.

     3.    <u>Representations and Warranties of the Company</u>.   The Company hereby represents and warrants to the Note Holder as follows:

     3.1    <u>Organization and Standing</u>.  The Company is a limited partnership duly formed, validly existing and in good standing under the laws of the State of Delaware.

     3.2    <u>Authority</u>.  The Company has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has

been duly authorized, executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to general principles of equity and to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

        3.3    <u>Limited Partnership Agreement</u>.  The Company has provided the Note Holder with true, correct and complete copies of (a) the Limited Partnership Agreement, (b) the Second Amendment, and (c) the Certificate of Limited Partnership of the Company, as filed with the Delaware Secretary of State on October 20, 2000 (the "<u>Certificate of Limited Partnership</u>").

    4.    <u>Representations and Warranties of the Note Holder</u>.  The Note Holder hereby represents and warrants to the Company as follows:

        4.1    <u>Authority</u>.  The Note Holder has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has been duly authorized, executed and delivered by the Note Holder and constitutes the legal, valid and binding obligation of the Note Holder, enforceable against the Note Holder in accordance with its terms, subject to general principles of equity and to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

        4.2    <u>Debt</u>.  The Total Amount Due represents the entire obligation and amount owed by the Company to the Note Holder, and, upon the consummation of the transactions contemplated by this Agreement, the Company shall not have any obligation to the Note Holder, except as otherwise set forth in this Agreement or the Limited Partnership Agreement, as amended by the Second Amendment.

        4.3    <u>No Assignments</u>.  Note Holder has not, at any time prior to the Effective Date, assigned or transferred the Note, or granted any rights or interest therein, to any other person or entity, in whole or in part.

        4.4    <u>Company Disclosures</u>

        (a)    The Note Holder has received a copy of the Limited Partnership Agreement, the Second Amendment, the Certificate of Limited Partnership and all other documents and informational materials concerning the Company that it has requested (collectively, the "<u>Disclosure Materials</u>").

        (b)    The Note Holder has carefully reviewed the Disclosure Materials, and has relied solely on the information contained therein.  The Note Holder has had ample opportunity to ask questions of and receive answers from the general partner and other authorized representatives (if any) of the Company concerning the Class A Interest, and all such questions have been answered to the full satisfaction of the Note Holder.

        (c)    No oral representations have been made and no oral information has been furnished to the Note Holder in connection with the offer and sale of the Class A

3

Interest which are in any way inconsistent with the information contained in the Disclosure Materials, and the Note Holder has not relied on any oral representations or oral information of any kind.

4.5     Accredited Investor Status. The Note Holder is an "accredited investor," as that term is defined in Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act").

4.6     Knowledge.   The Note Holder is, by reason of its knowledge and experience in business or financial matters, capable of evaluating the merits and risks of its investment and of protecting its own interests in connection with the purchase of the Class A Interest.

4.7     Investment Intent.   The Class A Interest is being acquired by the Note Holder for its own account for investment purposes only and not with a view towards the sale or distribution thereof.

4.8     Restricted Securities.   The Note Holder understands that (i) the Class A Interest is considered a "restricted security," as that term is defined in Rule 144 under the Securities Act; (ii) the sale or resale of the Class A Interest has not been registered under the Securities Act or any state securities laws; (iii) the Class A Interest may not be sold or transferred unless the sale or transfer is registered under the Securities Act and qualified under applicable state securities laws or an exemption from such registration and qualification requirements is available; and (iv) in addition to restrictions on transfer imposed by federal and state securities laws, the Class A Interest will also be subject to substantial restrictions on transfer set forth in the Limited Partnership Agreement, as amended by the Second Amendment.

4.9     Legend.   The Note Holder understands that the certificates (if any) evidencing the Class A Interest, when (and if) issued by the Company in the name of the Note Holder, will bear a restrictive legend in substantially the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE OFFERED, SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT AND COMPLIANCE WITH ALL APPLICABLE STATE SECURITIES LAWS, UNLESS OFFERED, SOLD OR TRANSFERRED PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF THOSE LAWS.

4

5.    Miscellaneous

5.1    Notices.   All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed given (a) if delivered personally or sent by facsimile transmission with confirmation of receipt, on the date given, (b) if delivered by a nationally recognized express delivery service, on the date of delivery, or (c) if by certified or registered mail, postage prepaid, return receipt requested, three (3) days after mailing, to the parties at the addresses listed below, or at such other address as any such party may designate by written notice in the manner aforesaid.

If to the Company, to:

BNC Frances Villas, L.P.
c/o BNC Real Estate
990 Highland Drive, Suite 207
Solana Beach, CA 92075
Facsimile:  858-481-3373
Attention:  Mr. Barry S. Nussbaum

with a copy (which shall not constitute notice) to:

Procopio, Cory, Hargreaves & Savitch LLP
530 B Street, Suite 2100
San Diego, CA 92101
Facsimile: (619) 744-5451
Attention:  Craig S. Sapin, Esq.

If to the Note Holder, to the address set forth under the Note Holder's signature on the signature page hereto.

5.2    Successors and Assigns.   No party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other parties hereto.  Any attempt by a party to assign any of its rights or obligations under this Agreement in violation of this Section 5.2 shall be void.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.3    Entire Agreement.   This Agreement supersedes all prior discussions, agreements and understandings (whether written or oral) between the parties hereto with respect to the subject matter hereof, and contains the sole and entire agreement of the parties with respect to the subject matter hereof.

5.4    Amendments and Waivers.   This Agreement may not be amended or modified, nor may any of its terms be waived, except by a written instrument signed by each of the parties hereto or, in the case of a waiver, by the party waiving compliance.  No failure or delay in exercising any right under this Agreement shall operate as a waiver thereof or of any other right, nor shall any single or partial exercise of any such right preclude any other or further exercise thereof, or of any other right.  Each waiver or consent under any provision of this

5

Agreement shall be effective only in the specific instance and for the specific purpose for which it was given.

5.5     Further Assurances.  Each of the parties agrees to promptly perform any additional acts, and execute and deliver any additional documents and instruments, that are reasonably necessary or appropriate to effectuate the transactions contemplated by this Agreement.

5.6     Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction), and the balance of this Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

5.7     Counterparts.  This Agreement may be executed in two or more counterparts and by facsimile, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

5.8     Consultation with Counsel; Mutual Drafting.  Each of the parties acknowledges and agrees that it fully understands its right to discuss all aspects of this Agreement with an independent attorney, and that to the extent, if any, it has desired, it has availed itself of this right, that it has carefully read and fully understands all of the provisions of this Agreement, and that it is voluntarily entering into this Agreement. The provisions of this Agreement have been carefully negotiated by the parties hereto and thereto, and the such parties do not intend that the presumptions of California Civil Code Section 1654 and similar laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive their effects.

5.9     Arbitration.  Any controversy or claim arising out of or related to this Agreement shall be submitted to arbitration in the City of San Diego, State of California in accordance with the Commercial Rules of the American Arbitration Association, as in effect from time to time.  There shall be a single arbitrator, and if the parties are unable to agree on a single arbitrator, the single arbitrator shall be selected in accordance with the rules of the American Arbitration Association.  The parties agree to abide by all awards rendered by the arbitrator, and such awards shall be final, non-appealable and binding and on all parties. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The provisions of this Section 5.9 shall be specifically enforceable.

5.10    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of California applicable to a contract executed and to be performed in such state, without giving effect to the conflicts of laws principles thereof.

5.11    No Third Party Beneficiaries.  Nothing in this Agreement is intended or shall be construed to give any person any legal or equitable right, remedy or claim under or in respect   of   this   Agreement   or   any   provision   contained   in   this   Agreement.

6

5.12   <u>Headings</u>.  The titles of the articles, sections, subsections, paragraphs and subparagraphs of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

5.13   <u>Time of Essence</u>.  Time is of the essence for each and every provision of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

7

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

COMPANY:

BNC FRANCES VILLAS, L.P.,
a Delaware limited partnership

By:   BNC Frances, L.P.,
      a Delaware limited partnership
Its:  General Partner

      By:   BNC Investments LLC,
            a Delaware limited liability company
      Its:  General Partner

            By: _____
            Name: Barry S. Nussbaum
            Title:  Manager


NOTE HOLDER:

ZENVEST LLC

_John W. Zerweck_____ X
[Printed Name]

_John W. Zk_____ X
[Signature]

_Managing Member_____ X
[Name and Title of Authorized Signatory if
Note Holder is an Entity]

Address:    _825 Donna Dr_____
            _Incline Village NV____
            _____89451__

Facsimile:  _____
Attention:  _____


[SIGNATURE PAGE TO DEBT CONVERSION AGREEMENT]

101685.000090/615619.01

## EXHIBIT A

**Summary of Debt Conversion Terms**

[See Attached]

## Summary of Debt Conversion Terms
### *of*
### BNC Frances Villas, L.P.,
### a Delaware limited partnership
### (the "Partnership")

1. **Formation; Purpose.**

The Partnership was formed on October 20, 2000.  The partners of the Partnership have entered into that certain Limited Partnership Agreement dated October 20, 2000, as amended by that certain First Amendment dated June 14, 2006 (the "Partnership Agreement").  The purpose of the Partnership is to own and operate that certain multi-family residential real estate property located at 900 Frances Way in the City of Richardson, State of Texas and known as Frances Villas Apartments (the "Property").  The Partnership is managed by its general partner, BNC Frances, L.P., a Delaware limited partnership (the "General Partner").  Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms as set forth in the Partnership Agreement.

2. **CIBC Refinancing; Required Conversion.**

The Partnership's current loan with GE Capital Commercial Mortgage Corporation ("Current Lender") is due and payable.  The proposed new lender, CIBC Inc. ("Lender"), is estimating its new loan to be in the aggregate amount of $7,250,000.  Lender is requiring, however, that all third-party debts be converted into equity interests in the Partnership, as further described below.

3. **Debt.**

The Partnership owes principal in the aggregate amount of $1,900,000 (the "**Debt**"), in the respective amounts set forth opposite each creditor's name set forth below (the "**Respective Creditor Debt(s)**"), plus accrued, unpaid interest and exit fees thereon in the aggregate amount of $429,807 (the "**Premium**"), to the following creditors (the "**Creditors**"), in the following amounts:

| Creditor | Respective Creditor Principal Debt(s) ("Principal") | Accrued and Unpaid Interest as of 6/18/06 by Creditor ("Interest") | Aggregate Principal Plus Interest by Creditor ("Total") | Exit Fee (if loan paid and fee paid) as of 6/18/06 by Creditor | Aggregate Interest Plus Exit Fee by Creditor ("Premium") |
|---|---|---|---|---|---|
| Jerry Ruyan | $600,000 | $105,900 | $705,900 | $60,000 | $165,900 |
| Zenvest LLC | $300,000 | $51,900 | $351,900 | $30,000 | $81,900 |
| Plaza Del Sol Real Estate Trust | $1,000,000 | $82,007 | $1,082,007 | $100,000 | $182,007 |

101685.000090/613080.06

4.     **Conversion Terms.**

      a.    <u>Conversion of Debt into Equity</u>.  The aggregate Principal plus Premium (i.e., $2,329,807, which is the aggregate principal plus accrued and unpaid interest and exit fee) is to be converted into limited partnership interests of the Partnership, and the promissory notes made by the Partnership with respect to all such obligations will be cancelled, as further described below.

      b.    <u>Two Classes of Limited Partnership Interests.</u>

      (i)    Except as otherwise indicated below with regard to the "Class A Priority Rights", the rights, preferences and privileges of the current Limited Partners (the "Current Limited Partners") will remain unchanged and in full force and effect in accordance with the terms and conditions of the Limited Partnership Agreement.

      (ii)    <u>Class A Limited Partners</u>.  The Creditors, as a result of converting and canceling their debt (i.e., the aggregate Principal plus Premium), will be designated "Class A Limited Partners" and hold Class A Limited Partnership interests, which shall have the following rights, preferences and privileges:

      •    <u>Class A Priority Rights</u>.  Class A Limited Partners will enjoy, over all other partners, a priority to distributions made by the Partnership on the following terms.  All Cash Receipts and Sale and Residual Proceeds (after satisfying outstanding debts and obligations of the Partnership and establishing or adding to Reserves of the Partnership), will be distributed as follows:

      o    First, to each Class A Limited Partner on a pro-rata basis until each Class A Limited Partner has received an amount equal to its Principal plus its Premium (i.e., its principal plus accrued and unpaid interest and exit fee), as reflected on the prior page, <u>plus</u> a 10% "Class A Priority Return" on its respective Total, as reflected on the prior page.  The 10% Class A Priority Return shall equal 10% per annum on the Total, beginning as of June 18, 2006, and it is cumulative but not compounded (but prorated for any partial year).

      o    Thereafter, to the current Partners as set forth in the Partnership Agreement.

      •    <u>Additional Terms Applicable to Class A Limited Partners.</u>

      o    Allocation of interest income (i.e., guaranteed payments to Class A Limited Partners) will generally be made in accordance with Partnership distributions to the Class A Limited Partners.

      o    Class A Limited Partners will not be entitled to vote on any Partnership matters.  Otherwise, and except for their priority rights to distributions (and different profit and loss allocations), the Class A Limited Partners will be subject to all of the remaining terms

and conditions of the Partnership Agreement and will possess the same rights and obligations as all other limited partners of the Partnership.

o   No Class A Limited Partner Interest will be issued unless and until appropriate documentation has been signed by each Class A Limited Partner in form satisfactory to the General Partner.

101685.000090/613080.06

# EXHIBIT B

Limited Partnership Agreement
*together with*
Second Amendment and Certificate of Limited Partnership

[See Attached]

LIMITED PARTNERSHIP AGREEMENT

---

# LIMITED PARTNERSHIP AGREEMENT

*of*

## BNC FRANCES VILLAS, L.P.,

### A Delaware Limited Partnership

October 20, 2000

---

101685.000000/255487.01

## TABLE OF CONTENTS

Page

ARTICLE 1 THE PARTNERSHIP ......................................................................................1

1.1    Formation of Limited Partnership......................................................................1
1.2    Name of Partnership...........................................................................................1
1.3    Purpose of Partnership........................................................................................1
1.4    Principal Place of Business; Registered Office and Registered Agent................2
1.5    Term of Partnership.............................................................................................3
1.6    Certificate of Limited Partnership. ....................................................................3
1.7    Glossary of Terms...............................................................................................3
1.8    Purchase Agreement; Tenant in Common Arrangement; Loan. ........................3
1.9    Site Improvements..............................................................................................5
1.10   Project Investigation. .........................................................................................5
1.11   Title to the Partnership Property.........................................................................5

ARTICLE 2 MEMBERS OF PARTNERSHIP ...................................................................5

2.1    General Partner....................................................................................................5
2.2    Admission of Additional General Partners..........................................................5
2.3    Replacement of General Partner. ........................................................................5
2.4    Limited Partners..................................................................................................6
2.5    Admission of Additional Limited Partners..........................................................6
2.6    Amendment of Partnership Records....................................................................6
2.7    Additional Partners Bound by Agreement...........................................................6

ARTICLE 3 CONTRIBUTIONS; WITHDRAWAL OF CAPITAL ...................................6

3.1    Capitalization......................................................................................................6
3.2    Interest on Contributions....................................................................................6
3.3    Withdrawal and Return of Capital to Limited Partners. .....................................6

ARTICLE 4  ALLOCATION OF PROFITS AND RECEIPTS AND SALE AND
RESIDUAL PROCEEDS ...................................................................................................7

4.1    Allocation of Profits and Losses.........................................................................7
4.2    Application and Distribution of Cash Receipts and Sale and Residual Proceeds......8
4.3    Special Tax Provisions........................................................................................8

ARTICLE 5 MANAGEMENT OF PARTNERSHIP AFFAIRS .........................................8

5.1    Control and Management.....................................................................................8
5.2    Restrictions on Limited Partners.........................................................................9
5.3    Standard of Care of General Partner....................................................................9
5.4    Removal of General Partner. ...............................................................................9
5.5    Indemnification of General Partner. ....................................................................9

i

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

| | | |
|---|---|---|
| 5.6 | Authority as to Third Persons. | 10 |
| 5.7 | Liability for Return of Capital. | 10 |
| 5.8 | Separateness of Operations. | 10 |

ARTICLE 6 BOOKS, RECORDS, AND ACCOUNTS ............................................. 11

| | | |
|---|---|---|
| 6.1 | Partnership Accounting Practices. | 11 |
| 6.2 | Maintenance of Records and Accounts. | 11 |
| 6.3 | Required Records. | 11 |
| 6.4 | Delivery of Records to Limited Partners. | 12 |
| 6.5 | Access to Records by Limited Partners. | 12 |
| 6.6 | Amendments to Agreement. | 12 |
| 6.7 | Income Tax and Project Data. | 12 |
| 6.8 | Partnership Tax or Information Returns. | 12 |
| 6.9 | Banking. | 12 |
| 6.10 | Partnership Expenses. | 12 |

ARTICLE 7 RIGHTS, POWERS, DUTIES AND RESTRICTIONS OF PARTNERS ............. 13

| | | |
|---|---|---|
| 7.1 | Devotion of Time by General Partner. | 13 |
| 7.2 | Rights and Powers of General Partner. | 13 |
| 7.3 | Compensation of General Partner. | 13 |
| 7.4 | Voting Rights of Limited Partners. | 14 |
| 7.5 | Meetings and Votes Without A Meeting. | 15 |
| 7.6 | Voting. | 16 |
| 7.7 | Partners Engaging in Other Business. | 17 |
| 7.8 | Responsibilities of Limited Partners. | 17 |

ARTICLE 8 TRANSFERS OF LIMITED PARTNER INTERESTS ......................................... 17

| | | |
|---|---|---|
| 8.1 | Transfer of Interests. | 17 |
| 8.2 | Bankruptcy, Death or Incompetency of Limited Partner. | 17 |
| 8.3 | Rights of Assignee of Record. | 18 |
| 8.4 | Prohibition on Assignments Causing Tax Termination. | 18 |
| 8.5 | Prohibition on Assignments Violating Securities Laws. | 18 |
| 8.6 | Transfers in Violation of Restrictions Void. | 18 |
| 8.7 | No Assignment Prior to Contribution of Capital. | 18 |
| 8.8 | Substituted Limited Partners. | 18 |
| 8.9 | Consent of Partners. | 19 |

ARTICLE 9 TERMINATION, WITHDRAWAL OF GENERAL PARTNER............................ 19

| | | |
|---|---|---|
| 9.1 | Termination of a General Partner. | 19 |
| 9.2 | Termination of all General Partners. | 19 |

101685.000000/255487.01

TABLE OF CONTENTS
(continued)

Page

9.3     Transfer by General Partner.................................................................19
9.4     Withdrawal of General Partner.............................................................20

ARTICLE 10 LIABILITIES OF PARTNERS .....................................................20

10.1    Liability of Limited Partners...............................................................20

ARTICLE 11 PROHIBITED TRANSACTIONS ...............................................20

11.1    Specified Acts. ...................................................................................20
11.2    Use of Partnership Assets. .................................................................21

ARTICLE 12 DISSOLUTION OF THE PARTNERSHIP ................................21

12.1    Dissolution and Winding Up. .............................................................21
12.2    Dissolution Upon Consent..................................................................21
12.3    Dissolution When General Partner Ceases as Such.............................21
12.4    Dissolution Upon Sale or Disposition of Assets. ...............................21
12.5    Dissolution Upon Judicial Decree. .....................................................21
12.6    Responsibility for Winding Up. ..........................................................21
12.7    Liquidation and Distribution...............................................................21
12.8    General Partner's Make Up Requirement Upon "Liquidation."...........22
12.9    Allocations and Distributions .............................................................23
12.10   Cancellation of Certificate of Limited Partnership.............................23
12.11   Unallowable Dissolution.....................................................................23

ARTICLE 13 LIMITED PARTNER REPRESENTATIONS ............................23

13.1    Representations and Warranties by Limited Partners..........................23
13.2    Notice of Transaction..........................................................................24
13.3    Representations of Limited Partners Regarding Legal Advice.............24
13.4    Tenancy in Common............................................................................24

ARTICLE 14 MISCELLANEOUS PROVISIONS.............................................25

14.1    Entire Agreement.................................................................................25
14.2    Amendments.........................................................................................25
14.3    Notices. ................................................................................................25
14.4    Successors............................................................................................25
14.5    Severability. .........................................................................................26
14.6    Election of Adjusted Basis...................................................................26
14.7    Tax Matters Partner..............................................................................26
14.8    Counterparts..........................................................................................26
14.9    Headings. ..............................................................................................26

iii

1016R5.000000/255487.01

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

14.10   Other Instruments..................................................................................26
14.11   Construction..........................................................................................26
14.12   Time. ....................................................................................................26
14.13   Incorporation by Reference. ...............................................................26
14.14   Additional Documents. ........................................................................27
14.15   Variation of Pronouns..........................................................................27
14.16   Governing Law; Choice of Forum. .......................................................27
14.17   Waiver of Action for Partition. .............................................................27
14.18   Partner Loans........................................................................................27
14.19   Separate Counsel for Partners..............................................................27
14.20   Arbitration.............................................................................................29
14.21   No Third-Party Beneficiary. .................................................................29

ARTICLE 15 POWER OF ATTORNEY .................................................................29

15.1   Attorney-in-Fact......................................................................................29
15.2   Limitation On Use....................................................................................29
15.3   Special Provisions. ..................................................................................30

<u>LIST OF EXHIBITS</u>

| EXHIBIT A | NAMES, ADDRESSES, AND PERCENTAGE INTERESTS OF PARTNERS |
|---|---|
| EXHIBIT B | GLOSSARY OF CERTAIN DEFINED TERMS |
| EXHIBIT C | TAX PROVISIONS |
| EXHIBIT D | TENANTS IN COMMON AGREEMENT |
| EXHIBIT E | OPTION AGREEMENTS |
| EXHIBIT F | PROPERTY MANAGEMENT AGREEMENT |
| EXHIBIT G | ASSET MANAGEMENT AGREEMENT |
| EXHIBIT H | LOAN AGREEMENTS AND PROMISSORY NOTES |

101685.000000/255487.01

THE LIMITED PARTNER INTERESTS REPRESENTED BY THIS INSTRUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "FEDERAL ACT"), OR THE SECURITIES LAWS OF THE VARIOUS STATES ("STATE LAW"). THEY HAVE BEEN ISSUED AND SOLD PURSUANT TO AN EXEMPTION FROM THE FEDERAL ACT AND STATE LAW AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED BY THE HOLDERS THEREOF AT ANY TIME EXCEPT WITH THE WRITTEN CONSENT OF THE GENERAL PARTNER, WHICH MAY BE WITHHELD IN ITS SOLE DISCRETION, AND WHICH MAY BE CONDITIONED UPON DELIVERY TO THE PARTNERSHIP OF AN OPINION OF COUNSEL SATISFACTORY TO THE GENERAL PARTNER THAT SUCH SECURITIES MAY BE TRANSFERRED WITHOUT REGISTRATION OR QUALIFICATION.

## LIMITED PARTNERSHIP AGREEMENT

### Preamble

THIS LIMITED PARTNERSHIP AGREEMENT (this "Agreement") dated effective as of October 20, 2000 (the "Effective Date") is entered into by and between BNC Frances, L.P., a Delaware limited partnership (hereinafter referred to as the "General Partner"), and Barry S. Nussbaum Company, Inc., a Texas corporation (hereinafter referred to as the "Initial Limited Partner"). The General Partner and the Initial Limited Partner hereby desire to form a limited partnership for the purposes and on the terms and conditions hereinafter set forth:

NOW, THEREFORE, IT IS HEREBY AGREED:

### ARTICLE 1 THE PARTNERSHIP

1.1    **Formation of Limited Partnership.** The General Partner and the Initial Limited Partner hereby form a limited partnership (hereinafter referred to as the "Partnership") pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act, as amended (the "Act").

1.2    **Name of Partnership.** The name of the Partnership is BNC Frances Villas, L.P., a Delaware limited partnership. The Partnership may conduct business under that name, or such other name as the General Partner may from time to time deem appropriate.

1.3    **Purpose of Partnership.** The nature of the business and of the purposes to be conducted and promoted by the Partnership, is to engage solely in the following activities:

(a)    To acquire a 50.9096% tenancy in common interest in certain residential real property, together with all related improvements thereon (and all related personal property), consisting of a multi-family residential project currently known as the Habitat Apartments, and anticipated to be renamed the Frances Villas Apartments, in the City of Richardson, State of Texas, having a street address 900 Frances Way (collectively, the "Project"), in which the other tenants in common will be BNC Frances Oaks LLC, a Delaware limited liability company

("BNC Frances Oaks LLC"), and BNC Frances Trails LLC, a Delaware limited liability company ("BNC Frances Trails LLC");

        (b)    To own, hold, sell, assign, transfer, operate, lease, mortgage, exchange, pledge and otherwise deal with the Project; and

        (c)    To exercise all powers enumerated in the Act necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

Notwithstanding any other provision of this Agreement and so long as any obligation secured by that certain Loan Agreement/Mortgage dated _____ 2000, in favor of General Electric Capital Corporation, as lender (the "Mortgage") remains outstanding and not discharged in full, without the prior written consent of the holder of the Mortgage, the General Partner and the Partnership shall have no authority to: (i) borrow money or incur indebtedness on behalf of the Partnership other than normal trade accounts payable and lease obligations in the normal course of business, or grant consensual liens on the Partnership's property; except, however, that the General Partner is hereby authorized to secure financing for the Partnership pursuant to the terms of the Mortgage and other indebtedness expressly permitted therein or in the documents related to the Mortgage and, to grant a mortgage, lien or liens on the Partnership's Property to secure such Mortgage; (ii) dissolve or liquidate the Partnership; (iii) sell or lease, or otherwise dispose of all or substantially all of the assets of the Partnership; (iv) amend, modify, or alter this Section 1.3 or Sections 1.11, 5.8 and 8.2, of this Agreement; (v) merge or consolidate with any other entity.

So long as any obligation secured by the Mortgage remains outstanding and not discharged in full, the General Partner and the Partnership shall have no authority, unless such action has been approved by the unanimous vote of the General Partner's partners and the unanimous vote of all other Partners, to file a voluntary petition or otherwise initiate proceedings to have the Partnership adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the partnership, or file a petition seeking or consenting to reorganization or relief of the Partnership as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Partnership; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Partnership or of all or any substantial part of the properties and assets of the Partnership, or make any general assignment for the benefit of creditors of the Partnership, or admit in writing the inability of the Partnership to pay its debts generally as they become due or declare or effect a moratorium on the Partnership debt or take any action in furtherance of any action.

So long as any obligation secured by the Mortgage remains outstanding and not discharged in full, the Partnership shall have a general partner that is a limited partnership having the restrictions and terms set forth in Section 2, 4, and 10 of the Limited Partnership Agreement dated as of the date hereof of BNC Frances, L.P., a Delaware limited partnership, and the Partnership shall have no other general partners.

    1.4    **Principal Place of Business; Registered Office and Registered Agent.**  The principal place of business of the Partnership shall be at 13151 Emily Road, Suite 250, Dallas,

Texas 75240, or at such other place as may be determined from time to time by the General Partner.

(a)    For purposes of section 17-104(a)(1) of the Act, the registered office of the Partnership is BNC Frances Villas, L.P., c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.  The General Partner may change the registered office of the Partnership from time to time as permitted under the Act provided that it has given the Limited Partners prior written notice of each such change.

(b)    The General Partner shall further take all necessary or appropriate actions to cause the Partnership to register to transact business in the State of Texas.

1.5    **Term of Partnership**.  The term of the Partnership shall commence on the date of this Agreement and shall continue until December 31, 2030, unless earlier terminated or dissolved in accordance with this Agreement or by law.

1.6    **Certificate of Limited Partnership**.  The General Partner has executed or shall execute a Certificate of Limited Partnership (the "Certificate") and has caused or will cause that Certificate to be filed in the office of the Secretary of State of Delaware.  The General Partner shall execute and cause to be filed certificates of amendment to the Certificate whenever required by the Act or this Agreement.

1.7    **Glossary of Terms**.  Except as otherwise stated in this Agreement, the terms defined in Exhibit B attached hereto and incorporated herein, which Exhibit shall be part of this Section 1.7 shall for the purposes of this Agreement have the meanings therein specified.

1.8    **Purchase Agreement; Tenant in Common Arrangement; Loan**.  An Affiliate of the General Partner, as "Purchaser," has entered into that certain Commercial Contract of Sale dated effective as of May 3, 2000, with The Habitat, Ltd., as "Seller," (as amended to date, collectively the "Purchase Agreement"), and has caused such Purchase Agreement to be transferred to the Partnership, BNC Frances Oaks LLC and BNC Frances Trails LLC, all as tenants in common.  The purchase price for the Project under the Purchase Agreement is Eight Million Dollars ($8,000,000).  The General Partner shall be reimbursed any down payment plus its other out-of-pocket expenses related to the purchase and financing of the Project (which are not expected to exceed $100,000).

Although the General Partner has provided all services necessary to enable the Partnership, BNC Frances Trails LLC and BNC Frances Oaks LLC to purchase their respective interests in the Project, and has caused or enabled the Partnership to accept an assignment and assumption of the Purchase Agreement so as to allow the Purchase Agreement to be in the Partnership's name, the General Partner shall not receive a Capital Account or Capital Contribution credit for such contribution to the Partnership.

The Partnership, BNC Frances Oaks LLC, and BNC Frances Trails LLC shall own the Project as tenants in common pursuant to a Tenants in Common Agreement, the form of which is attached hereto as Exhibit D.  The Partnership shall own an approximately Fifty and 9096/10000 percent (50.9096%) interest in the Project; an approximately Thirty Three and 0690/10000

percent (33.0690%) interest in the Project shall be owned by BNC Frances Oaks LLC, and an approximately Sixteen and 214/10000 percent (16.0214%) interest in the Project shall be owned by BNC Frances Trails LLC. The Partnership's percentage, however, will decrease if less than $2,300,000 is raised by the Partnership by the sale of Limited Partner Interests (i.e., the Partnership will have a lesser tenancy in common percentage). BNC Frances Oaks LLC and BNC Frances Trails LLC are purchasing their interests as tenants in common, and not as Partners, for their own individual tax purposes (i.e., completing Section 1031 exchanges).

It is anticipated that the Partnership, BNC Frances Oaks LLC and BNC Frances Trails LLC will borrow approximately Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000) (the "Bank Loan") from General Electric Capital Corporation ("Lender") in connection with the purchase of the Project. The Bank Loan will be secured by the lien of a first deed of trust on the Project and encumbrances on other assets of the Partnership. The Bank Loan will include the terms and provisions as are set forth in a loan application (the "Loan Application") with Lender, with such modifications thereto as may be negotiated by the General Partner. It is anticipated that the Bank Loan will carry a fixed interest rate of two hundred thirty (230) basis points over five (5) year U.S. Treasury Notes; have a monthly principal and interest payment based on a thirty (30) year amortization; and have a maturity date of five (5) years. The Bank Loan will be on such other terms and conditions as are deemed reasonable and appropriate by the General Partner. The General Partner is authorized to execute and deliver all documents, including any promissory note, promissory note, deed of trust, security agreement, fixture filing, replacement reserve and security agreement, assignment of management agreement, financing statement, guarantees, assignment of rents and leases, environmental indemnity agreement, escrow agreement, certificates and applications and any and all other instruments, documents, certificates and applications that may be required or that it deems necessary or desirable in connection with or relating to the Bank Loan (collectively, the "Loan Documents"), the purchase of the Project, and/or any refinancing(s) of the Bank Loan. The Partners further agree that the General Partner is hereby authorized and directed to negotiate and document any and all changes and modifications to the terms of the Bank Loan as are determined to be reasonable and appropriate by the General Partner, such determination to be conclusively evidenced by the General Partner's execution of such documentation.

In connection with the Bank Loan, the General Partner shall have the power to unilaterally amend and make any and all changes and modifications to the terms of this Agreement as may be requested by Lender from time to time and as are determined to be reasonable and appropriate by the General Partner, such determination to be conclusively evidenced by the General Partner's execution of any and all such documentation. The Limited Partners hereby give the General Partner their Power of Attorney to make any such amendments or changes, as described in Section 15.1 below.

The Partnership shall hold an option to purchase on or after two (2) years after the Effective Date (i.e., October 20, 2002), each of the tenancy in common interests held by BNC Frances Oaks LLC and BNC Frances Trails LLC pursuant to the Option Agreement (the "Option Agreement"), in substantially the form attached hereto as <u>Exhibit E</u>. The purchase price for the tenancy in common interests under the Option Agreement shall be an amount equal to the outstanding balance of principal and interest owed by BNC Frances Trails LLC and BNC

Frances Oaks LLC to the Partnership (as discussed in Section 13.4 below) plus assumption of such tenant's share of liabilities secured by or related to the Project. The Lender may require the Partnership to exercise such option, or the General Partner may elect to exercise such options in its discretion (e.g., the Project appreciates in value).

     1.9    **Site Improvements.** The Partnership intends to make certain on and off site improvements on the Project over the next 12 months. The General Partner expects that the cost of such improvements will be approximately equal to Eight Hundred Thousand Dollars ($800,000). In connection with the improvements to the Project, the Partnership is contracting with a fence company to install a security fence surrounding the Project. BNC Frances Trails LLC and BNC Frances Oaks LLC each have agreed to issue a note payable to the Partnership to account for their respective shares of the cost of the improvements (based on their tenancy in common percentages), the forms of which notes are attached in Exhibit H.

     1.10    **Project Investigation.** The General Partner has personally inspected the Project. No outside company has inspected the Project on behalf of the Partnership or the General Partner. The occupancy level of the Project as of September 19, 2000, was approximately 96%. A Phase I report has been ordered. Additionally, the Partnership does not intend to purchase certain types of insurance, including flood and earthquake insurance.

     1.11    **Title to the Partnership Property.** All property owned by the Partnership shall be owned by the Partnership as an entity and, insofar as permitted by applicable law, no Partner shall have any ownership interest in any Partnership property in its individual name or right, and each Partner's General Partner Interest and Limited Partner Interest shall be personal property for all purposes.

## ARTICLE 2  MEMBERS OF PARTNERSHIP

     2.1    **General Partner.** The name of the original General Partner is as set forth in the Preamble of this Agreement. The General Partner shall not make a Capital Contribution to the Partnership.

     2.2    **Admission of Additional General Partners.** No additional general partners will be admitted to the Partnership except in the case of the General Partner ceasing to serve as general partner.

     2.3    **Replacement of General Partner.**

        (a)    When the sole remaining General Partner ceases to be a General Partner pursuant to the provisions of Section 17-402 of the Act (e.g., as a result of death, incompetency, dissolution, etc.), one or more new General Partners may be admitted to the Partnership upon the written consent of all of the Limited Partners; provided that the remaining Partners agree in writing to continue the business of the Partnership pursuant to Section 12.3 of this Agreement.

        (b)    When one of the General Partners ceases to be a General Partner pursuant to the provisions of Section 17-402 of the Act, and one or more of the General Partners remain, one or more new General Partners may be admitted to the Partnership upon the written agreement of the remaining General Partners and the written consent of a Majority in interest of

the Limited Partners; provided that the remaining General Partners vote to continue the business of the Partnership pursuant to Section 12.3 of this Agreement.

2.4     **Limited Partners.** The Barry S. Nussbaum Company, Inc., as the Initial Limited Partner, shall be admitted as a one percent (1%) Limited Partner as of the date of this Agreement without any Capital Contribution, at which time the Partnership shall be formed. Thereafter, the Partnership intends to sell and issue a minimum of Two Million Dollars ($2,000,000) and a maximum of Two Million Three Hundred Thousand Dollars ($2,300,000) of Limited Partner Interests. Upon the execution of a signature page to this Agreement (and/or a Subscription Agreement) by a Person as a Limited Partner and the General Partner's acceptance thereof, such Person shall be admitted as a Limited Partner of the Partnership. The name of each Limited Partner shall be set forth on Exhibit A to this Agreement, as the same may be updated from time to time by the General Partner. Upon the admission of a Limited Partner other than the Initial Limited Partner, the Initial Limited Partner shall no longer have any interest in or liability to the Partnership as a Limited Partner.

2.5     **Admission of Additional Limited Partners.** Subject to the provisions of Article 8 of this Agreement and subject to the admission of Limited Partners contemplated under Section 1.8 and Section 2.4 above, a Person may acquire a Limited Partner Interest in the Partnership directly from the Partnership and be admitted as an additional Limited Partner only upon the consent of the General Partner and the written consent of a Majority in interest of the other Limited Partners.

2.6     **Amendment of Partnership Records.** Upon admission of a General Partner or Limited Partner, the General Partner shall add the name, address, contribution, and that Partner's share in Profits or Losses to the list of Partners kept in the principal executive office of the Partnership.

2.7     **Additional Partners Bound by Agreement.** Before any Person is admitted to the Partnership as a General or Limited Partner, that Person shall agree in writing to be bound by all of the provisions of this Agreement.

## ARTICLE 3  CONTRIBUTIONS; WITHDRAWAL OF CAPITAL

3.1     **Capitalization.** The Partnership shall have an initial cash capitalization of not less than Two Million Dollars ($2,000,000) and not more than Two Million Three Hundred Thousand Dollars ($2,300,000), all of which shall be contributed by the Partners in cash in the proportions set forth on Exhibit A. No funds shall be released or used by the Partnership for the purchase of the Project or any other purpose unless and until Two Million Dollars ($2,000,000) has been received by the Partnership from the Limited Partners. No additional contributions of capital shall be required of the Partners.

3.2     **Interest on Contributions.** No interest shall be paid on the contributions to the Partnership capital except as otherwise provided herein.

3.3     **Withdrawal and Return of Capital to Limited Partners.** Except as otherwise provided herein, no Partner may withdraw any portion of the capital of the Partnership, and no Partner, General or Limited, shall be entitled to the return of that Partner's contribution to the

capital of the Partnership. Under circumstances requiring a return of any Capital Contributions, no Partner shall have the right to receive Property other than cash, except as may be specifically provided herein.

## ARTICLE 4  ALLOCATION OF PROFITS AND LOSSES AND DISTRIBUTION OF CASH RECEIPTS AND SALE AND RESIDUAL PROCEEDS

4.1     Allocation of Profits and Losses.

(a)     Except as otherwise provided in Section 4.3 or Section 13.4, for each fiscal year or other period, Profits shall be allocated as follows:

(i)     First, among the Partners until the cumulative Profits allocated to each Partner for such fiscal year and all previous years pursuant to this Section 4.1(a)(i) are equal to the cumulative Losses allocated to each Partner pursuant to Section 4.1(b) for all previous fiscal years. Such Profit allocations under this Section 4.1(a)(i) shall (commencing with Losses most recently allocated and continuing thereafter to consecutive prior allocations) be to the same extent and in the same ratio as the allocated Losses to the extent they have not been offset by prior Profit allocations pursuant to this Section 4.1(a)(i);

(ii)     Second, to the Partners in proportion to the cumulative distributions each has received pursuant to Section 4.2(c)(i) (the 10% Priority Return) from the commencement of the Partnership to the end of such fiscal year until the aggregate amount allocated to each Partner pursuant to this Section 4.1(a)(ii) for such fiscal year and all previous fiscal years is equal to the cumulative amount of distributions under Section 4.2(c)(i) to such Partner;

(iii)     Thereafter, the balance, if any, to the Partners in proportion to their Percentage Interests as set forth on Exhibit A, as the same may be amended from time to time.

(b)     Except as otherwise provided in Section 4.3, each fiscal year or other period, Losses shall be allocated as follows:

(i)     First, among the Partners until the cumulative Losses allocated to each Partner for such fiscal year and all prior years pursuant to this Section 4.1(b)(i) are equal to the cumulative Profits allocated to such Partner pursuant to Section 4.1(a)(iii) for all previous fiscal years. Such Loss allocations under this Section 4.1(b)(i) shall (commencing with Profits most recently allocated and continuing thereafter to consecutive prior allocations) be to the same extent and in the same ratio as the Profit allocations referenced in the sentence above which have not been offset by prior Loss allocations pursuant to this Section 4.1(b)(i);

(ii)     Second, to the General Partner until its positive Capital Account balance has been reduced to zero;

(iii)   Third, to the Limited Partners, in the ratio of their Percentage Interests, until the positive Adjusted Capital Account Balances of the Limited Partners are reduced to zero; and

(iv)   Thereafter, the balance, if any, to the General Partner.

4.2   **Application and Distribution of Cash Receipts and Sale and Residual Proceeds.** Cash Receipts and Sale and Residual Proceeds shall be applied or distributed, as the case may be, in the following order of priority:

(a)   To pay all outstanding debts and obligations of the Partnership (to the extent that such debts and liabilities are currently due), including debts owed to any Partner or Affiliate thereof;

(b)   To establish or add to any Reserves;

(c)   To distribute any Cash Receipts or Sale and Residual Proceeds not disbursed or reserved in accordance with the foregoing provisions, if any, as follows:

(i)   First, to each Partner on a pro rata basis until each Partner has received an amount equal to (A) its cumulative 10% Priority Return as of the end of the calendar month preceding the month during which such distribution is made, less (B) the sum of all Priority Return distributions previously made to such Partner pursuant to this Section 4.2(c)(i);

(ii)   Second, to each Partner, pro rata, until each of the Partners has received an amount equal to such Partner's Adjusted Capital Contribution as of the date on which such distribution is made; and

(iii)   Thereafter, to distribute any Cash Receipts or Sale and Residual Proceeds not disbursed or reserved in accordance with the foregoing provisions to the Partners in proportion to their respective Percentage Interests.

Any Cash Receipts or Sale and Residual Proceeds available for distribution to the Partners shall be distributed to Partners at such times as are determined in the discretion of the General Partner, but it is anticipated distributions will be made on a monthly basis. All references to Percentage Interests under this Article 4 shall refer to the Percentage Interests as of the date of such distribution.

4.3   **Special Tax Provisions.**

Sections 4.4 through Section 4.14 are set forth on <u>Exhibit C</u> attached hereto and incorporated herein.

## ARTICLE 5 MANAGEMENT OF PARTNERSHIP AFFAIRS

5.1   **Control and Management.** The General Partner shall have sole and exclusive control of the Partnership. Subject only to the limitations and required vote by the Limited Partners as expressly set forth in this Agreement, the General Partner shall have the power and

authority to take such action from time to time as it may deem to be necessary, appropriate or convenient in connection with the management and conduct of the business and affairs of the Partnership.

5.2     **Restrictions on Limited Partners.**   Except as otherwise provided in this Agreement or under the Act, no Limited Partner shall have either the obligation or the right to take part, directly or indirectly, in the active management or control of the business of the Partnership, and no Limited Partner shall have the right or authority to act for or bind the Partnership.

5.3     **Standard of Care of General Partner.**   The General Partner shall exercise ordinary business judgment in managing the affairs of the Partnership. Unless fraud, deceit, willful misconduct or a wrongful taking is involved, the General Partner shall not be liable or obligated to the Limited Partners for any mistake of fact or judgment made by the General Partner in operating the business of the Partnership that results in any loss to the Partnership or its Partners. The General Partner does not, in any way, guarantee the return of the Limited Partners' capital or a profit from the operations of the Partnership; neither shall the General Partner be responsible to any Limited Partner because of a loss of that Partner's investment or a loss in operations, unless it has been occasioned by fraud, deceit, willful misconduct or a wrongful taking by that General Partner.

5.4     **Removal of General Partner.**   Any General Partner may be removed by the affirmative vote of a Majority in interest of the Limited Partners, exclusive of any Limited Partner Interest owned by the General Partner or its Affiliates; provided, however, a General Partner may be removed by the Limited Partners only for "cause." The term "cause" means willful misconduct, breach of fiduciary duty, gross negligence, conviction of a crime of moral turpitude or material breach of this Agreement. Written notice of a General Partner's removal shall be served upon such General Partner by certified mail. That notice shall set forth the day on which the removal is to be effective, which date shall not be less than thirty (30) days after the service of notice on such General Partner. Upon the removal of a General Partner, the Limited Partners may within thirty (30) days thereafter elect a new General Partner pursuant to the provisions of Section 2.3 of this Agreement. If the removal of a General Partner does not cause the dissolution of the Partnership, that removal shall cause that General Partner's Interest in the Partnership to be converted to that of a Limited Partner, provided that the Interest in Profits, Losses and distributions of said former General Partner shall remain unchanged.

5.5     **Indemnification of General Partner.**   To the extent of the Partnership's Property, the Partnership agrees to indemnify the General Partner and its officers, directors, partners, agents and Affiliates to the fullest extent permitted by law and to defend, save and hold them harmless from and in respect of all fees, costs, losses, damages and expenses (including attorneys' fees) incurred in connection with or resulting from any claim, action or demand arising out of or in any way relating to the Partnership or its properties, including amounts paid in settlement or compromise (if recommended by the Partnership's counsel) of any such claim, action or demand and all fees, costs and expenses (including attorneys' fees) in connection therewith. The termination of any action, suit or proceeding by judgment, order, settlement or upon a plea of nolo contendere or its equivalent, shall not of itself create a presumption that any Person acted with recklessness or willful misconduct.

5.6     **Authority as to Third Persons.** No third party dealing with the Partnership shall be required to investigate the authority of the General Partner or secure the approval or confirmation by the Limited Partners of any act of the General Partner in connection with the conduct of the Partnership business. No purchaser of any property or interest owned by the Partnership shall be required to determine the right to sell or the authority of the General Partner to sign and deliver any instrument of transfer on behalf of the Partnership, or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith. The General Partner shall have full authority to execute on behalf of the Partnership any and all agreements, contracts, subleases, licenses, conveyances, deeds, mortgages and other instruments, and the execution thereof by the General Partner shall be the only execution necessary to bind the Partnership without the signature of any Limited Partner shall be required. The Partnership shall have the right by separate instrument or document to authorize one or more persons to execute subleases, licenses, operating agreements and documents related thereto on behalf of the Partnership and any such documents executed by such agent shall be binding upon the Partnership as if executed by the General Partner.

5.7     **Liability for Return of Capital.** Neither the General Partner nor any Affiliate of the General Partner shall be personally liable for the return of Capital Contributions made by any Partner. The General Partner is specifically permitted to satisfy any Partnership obligations as to which the General Partner is personally liable before satisfying Partnership obligations as to which the General Partner has no such personal liability.

5.8     **Separateness of Operations.** For so long as any obligation secured by the Mortgage remains outstanding and not discharged in full, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Partnership shall:

(a)     maintain books and records and bank accounts separate from those of any other person;

(b)     maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets;

(c)     hold regular Partnership meetings, as appropriate, to conduct the business of the Partnership, and observe all other Partnership formalities;

(d)     hold itself out to creditors and the public as a legal entity separate and distinct from any other entity;

(e)     prepare separate tax returns and financial statements, or if part of a consolidated group, then it will be shown as a separate member of such group;

(f)     allocate and charge fairly and reasonably any common employee or overhead shared with affiliates;

(g)     transact all business with affiliates on an arm's length basis and pursuant to enforceable agreements;

(h)    conduct business in its own name, and use separate stationery, invoices, and checks;

(i)    not commingle its assets or funds with those of any other person;

(j)    not assume, guarantee or pay the debts or obligations of any other person;

(k)    correct any known misunderstanding as to its separate identity;

(l)    not permit any affiliate to guarantee or pay its obligations (other than limited guarantees set forth in the Mortgage or related documents); and

(m)    not make loans or advances to any other person without the Lender's written consent.

## ARTICLE 6 BOOKS, RECORDS, AND ACCOUNTS

6.1    **Partnership Accounting Practices.** The Partnership's books shall be kept on an accrual basis. The Partnership's books shall be closed and balanced by a certified public accountant at the end of each fiscal year of the Partnership.

6.2    **Maintenance of Records and Accounts.** At all times, the General Partner shall maintain or cause to be maintained true and proper books, records, reports and accounts in which shall be entered fully and accurately all transactions of the Partnership.

6.3    **Required Records.** The General Partner shall maintain at the principal executive office of the Partnership all of the following:

(a)    A current list of the full name and last known business or residence address of each Partner, set forth in alphabetical order, together with the contribution and the share in Profits and Losses of each Partner.

(b)    A copy of the Certificate and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed.

(c)    Copies of the Partnership's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years.

(d)    Copies of this Agreement and all amendments thereto.

(e)    Financial statements of the Partnership for the six most recent calendar years.

(f)    The Partnership's books and records for at least the current and past three calendar years, including all records, invoices, rent rolls, receipt books and other documents relating to the Project which are in its actual possession (i.e., all documents (other than the

statements described in subparagraph 6.3(g) below) relating to the Project delivered to it from the Property Manager).

> (g)   All statements from the Property Manager regarding the Project for the two most recent calendar years.

**6.4   Delivery of Records to Limited Partners.**  Upon the request of any Limited Partner, the General Partner shall promptly deliver to that Limited Partner, at the expense of the Partnership, a copy of the information required to be maintained under Section 6.3 of this Agreement.

**6.5   Access to Records by Limited Partners.**  Each Limited Partner and its duly authorized representative, attorney or attorney in fact, shall have the right, upon reasonable request, to:

> (a)   Inspect and copy, during normal business hours, any and all Partnership records and/or documents relating to the Project.  The Limited Partners, and their representative(s), are urged to review such records prior to becoming Limited Partner(s) in the Partnership.

> (b)   Obtain from the General Partner, promptly after becoming available, a copy of the Partnership's federal, state and local income tax or information returns for each year.

**6.6   Amendments to Agreement.**  The General Partner shall promptly furnish to any Limited Partner who executed a power of attorney authorizing a General Partner to execute an amendment to this Agreement with a copy of any amendment to this Agreement executed by the General Partner pursuant to such power of attorney.

**6.7   Income Tax and Project Data.**  The General Partner shall send to each Partner, within ninety (90) days after the end of each taxable year, such information as is necessary for the Partners to complete their federal and state income tax or information returns.

**6.8   Partnership Tax or Information Returns.**  The General Partner shall send to each Partner a copy of the Partnership's federal, state and local income tax or information returns for each taxable year within ninety (90) days after the end of each taxable year.

**6.9   Banking.**  The General Partner shall open and thereafter maintain one or more separate bank accounts in the name of the Partnership with a reputable bank or other financial institution in the Dallas or Houston area in which there shall be deposited funds of the Partnership.  No other funds shall be deposited in said accounts.  The funds in said account shall be used solely for the business of the Partnership, and all withdrawals therefrom are to be made only on checks signed by the General Partner or such other Person or Persons as the General Partner may from time to time designate.

**6.10   Partnership Expenses.**  The Partnership shall pay all of its expenses, which may include, but are not limited to:  (a) all employee costs for salaries, compensation and fringe benefits of personnel employed or leased by the Partnership and involved in the Partnership business; (b) all costs of borrowed money, taxes and assessments on the Partnership's assets and

other taxes applicable to the Partnership's assets; (c) legal and accounting services (including General Partner expenses in regard to the formation the General Partner and the sale of Limited Partnership Interests), consulting and brokerage fees; (d) expenses and taxes incurred in the distribution, transfer and recording of documents evidencing ownership of an interest in the Partnership or in the Partnership's assets; and (e) all costs and expenses for the acquisition, repair, leasing, maintenance, refinancing and operation of the Partnership's Property.  The General Partner shall pay and shall not be reimbursed by the Partnership for overhead expenses of the General Partner or its Affiliates, including rent and general office expenses.  Certain expenses are set forth in the Management Agreement as expenses of the Project and such expenses shall be paid by and shall be the obligation of the Partnership.

## ARTICLE 7 RIGHTS, POWERS, DUTIES AND RESTRICTIONS OF PARTNERS

**7.1    Devotion of Time by General Partner**.  The General Partner shall devote such care, attention and business capacity to the affairs of the Partnership as may be reasonably necessary.  In this connection, the Partners hereby acknowledge that the General Partner is the manager and general partner of other partnerships and it shall continue to manage other partnerships, and it may (and it intends to) continue to engage in other distinct or related businesses, whether or not competitive with the business of the Partnership.

**7.2    Rights and Powers of General Partner**.  Except as otherwise expressly provided in this Agreement, each General Partner shall have all the rights and powers granted to general partners under the Act and the Delaware Uniform Partnership Act.

**7.3    Compensation of General Partner**.  In addition to allocations of Profits, the General Partner and its Affiliates shall receive compensation from the Partnership for their services as follows:

(a)    The Property Manager, an Affiliate of the General Partner, will receive fees, payable monthly, for managing the Project pursuant to the Property Management Agreement, a copy of which is attached hereto as <u>Exhibit F</u>.  The fees for such property management services will be equal to four percent (4%) of Gross Monthly Collections (as that term is defined in the Property Management Agreement) for the preceding month (see also Section 7.3 (c) below). In addition, Affiliate(s) of the General Partner will also receive (i) fees for payroll services at rates not higher than those charged by independent third parties rendering similar services in similar areas plus (ii) overtime charges which run approximately Two Hundred Fifty Dollars ($250.00) per month.  Finally, the General Partner or its Affiliate may retain an in-house lawyer for its legal needs.  In such event, the Partnership may be charged an hourly fee of One Hundred Dollars ($100.00) per hour, which rate may be increased from time to time.

(b)    The General Partner shall receive reimbursement for matters related to managing and operating the Partnership, acquisition of the Project, and costs and fees associated with the formation of this Partnership.

(c)    The General Partner and/or an Affiliate of the General Partner (the Property Manager) shall be paid a fee for (i) organizing the Partnership ($100,000) and (ii) extraordinary management services for the first year leasing and rehabilitation of the Project ($100,000), or an aggregate amount of Two Hundred Thousand Dollars ($200,000), which amount shall be paid to the General Partner and its Affiliate from time to time out of proceeds from formation of the Partnership, or if not sufficient, out of Cash Receipts or Sale and Residual Proceeds but in no event later than twenty-four (24) months after the purchase of the Project (without interest).

(d)    The Property Manager will receive fees, payable monthly, for managing the Project pursuant to the Asset Management Agreement, a copy of which is attached hereto as <u>Exhibit G</u>. The fees for such asset management services will be equal to two percent (2%) of Gross Monthly Collections (as that term is defined in the Asset Management Agreement) for the preceding month.

(e)    The General Partner may receive a payment from a real estate broker involved in the acquisition of the Project to cover travel and related expenses (at no cost or benefit to the Partnership). The amount, if any, is currently not known and it is not expected to exceed Twenty Thousand Dollars ($20,000).

(f)    To the extent capital improvements are required on the Project, the Partnership may from time to time employ or use an employee of the General Partner or its Affiliate to supervise such construction and/or repairs and pay such employee a fee or wage for said services, provided such charges shall not be more favorable than fees otherwise charged by independent third parties rendering similar services in similar areas. It is anticipated that the Partnership shall pay to an employee of the Property Manager a fee of $25,000 as a renovation supervision fee.

**7.4    Voting Rights of Limited Partners.**  Except as specifically set forth to the contrary, the Limited Partners shall only have the right to vote on the matters set forth in this Section 7.4.

(a)    The approval of a Majority in interest of the Limited Partners and the consent of the General Partner shall be required for each of the following actions:

(i)    The sale, exchange, lease or other transfer of any asset of the Partnership having a value in excess of Four Hundred Thousand Dollars ($400,000) (no additional consent shall be required relating to the first deed of trust on the Project given in connection with the Bank Loan, as described in Section 1.8 of the Agreement);

(ii)    The admission of a new General Partner except under the circumstances described in Sections 2.3(a) and 12.3;

(iii)    Other than the acquisition of the Project as contemplated under this Agreement or the exercise of the Partnership's option to purchase the tenancy in common interests in the Project of BNC Frances Oaks LLC and BNC Frances Trails LLC, the acquisition, by purchase, exchange, lease or otherwise, of real or personal property for the use of the

Partnership, except property having a cost of under Four Hundred Thousand Dollars ($400,000) or except in connection with the rehabilitation of the Project;

       (iv)    Other than pursuant to the Property Management Agreement, the retention of a management company to operate the Project;

       (v)    The sale or transfer of a General Partner Interest as described in Section 9.3;

       (vi)    The sale of additional Limited Partner Interests as described in Section 2.5;

       (vii)    The filing of Bankruptcy as described in Section 1.7(h);

       (viii)    The withdrawal of a General Partner pursuant to Section 9.4; and

       (ix)    An amendment to this Agreement except as otherwise provided in Section 14.2.

       (b)    The unanimous approval of the Limited Partners and the General Partner shall be required for certain amendments to this Agreement as provided in Section 14.2.

       (c)    The approval of a Majority in interest of the Limited Partners, with or without the consent of the General Partner, shall be required to remove the General Partner for cause as provided in Section 5.4.

       (d)    The unanimous approval of the Limited Partners, with or without the consent of the General Partner, shall be required for the admission of a new General Partner and the election to continue the business of the Partnership under the circumstances described in Sections 2.3(a) and 12.3.

       (e)    Upon the approval of the Limited Partners holding not less than seventy five percent (75%) of the Limited Partner Interests, the Limited Partners shall have the right to terminate the Management Agreement pursuant to the terms of such agreement after an Event of Default (as defined in the Management Agreement) by the Property Manager, with or without the consent of the General Partner.

       7.5    **Meetings and Votes Without A Meeting.**  The General Partner may at any time call for a meeting of the Partners or for a vote without a meeting.  Additionally, the General Partner shall call for a meeting or for a vote without a meeting following receipt of written request therefor from Limited Partners holding twenty percent (20%) or more of the Limited Partner Interests entitled to vote as of the date of receipt of such written request (the "Notice Date").

       (a)    A meeting of the Partners or a vote without a meeting may be called only with respect to matters on which the Limited Partners are entitled to vote.

(b)     Within ten (10) days after the earlier of a Notice Date or the date on which the General Partner decides to call a meeting of the Partners or for a vote without a meeting, the General Partner shall notify all Limited Partners of record as of the Notice Date of:

(i)      the time and place of the Partnership meeting, if called, and the general nature of the business to be transacted thereat; or

(ii)     if no such meeting has been called, the matter or matters to be voted upon and the date upon which votes cast without a meeting will be counted.

(c)     Any Partnership meeting or the date upon which votes cast without a meeting will be counted shall be held not less than ten (10) nor more than sixty (60) days following mailing of the notice thereof by the General Partner. Any Partnership meeting shall be held in either in Dallas, Texas, Houston, Texas or San Diego, California, in the discretion of the General Partner.

(d)     All expenses of a meeting of the Partners, a vote without a meeting and of notice to the Partners shall be borne by the Partnership.

(e)     Any Partner may participate in a meeting by means of conference telephone or similar communications equipment, as long as all Partners participating in the meeting can hear one another, and participation in a meeting by such means shall constitute presence in person at such meeting.

7.6     **Voting.** Except as otherwise provided in this Section 7.6, a Limited Partner shall be entitled to cast such number of votes as is equal to the product of such Limited Partner's Percentage Interest multiplied by one hundred (100).

(a)     Votes at a meeting of the Partners shall be cast in person, by written proxy or by a signed writing directing the manner in which the Partner desires its vote to be cast, which writing must be received by the General Partner prior to such meeting. The General Partner is authorized to poll individual Partners for purposes of soliciting consents, proxies, or writings, from the Partners in connection with any action requiring the vote of the Partners.

(b)     Votes without a meeting of the Partners shall be cast by a signed writing directing the manner in which the Partner desires its vote to be cast, which writing must be received by the General Partner prior to the date upon which the votes of Limited Partners are to be counted. The General Partner is authorized to poll individual Partners for purposes of soliciting consents, proxies, or writings, from the Partners in connection with any action requiring the vote of the Partners.

(c)     A General Partner may vote with respect to any Limited Partner Interest owned by such General Partner.

(d)     The laws of the State of Delaware pertaining to the validity and use of corporate proxies shall govern the validity and use of proxies given by Limited Partners.

7.7     **Partners Engaging in Other Business.** Except as otherwise provided in this Agreement, any of the Partners may engage in or possess an interest in other business ventures of every nature and description independently or with others, whether or not competitive with the Project and/or the Partnership, and neither the Partnership nor the Partners shall have any right by virtue of this Agreement in and to any such independent ventures or to the income or profits derived therefrom.  The Limited Partners should be aware that the General Partner or its Affiliates are the general partners and managers and/or members of a substantial number of other limited partnerships and limited liability companies which own rental real property in Dallas and/or Ft. Worth and/or Houston.  Additionally, the General Partner or its Affiliates intend to purchase commercial and/or residential real property in the future in Ft. Worth, Dallas and Houston, whether individually or as a general partner or member and/or manager.  These business ventures may be competitive with the Partnership, in terms of actual competition or in terms of time demands upon the General Partner and its Affiliates.

7.8     **Responsibilities of Limited Partners.** To the maximum extent permitted by law, each Limited Partner shall have a duty to deal fairly, justly and equitably with respect to the Partnership and its affairs.

## ARTICLE 8 TRANSFERS OF LIMITED PARTNER INTERESTS

8.1     **Transfer of Interests.** Subject to the provisions of Sections 8.4 through 8.9 and upon the General Partner's prior written consent (which consent shall be in its sole and absolute discretion), Limited Partners shall have the right to assign all or any part of their Limited Partner Interests by a written instrument of assignment, the terms of which are not in contravention of any of the provisions of this Agreement, which instrument has been duly executed by the assignor of such Interest.

8.2     **Bankruptcy, Death or Incompetency of Limited Partner.** The bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Limited Partner shall not cause the termination or dissolution of the Partnership and the business of the Partnership shall continue.   Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Limited Partner, subject to Section 8.1 above, shall have all the rights of such Limited Partner for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee as a substitute Limited Partner.  The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Partnership Interest shall be subject to all of the restrictions, hereunder to which such transfer would have been subject if such transfer had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Limited Partner.

8.3     **Rights of Assignee of Record.** Any Assignee of Record shall be entitled to receive distributions from the Partnership attributable to the Limited Partner Interest (or portion thereof) acquired by reason of such assignment from and after the effective date of the assignment of such Limited Partner Interest to him; however, anything herein to the contrary notwithstanding, the Partnership and the General Partner shall be entitled to treat the assignor of such Limited Partner Interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of Profits or Losses, or for distributions, or transmittal of reports and

notices required to be given to Limited Partners hereunder which are made in good faith to such assignor until such time as the written instrument of assignment has been received by the Partnership and recorded on its books and the effective date of the assignment has passed. Provided the Partnership has actual notice of an assignment of a Limited Partner Interest, the effective date of such assignment on which the Assignee shall be deemed an Assignee of Record shall be the first day of the calendar quarter following the receipt of the written instrument of the assignment by the Partnership and following the date of the assignment set forth on the written instrument of assignment. Any Person who is an Assignee or Assignee of Record with respect to a Limited Partner Interest, but who does not become a Substituted Limited Partner and desires to make a further assignment of any such Interest, shall be subject to all the provisions of this Article 8 to the same extent and in the same manner as any Limited Partner desiring to make an assignment of its Limited Partner Interest. Until admitted as a Substituted Limited Partner, an Assignee or Assignee of Record shall have no right to inspect the Partnership's books and records or to exercise voting rights or any other right or privilege as a Limited Partner.

8.4     **Prohibition on Assignments Causing Tax Termination.** Except as provided in this Section 8.4, no assignment of any Interest by a Limited Partner may be made if the Limited Partner Interest sought to be assigned when added to the total of all other Interests assigned within the period of twelve (12) consecutive months prior to the proposed date of assignment would, in the opinion of counsel for the Partnership, result in a termination of the Partnership under Section 708 of the Code.

8.5     **Prohibition on Assignments Violating Securities Laws.** No transfer or assignment of any Limited Partner Interest shall be made if counsel for the Partnership shall be of the opinion that such transfer or assignment would be in violation of the Federal Act or any State Law applicable to the Partnership.

8.6     **Transfers in Violation of Restrictions Void.** Any assignment, sale, exchange or other transfer in contravention of any of the provisions of this Article 8 shall be void and ineffectual, and shall not bind or be recognized by the Partnership.

8.7     **No Assignment Prior to Contribution of Capital.** No Limited Partner shall have the right to assign any part of its Limited Partner Interest prior to such Limited Partner's payment to the Partnership of the full amount of its agreed Capital Contribution.

8.8     **Substituted Limited Partners.**

(a)     Subject to the provisions of this Article 8, any Assignee or Assignee of Record may become a Substituted Limited Partner when all of the following conditions have been satisfied:

(i)     A duly executed and acknowledged written instrument of assignment shall have been filed with the Partnership, which instrument shall specify the Limited Partner Interest being assigned and set forth the intention of the assignor that the Assignee or Assignee of Record succeed to the assignor's Limited Partner Interest as a Substituted Limited Partner;

(ii)     The assignor and Assignee or Assignee of Record shall have executed such other instrument as the General Partner may deem necessary or desirable to effect such

substitution, including the written acceptance and adoption by the Assignee or Assignee of Record of the provisions of this Agreement and its execution, acknowledgment and delivery to the General Partner of a special power of attorney as described in Article 15 of this Agreement;

(iii)    The written consent of the General Partner to such substitution shall have been obtained, the granting or denial of which shall be within the absolute discretion of the General Partner;

(iv)    A transfer fee shall have been paid to the Partnership in an amount equal to the greater of (A) Five Hundred Dollars ($500) or (B) the actual costs incurred by the Partnership and the General Partner in connection with such transaction; and

(v)    The other provisions of Article 8 of this Agreement shall have been complied with.

8.9    **Consent of Partners.**  By executing or adopting this Agreement, each Partner consents to the assignment of Limited Partner Interests (or portions thereof) and to the admission of Substituted Limited Partners by the General Partner in accordance with the provisions of this Agreement.

## ARTICLE 9  TERMINATION, WITHDRAWAL OF GENERAL PARTNER; TRANSFER OF GENERAL PARTNER INTEREST

9.1    **Termination of a General Partner.**  A Partner shall cease to be a General Partner upon the happening of any of the following events:

(a)    Withdrawal as a General Partner pursuant to Section 9.4;

(b)    The dissolution of a General Partner under Delaware law;

(c)    The Bankruptcy of a General Partner (subject to Section 12.11 below), or

(d)    Removal of a General Partner pursuant to Section 5.4 above.

9.2    **Termination of all General Partners.**  If all General Partners cease to be General Partners under Section 9.1, the Partnership shall be dissolved.  The Limited Partners may, however, reconstitute the business of the Partnership as provided in Section 2.3(a).  Upon such reconstitution, the terminated General Partner's Interest in the Partnership shall be converted to that of a Limited Partner, provided that the Interest in Profits, Losses and distributions of said former General Partner shall remain unchanged.

9.3    **Transfer by General Partner.**  The General Partner may transfer all or any part of its General Partner Interest only upon written approval of a Majority in interest of the Limited Partners; provided, however, that the General Partner may assign all or a portion of its right to be allocated Profits and Losses and receive distributions in its sole discretion without the consent of the Limited Partners.

9.4    Withdrawal of General Partner.  The General Partner may withdraw from the Partnership only upon the written approval of a Majority in interest of the Limited Partners.  The terms of the withdrawal shall be determined at the time of the approval by a Majority in interest of the Limited Partners.   Upon the General Partner's withdrawal and if the General Partner becomes a Limited Partner, the General Partner's obligation to restore any deficit balance in its Capital Account shall not exceed the then negative balance in the General Partner's Capital Account, if any.  If the negative balance is subsequently reduced, the General Partner's obligation to restore is also reduced until the Capital Account becomes zero.  At that time, the General Partner (now a Limited Partner) will have no obligations under Section 12.8.  The former General Partner may satisfy any negative balance as a General Partner with any positive balance of a Capital Account held as a Limited Partner.

## ARTICLE 10  LIABILITIES OF PARTNERS

10.1    Liability of Limited Partners.  Subject to the terms of this Agreement and Section 17-502 of the Act, the liability of each Limited Partner is restricted and limited to the amount of the actual Capital Contribution which such Limited Partner makes or agrees to make to the Partnership; provided, however, that a Limited Partner may be obligated, pursuant to Delaware law, to return a distribution received from the Partnership, including without limitation, in the event and to the extent that, immediately after giving effect to such distribution, the Partnership's liabilities exceed the fair value of its assets.

## ARTICLE 11  PROHIBITED TRANSACTIONS

11.1    Specified Acts.  Except as otherwise permitted herein, during the time of the organization or continuation of the Partnership, neither the General Partner nor any Limited Partner shall, and the Partners specifically promise not to:

(a)    Use the name of the Partnership (or any substantially similar name) or any trademark or trade name adopted by the Partnership except in the course of the Partnership's business;

(b)    Disclose to any non-partner any of the Partnership's business practices, trade secrets or any other information not generally known to the business community;

(c)    Engage in any conduct with the intention of harming the business operations of the Partnership;

(d)    Engage in any conduct contrary to this Agreement, except with the prior express written approval of all of the Partners;

(e)    Engage in any conduct that would make it impossible to carry on the intended or ordinary business of the Partnership;

(f)    Confess a judgment against the Partnership; or

(g)    Abandon, or transfer or dispose of the Partnership's Property, real or personal, except in the ordinary course of business.

11.2   Use of Partnership Assets.   The General Partner shall not use, directly or indirectly, the assets of the Partnership for any purpose other than conducting the business of the Partnership, for the full and exclusive benefit of all its Partners.

## ARTICLE 12   DISSOLUTION OF THE PARTNERSHIP

12.1   Dissolution and Winding Up.   The Partnership shall be dissolved, and its affairs shall be wound up upon the expiration of the term provided for the existence of the Partnership in Section 1.5, or upon the occurrence of any of the events specified in Sections 12.2 through 12.5, whichever is the first to occur.

12.2   Dissolution Upon Consent.   The Partnership shall be dissolved upon any date specified in a consent to dissolution signed by the General Partner.

12.3   Dissolution When General Partner Ceases as Such.   The Partnership shall dissolve and its affairs shall be wound up if a General Partner dies, retires, resigns, is expelled, dissolves or otherwise ceases to be a General Partner pursuant to Section 17-402 of the Act unless the remaining General Partners all vote to continue the business of the Partnership and the Partners continue such business.   The Partnership shall also dissolve and its affairs shall be wound up if a sole General Partner dies, retires, resigns, is expelled, dissolves or otherwise ceases to be a General Partner pursuant to Section 17-402 of the Act unless all Partners agree in writing to continue the business of the Partnership and to the admission of one or more new General Partners.

12.4   Dissolution Upon Sale or Disposition of Assets.   The Partnership shall be dissolved and its affairs shall be wound up when all or substantially all of its assets are sold or otherwise disposed of, and the only property of the Partnership consists of cash from such sale or dispositions available for distribution to the Partners.

12.5   Dissolution Upon Judicial Decree.   The Partnership shall be dissolved and its affairs shall be wound up when required by a decree of judicial dissolution entered under Section 17-402 of the Act.

12.6   Responsibility for Winding Up.   Upon dissolution of the Partnership, the affairs of the Partnership shall be wound up by those General Partners who have not wrongfully caused the dissolution, or if there are no General Partners remaining, the Partnership's affairs shall be wound up by the Limited Partners.   If the Limited Partners wind up the Partnership's affairs, they shall be entitled to reasonable compensation.

12.7   Liquidation and Distribution.   Notwithstanding anything herein to the contrary, the Person or Persons responsible for winding up the affairs of the Partnership pursuant to Section 12.6 shall take full account of the Partnership's assets and liabilities, shall liquidate the assets of the Partnership as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds (with non-cash items being valued at fair market value as reasonably determined by the Persons responsible for the winding up) in the following order:

(a)   To creditors of the Partnership, including Partners who are creditors to the extent permitted by law, in satisfaction of liabilities of the Partnership;

(b)     To a reserve as reasonably required for contingent liabilities (after passage of a reasonable time the balance, if any, in said reserve shall be distributed as set forth below); and

(c)     The remaining assets shall be distributed to the Partners in accordance with Section 4.2 above. Such distribution shall be made after (i) the final allocations of Profits and Losses in connection with the dissolution of the Partnership and the liquidation of its assets have been made, and (ii) all such events, transactions and allocations have been fully reflected in the Partners' Capital Accounts as required by Treasury Regulation 1.704-1(b). Such distribution required by this Section 12.7(c) shall be made by the end of the fiscal year in which such dissolution occurs, or, if later, within ninety (90) days after the date of such dissolution, and shall otherwise comply with the requirements of Treasury Regulation 1.704-1(b). Distributions pursuant to this Section 12.7(c) may be made to a trust established for the benefit of the Partners for the purposes of liquidating the Partnership's assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partner arising out of or in connection with the Partnership. The assets of any such trust shall be distributed to the General Partner and Limited Partner from time to time, in the reasonable discretion of the General Partner, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the General Partner and Limited Partners pursuant to this Agreement.

(d)     Notwithstanding the foregoing, if and only if the Tenant Notes (as defined in Section 13.4 below) have not been repaid in full by the time the Partnership has dissolved and liquidated pursuant to this Section 12.7, then immediately prior to the distributions to the Partners set forth in this Section 12.7 (and the final allocations of Profits and Losses) the General Partner shall be obligated to contribute to the Partnership an amount of cash equal to the outstanding balances owed under the Tenant Notes.

**12.8   General Partner's Make Up Requirement Upon "Liquidation."** Notwithstanding anything in this Agreement to the contrary, in the event the Partnership is "liquidated" (or any General Partner Interest in the Partnership is "liquidated") (as that term is defined in Treasury Regulation 1.704-1(b)(2)(ii)(g)) and any General Partner's Capital Account (or, as the case may be, Capital Account of the General Partner whose Interest is "liquidated") has a deficit balance (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such "liquidation" occurs), such General Partner(s) shall contribute to the capital of the Partnership the amount necessary to restore such deficit balance to zero in compliance with Treasury Regulation 1.704-1(b)(2)(ii)(b)(3). Any funds received by the Partnership pursuant to this Section 12.8 shall be distributed in accordance with Section 12.7.

**12.9   Allocations and Distributions.** The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the priority distributions that would occur under Section 12.7 if said liquidating proceeds were distributed pursuant to Section 4.2 (Application and Distribution of Sale and Residual Proceeds). To the extent that the tax allocation provisions of this Agreement would not produce the Target Final Balances, the Partners agree to take such

actions in the year of liquidation as are necessary to amend such provisions to produce such Target Final Balances. Notwithstanding the other provisions of this Agreement, allocations of Partnership gross income and deductions shall be made prospectively as part of such liquidation as necessary to produce such Target Final Balances (and, to the extent such prospective allocations would not reach such result, the prior tax returns of the Partnership shall be amended to reallocate Partnership gross income and deductions to produce such Target Final Balances).

12.10  **Cancellation of Certificate of Limited Partnership.**  Upon completion of the dissolution of the Partnership and winding up of the Partnership's affairs, the Partners conducting the winding up of the Partnership's affairs shall execute and file in the office of the Secretary of State of Delaware a certificate of cancellation of the Certificate of Limited Partnership and shall execute and file in the Office of the Secretary of State of Texas the required documents to withdraw the Partnership from registration with the State of Texas. If dissolution occurs after a sole General Partner ceases to be a General Partner, the Limited Partner(s) conducting the winding up of the Partnership's affairs shall file the certificate of cancellation.

12.11  **Unallowable Dissolution.**  Notwithstanding anything in this Article 12 to the contrary, the Partnership shall not terminate solely as a consequence of the bankruptcy of one or more of the general partners of the Partnership so long as there remains a solvent general partner of the Partnership.

## ARTICLE 13  LIMITED PARTNER REPRESENTATIONS

13.1  **Representations and Warranties by Limited Partners.**  Each Limited Partner represents and warrants that:

(a)  It is purchasing its Interest for its own account (or a trust account if the purchaser is a trustee) and not with a view to or for sale in connection with any distribution of the Interest acquired;

(b)  It has been given ample opportunity to ask questions of and receive answers from the General Partner concerning the Partnership's business and/or the Project and to obtain any additional information necessary to verify the accuracy of the information provided to the Limited Partner, and the General Partner has answered all inquiries that the Limited Partner, or its representative, if any, have made concerning the Partnership and/or the Project;

(c)  It has the financial ability to bear the economic risk of its participation in the Partnership, has adequate means of providing for current needs and contingencies and has no need for liquidity with respect to its Partnership Interest;

(d)  It has reviewed the risks and merits of its participation in the Partnership with tax and legal counsel and its advisors to the extent it deems advisable;

(e)  It has the capacity to protect its own interests by reason of its business or financial experience or the business or financial experience of its professional advisors who are unaffiliated with and who are not compensated by the General Partner or any Affiliate of the General Partner, whether directly or indirectly;

(f)     It acknowledges that it has not received or been presented with any advertisement in connection with its participation in the Partnership; and

(g)     It acknowledges that it is purchasing its Interest in reliance solely on (i) its inspection of the Project or, if none, its independent determination not to make such an inspection, (ii) such Limited Partner's independent verification of the accuracy of any (a) documents delivered by the General Partner to the Limited Partner and (b) statements made by the General Partner to the Limited Partner concerning the Project and the Partnership, and (iii) the opinions and advice concerning the Project and the Partnership of consultants and/or advisors engaged by such Limited Partner.

Each Limited Partner understands that the General Partner is relying upon the representations, warranties, covenants and acknowledgments made by such Limited Partner in this Article 13, and each Limited Partner shall protect, defend, indemnify and hold the General Partner harmless from and against any damages, losses, liabilities, claims or expenses (including the reasonable cost of investigating and defending against any such claims, including reasonable attorneys' fees) incurred by it as a result of the inaccuracy of any representation, or warranty made by such Limited Partner or the breach of any covenant contained in this Agreement.

13.2     **Notice of Transaction.**  The General Partner shall timely file such notices or documents as may be necessary or appropriate under applicable State Laws, in connection with the issuance of the Limited Partner Interests.

13.3     **Representations of Limited Partners Regarding Legal Advice.**  Each Limited Partner further warrants and represents to the General Partner that it has sought and obtained the advice of independent legal counsel of its choice regarding all legal issues pertaining to its participation in the Partnership, including, without limitation, the federal income tax consequences of ownership of an Interest in the Partnership and the application of the securities laws to an investment in the Partnership.

13.4     **Tenancy in Common.**  The Partners acknowledge that BNC Frances Oaks LLC and BNC Frances Trails LLC (which are Affiliates of the General Partner) are purchasing approximately 33.0690% and a 16.0214% interests, respectively, in the Project as tenants in common.   BNC Frances Oaks LLC and BNC Frances Trails LLC are collectively expending approximately $613,630 to purchase such interests (including related costs).  At the same time, the Partnership is loaning to each of BNC Frances Oaks LLC and BNC Frances Trails LLC the sum of up to approximately $613,630 (in addition to the notes payable owed by such LLCs to the Partnership for the improvements as discussed in Section 1.9 above) pursuant to the terms of the Loan Agreement and Promissory Notes executed by BNC Frances Oaks LLC and BNC Frances Trails LLC in favor of the Partnership (collectively, the "Tenant Notes"), the forms of which are attached hereto as Exhibit H and are incorporated herein by this reference.  The General Partner shall be specially allocated Profits each fiscal year or other period in an amount equal to the accrued interest under the Tenant Notes, until the Tenant Notes are repaid in full (e.g., upon the Partnership's exercise of the option to purchase the other tenancy in common interests of BNC Frances Oaks LLC and BNC Frances Trails LLC).

## ARTICLE 14 MISCELLANEOUS PROVISIONS

**14.1   Entire Agreement.** THIS AGREEMENT AND THE QUESTIONNAIRE & SUBSCRIPTION AGREEMENT AND THE PRIVATE PLACEMENT MEMORANDUM RELATING TO THIS PARTNERSHIP CONTAIN THE ENTIRE UNDERSTANDING AMONG THE PARTNERS AND SUPERSEDE ANY PRIOR WRITTEN OR ORAL AGREEMENTS BETWEEN THEM RESPECTING THE SUBJECT MATTER CONTAINED HEREIN, INCLUDING WITHOUT LIMITATION ANY FINANCIAL INFORMATION OR PROJECTIONS PREVIOUSLY DELIVERED TO ANY LIMITED PARTNER. THERE ARE NO REPRESENTATIONS, AGREEMENTS, ARRANGEMENTS OR UNDERSTANDINGS, ORAL OR WRITTEN, AMONG THE PARTNERS RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT WHICH ARE NOT FULLY EXPRESSED HEREIN OR THEREIN.

**14.2   Amendments.** The provisions of this Agreement may be amended by vote of the General Partner and a Majority in interest of the Limited Partners; provided, however, that this Agreement also may be amended unilaterally by the General Partner in accordance with Section 1.8 herein, and Exhibit A to this Agreement may be unilaterally amended by the General Partner to update the information set forth therein. Any amendment of this Agreement shall be in writing, dated, and executed by the General Partner. If any conflict arises between the provisions of any amendment and this Agreement as previously amended, the most recent provisions shall control. Except as otherwise set forth in this Agreement, no amendment shall, without the unanimous consent of all Partners, adversely modify the allocation of Profits, Losses or distributions or amend this Section.

**14.3   Notices.** Unless otherwise provided herein, any notice request, instruction or other document to be given hereunder by either party to the other shall be in writing and delivered personally or mailed by certified mail, postage prepaid, return receipt requested or by national carrier (e.g., Federal Express) (such mailed notice to be effective on the date such receipt is acknowledged), as follows:

> If to the General Partner, addressed to:

> BNC Frances, L.P.
> c/o Barry S. Nussbaum
> 13151 Emily Road, Suite 250
> Dallas, Texas 75240

If to a Limited Partner, addressed to the address for such Limited Partner as shown on Exhibit A (which initially shall be the address designated by such Limited Partner on its Limited Partner Signature Page); or to such other place and with such other copies as any party may designate as to itself by written notice to the others.

**14.4   Successors.** This Agreement shall inure to the benefit of, and be binding upon, the permitted assigns, successors in interest, personal representatives, estates, heirs, and legatees of each of the parties to this Agreement.

14.5   **Severability.**  If any provisions of this Agreement shall be declared by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall continue in full force and effect.

14.6   **Election of Adjusted Basis.**  In the event of a transfer of all or part of the Limited Partner Interest of a Limited Partner, the General Partner, in its sole and absolute discretion, may elect, on behalf of the Partnership, to adjust the basis of the Partnership property pursuant to Section 754 of the Code. All other elections required or permitted to be made by the Partnership under the Code shall be made by the General Partner in such manner as will, in its opinion, be most advantageous to a Majority in interest of the Limited Partners.

14.7   **Tax Matters Partner.**  The General Partner is appointed the "Tax Matters Partner" and "Organizer" (for purposes of any tax shelter registration) to act for and on behalf of the Partnership with respect to all tax matters, including all federal income tax matters, including without limitation all actions permitted to be made or taken pursuant to the provisions of Sections 6221-6232 of the Code, including without limitation any affirmative election to be taxed as a partnership.

14.8   **Counterparts.**  This Agreement may be executed in several counterparts (including by counterpart execution of a signature page to a subscription agreement) and all counterparts so executed shall constitute one agreement which shall be binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

14.9   **Headings.**  The headings preceding the paragraphs of this Agreement are for convenience of reference only, are not a part of this Agreement, and shall be disregarded in the interpretation of any portion of this Agreement.

14.10  **Other Instruments.**  The parties hereto covenant and agree that they shall execute such other and further instruments and documents as are or may become necessary or convenient to effectuate and carry out the Partnership created by this Agreement.

14.11  **Construction.**  This Agreement has been negotiated at arms length and between persons sophisticated and knowledgeable in the matters dealt with in this Agreement. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Partner. In addition, each party has been (or has had the opportunity to have been) represented by experienced and knowledgeable legal counsel. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purpose of the parties and this Agreement.

14.12  **Time.**  Time is of the essence with respect to this Agreement.

14.13  **Incorporation by Reference.**  Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference. This Agreement contains the entire agreement of the parties and it supersedes any prior or

contemporaneous, written or oral, agreements, representations or warranties with respect to the subject matter of this Agreement.

14.14  **Additional Documents.**  Each Partner agrees to perform all further acts and execute, acknowledge and deliver any instruments and documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

14.15  **Variation of Pronouns.**  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter genders, singular or plural, as the identity of the Person or Persons may require.

14.16  **Governing Law; Choice of Forum.**  This Agreement is made in San Diego, California and the rights of the parties hereunder shall be governed by and interpreted in accordance with the internal laws of the State of Delaware, without reference to the rules regarding conflict or choice of laws of such State.  Notwithstanding the foregoing, Section 14.20 shall apply with respect to any dispute or controversy arising out of, under, or in connection with, or in relation to this Agreement and any amendments hereof, or the breach hereof.

14.17  **Waiver of Action for Partition.**  Each of the Partners irrevocably waives any right that it may have to maintain any action for partition with respect to any of the Project.  Each Partner hereby waives the right to seek a court decree of dissolution or to seek the appointment by a court of a liquidator for the Partnership.

14.18  **Partner Loans.**  Any Partner may, with the consent of the General Partner, lend or advance money to the Partnership.  If any Partner shall make any loan or loans to the Partnership or advance money on its behalf, the amount of any such loan or advance shall not be treated as a contribution to the capital of the Partnership but shall be a debt due from the Partnership.  The amount of any such loan or advance by a lending Partner shall be repayable out of the Partnership's cash and shall bear interest at the lesser of (i) ten percent (10%), or (ii) the maximum rate allowed by law.

14.19  **Separate Counsel for Partners.**

(a)  The General Partner has retained Procopio, Cory, Hargreaves & Savitch LLP ("PCHS") to prepare this Agreement.  Every Limited Partner is advised that he or she is entitled to be represented by counsel of his or her choice with respect to becoming a Limited Partner in this Partnership, and the General Partner recommends that each Limited Partner or potential Limited Partner seek advice from their own counsel in regard to his or her investment in the Partnership and execution of this Agreement and each Limited Partner by its signature below acknowledges that it has sought advice from counsel in this regard or has chosen not to do so.

(b)  From time to time, PCHS shall be permitted to render legal advice and to provide legal services to the General Partner and its Affiliates with respect to the Project, the Partnership or otherwise.  In no event shall an attorney/client relationship exist between PCHS on the one hand, and any Limited Partner or any of their respective Affiliates, on the other hand.

(c)     To the extent requested by the General Partner or its Affiliates, PCHS shall be permitted to render legal advice and to provide legal services to the Partnership, from time to time, and the General Partner and each of the Limited Partners covenants and agrees that such representation of the Partnership by either or both of such firms, from time to time, shall not disqualify such firms from providing legal advice and legal services as set forth in Section 14.19(a) and in Section 14.19(b) at any time in the future.

(d)     The Partners acknowledge and agree that Procopio, Cory, Hargreaves & Savitch LLP ("PCH&S") has represented the General Partner and certain of its Affiliates in connection with this Agreement, all other agreements contemplated by this Agreement and the Project. From time to time, PCH&S shall be permitted to render legal advice and to provide legal services to the General Partner, Barry S. Nussbaum and their Affiliates with respect to the Project, the Partnership or otherwise. In no event shall an attorney/client relationship exist between PCH&S on the one hand, and any Limited Partner or any of their Affiliates, on the other hand.

(e)     To the extent requested by the General Partner or their respective Affiliates, PCH&S shall be permitted to render legal advice and to provide legal services to the Partnership, from time to time, and each Limited Partner covenants and agrees that such representation of the Partnership by such firm, from time to time, shall not disqualify such firm from providing legal advice and legal services as set forth in Section 14.19(a) at any time in the future. In no event shall an attorney/client relationship exist between PCH&S on the one hand, and any Limited Partner or any of their Affiliates, on the other hand.

(f)     Every Limited Partner is advised that he or she is entitled to be represented by counsel of its or her choice with respect to becoming a Limited Partner in this Partnership, and the General Partner recommends that each Limited Partner or potential Limited Partner seek advice from their own counsel in regard to its or her investment in the Partnership and execution of this Agreement and each Limited Partner acknowledges that it has sought advice from counsel in this regard or has chosen not to do so.

(g)     Each Limited Partner acknowledges and represents that (i) PCH&S has not undertaken any and has no duty or obligation of any kind to any Limited Partner, (ii) PCH&S has not endorsed or recommended the investment in the Partnership, and (iii) in making its investment decision, each Limited Partner has not in any way relied on the involvement of PCH&S in this transaction or upon any information or material furnished or provided by PCH&S. Each Limited Partner will at all times continue to engage and consult with their own separate legal counsel, if any, in connection with matters and affairs relating to the Partnership. If PCH&S represents the Partnership on various matters from time to time, and if conflicts of interest or other controversies develop between the General Partner and any one or more Limited Partners, PCH&S may withdraw as counsel to the Partnership or its principals on matters relating to the Partnership and its business and affairs, including matters directly adverse to any one or more Limited Partners; provided, however, that PCH&S shall not represent the General Partner or its principals in matters which are directly adverse to the Partnership.

14.20   Arbitration.  Any dispute or controversy arising out of, under, or in connection with, or in relation to this Agreement, and any amendments hereof, or the breach hereof, shall be

determined and settled by arbitration to be held before one impartial arbitrator in San Diego, California, in accordance with then applicable commercial arbitration rules of the American Arbitration Association. In the event the parties cannot agree to the appointment of an arbitrator, an arbitrator shall be appointed in accordance with Section 1281.6 of the California Code of Civil Procedure. Any arbitration shall allow for production of relevant documents and depositions, and sanctions, at the discretion of the arbitrator, for failure to comply with any such discovery requests.

14.21 **No Third-Party Beneficiary.** Any agreement to pay any amount and any assumption of liability herein contained, express or implied, shall be only for the benefit of the Partners and their respective heirs, successors, and assigns, and such agreements and assumptions shall not inure to the benefit of the obligees of any indebtedness or any other party, whomsoever, deemed to be a third-party beneficiary of this Agreement. In this regard, it is hereby expressly agreed and understood that any right of the Partnership or the Partners to permit any Capital Contributions under the terms of this Agreement shall not be construed as conferring any rights or benefits to or upon any party not a party to this Agreement.

## ARTICLE 15 POWER OF ATTORNEY

15.1 **Attorney-in-Fact.** Each Limited Partner hereby grants to the General Partner a special power of attorney irrevocably making, constituting and appointing the General Partner as such Limited Partner's attorney-in-fact, with full power of substitution, with power and authority to act in its name and on its behalf to execute, acknowledge and swear to in the execution, acknowledgment and filing of the below-mentioned documents:

(a) This Agreement, any separate Certificate of Limited Partnership, as well as any amendments to the foregoing which, under the laws of the State of Delaware or the laws of any other state, are required to be executed or filed or which the General Partner deems to be advisable to execute or file;

(b) Any other instrument or document which may be required to be filed by the Partnership under the laws of any state or by any governmental agency, or which the General Partner deems advisable to file;

(c) Any instrument or document which may be required to effect the continuation of the Partnership, the admission of additional or substituted Limited Partners, or the dissolution and termination of the Partnership (provided the continuation, admission or dissolution and termination are in accordance with the terms of this Agreement); and

(d) An amendment to this Agreement as may be requested by the Lender from time to time in connection with the Bank Loan and as are deemed to be reasonable and appropriate by the General Partner, such determination to be conclusively evidenced by the General Partner's execution of any and all such documentation.

15.2 **Limitation On Use.** The General Partner shall promptly furnish to the Limited Partners a copy of any amendment to this Agreement executed by the General Partner pursuant to Section 15.1(a) above. The General Partner shall not use its above-described power of attorney for any purpose other than as specifically set forth in Section 15.1 above.

15.3    Special Provisions.  The special power of attorney granted by each Limited Partner:

(a)    Is a special power of attorney coupled with an interest, is irrevocable, shall survive the death or incapacity of the granting Limited Partner and is limited to the matters set forth herein; and

(b)    May be exercised by any General Partner acting for the Limited Partners by a facsimile signature of the General Partner.

Executed as of the Effective Date at San Diego, California.

INITIAL LIMITED PARTNER:

BARRY S. NUSSBAUM COMPANY, INC.
a Texas corporation

By: _____
    Barry S. Nussbaum, President

GENERAL PARTNER:

BNC FRANCES, L.P.,
a Delaware limited partnership

By: BNC INVESTMENTS LLC,
    a Delaware Limited liability company
    its sole general partner

By: _____
    Barry Nussbaum, Manager

ALL LIMITED PARTNERS AS OF THE DATE FIRST SET FORTH ABOVE:

EXHIBIT A

INITIAL PERCENTAGE INTERESTS AND LIST OF PARTNERS

BNC FRANCES VILLAS, L.P.

A DELAWARE LIMITED PARTNERSHIP

GENERAL PARTNER

| Name of Partner | Address | Cash Contribution | Percentage Interest |
|---|---|---|---|
| BNC Frances, L.P., a Delaware limited partnership | Attn.  Barry S. Nussbaum 13151 Emily Road, Suite 250 Dallas, Texas 75240 | $0 | 50% |

INITIAL
LIMITED PARTNER

| Name of Partner | Address | Cash Contribution | Percentage Interest |
|---|---|---|---|
| Initial Limited Partner) Barry S. Nussbaum Company, a Texas corporation | Attn.  Barry S. Nussbaum 13151 Emily Road, Suite 250 Dallas, Texas 75240 | $0 | 0[1] |

TOTALS:

| | | | |
|---|---|---|---|
| | | $0 | 0 |

---

[1] 1% interest until additional Limited Partners admitted at which time its Interest shall terminate.

## ADDITIONAL
## LIMITED PARTNERS

| Name and TIN of Limited Partners | Address | Cash Contribution | Percentage Interest |
|---|---|---|---|
| Gelbart Family Trust<br>TIN: 6716 | 5983 Madra Ave. S.D., CA 92120 | $125,000 | 2.7080% |
| Samuel & Frances Gelbart as Trustees of the Gelbart Family Trust<br>TIN: 5498 & -0545 | 2291 Paseo Saucedal, Carlsbad, CA 92009 | $125,000 | 2.7080% |
| Gabriel B. Wisdom<br>TIN: 0403 | P.O. Box 3815<br>6605 Nieman Ranch Road<br>Rancho Sante Fe, CA 92067 | $200,000 | 4.3327% |
| Noonan and Zwickel Partnership<br>TIN: 7807 | c/o Abdul R. LaLa, CPA<br>10999 Riverside Dr., Ste. # 208<br>North Hollywood CA 91602 | $250,000 | 5.4159% |
| Barry Owen Moores<br>TIN: 1766 | P.O. Box 491<br>5041 El Secreto<br>Rancho Santa Fe, CA 92067 | $1,350,000 | 29.2461% |
| Team Wealth Investors, L.P.<br>TIN: | c/o BNC Real Estate<br>13151 Emily Road, Suite 250<br>Dallas, TX 75240 | $58,000 | 1.2565% |
| Jack Zemer<br>TIN: | 1227 Prospect Street,<br>LA Jolia, CA 92037 | $200,000 | 4.3327% |
| TOTALS: | | $2,308,000 | 50.00% |

## EXHIBIT B

## GLOSSARY OF CERTAIN DEFINED TERMS

1.7    Except as otherwise stated in this Agreement, the terms defined in this Section shall for the purposes of this Agreement have the meanings herein specified.

(a)    "Act" means the Delaware Revised Uniform Limited Partnership Act, as amended from time to time.

(b)    "Adjusted Capital Account Balance" means, with respect to any Limited Partner, the balance, if any, in such Limited Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)    Increase such balance by any amounts which such Limited Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate (second to last) sentence of Treasury Regulations 1.704-2(g)(1) and 1.704-2(i)(5) (i.e., minimum gain); and

(ii)    Decrease such balance by such Limited Partner's share of the items described in Treasury Regulations 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Treasury Regulation 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(c)    "Adjusted Capital Contribution" means, as of any day, a Partner's Capital Contributions adjusted as follows:

(i)    Increased by the amount of any Partnership liabilities which, in connection with distributions pursuant to Sections 4.2(c) and 12.7(c) hereof, are assumed by such Partner or are secured by any Partnership Property distributed to such Partner, and

(ii)    Reduced by (i) the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to Sections 4.2(c)(ii) hereof, and (ii) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

In the event any Partner transfers all or any portion of its Interest in accordance with the terms of this Agreement, its transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Interest.

(d)    "Affiliate" means any Person controlling or controlled by or under common control with the Partnership including, without limitation (i) any Person who has a familial relationship, by blood, marriage or otherwise with any Partner or employee of the Partnership, or any Affiliate thereof and (ii) any Person which receives compensation for administrative, legal or

accounting services from this Partnership, or any Affiliate.  For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(e)  "Agreement" means this Limited Partnership Agreement, as may be further amended from time to time.

(f)  "Assignee" means a Person who has been assigned the beneficial interest in all or a portion of an Interest, by a Limited Partner, pursuant to Article 8 of this Agreement, but who is not an Assignee of Record.

(g)  "Assignee of Record" means a Person who has been assigned the beneficial interest in all or a portion of an Interest, by a Limited Partner pursuant to Article 8 of this Agreement, and whose ownership of the beneficial interest in the Interest (i) has been recorded on the books of the Partnership and (ii) is the subject of a written instrument of assignment, the effective date of which assignment has passed.

(h)  "Bankruptcy" means any of the following:  (a) the filing of a voluntary petition under any federal or state law for the relief of debtors; (b) the filing of an involuntary proceeding under any such law; (c) the making of a general assignment for the benefit of the assignor's creditors; (d) the appointment of a receiver or trustee of a substantial portion of a Person's assets; (e) the seizure by a sheriff, receiver or trustee of a substantial portion of a Person's assets; provided that no bankruptcy shall occur in the case of an event described in clause (b), (d) or (e) above, until the proceeding, appointment or seizure has been pending for sixty (60) days.

(i)  "Capital Account" means an account which shall be maintained for each Partner in accordance with Treasury Regulation 1.704-1(b)(2)(iv), including the following requirements:

(i)  Each Partner's Capital Account shall be credited with (i) the amount of the Partner's Capital Contributions; (ii) the Partner's distributive share of Profits (and any item in the nature of income or gain which is allocated to such Partner including income and gain exempt from tax); and (iii) the amount of any Partnership liabilities assumed by such Partner or which are secured by any Partnership Property distributed to such Partner.

(ii)  Each Partner's Capital Account shall be debited by (i) the amount of cash and the Gross Asset Value of any Partnership Property distributed to the Partner; (ii) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any Property contributed by such Partner to the Partnership; and (iii) such Partner's distributive share of Losses.

(iii)  Whenever the Gross Asset Values of Partnership Property are adjusted pursuant to Section 1.7(t)(ii), the Capital Accounts of all Partners shall be adjusted in the manner provided in Treasury Regulations 1.704-1(b)(2)(iv)(f) and (g) to reflect, among other

items, the aggregate net adjustment as if the Partnership had recognized gain or loss equal to the amount of the adjustment.

(iv)   If any Interest in the Partnership is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(v)   If Property is distributed to a Partner, then, before the Capital Account of such Partner is adjusted as required by this Section 1.7(i), the Capital Accounts of the Partners shall be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such Property (that has not been reflected in such Capital Accounts previously) would be allocated among the Partners if there were a taxable disposition of such Property for its fair market value on the date of distribution.

(vi)   In the event that a Partner shall be both a General Partner and a Limited Partner of the Partnership, a single Capital Account shall be maintained for that Partner. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Partner, upon the advice of tax counsel, determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulation, the General Partner is hereby authorized to make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Limited Partner pursuant to Section 12.7(c) upon the dissolution of the Partnership.

(j)   "Capital Contribution" means the total amount of money and the initial Gross Asset Value of any property contributed to the Partnership by any Partner.

(k)   "Cash Receipts" means all cash received by the Partnership during any fiscal year from all sources, except proceeds resulting from a Major Capital Event.

(l)   "Certificate" has the meaning set forth in Section 1.6.

(m)   "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(n)   "Depreciation" means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

(o)   "Effective Date" has the meaning set forth in the Preamble to this Agreement.

(p)  "Exempt Limited Partners" has the meaning set forth in Section 4.12(a) of Exhibit C.

(q)  "Federal Act" means the Securities Act of 1933, as amended.

(r)  "Financing" means any mortgage financing, refinancing or borrowing secured by any Property including additions to borrowings initially made to finance the purchase of any Property, but excluding any loan made by the Partnership.

(s)  "General Partner" refers to BNC Frances, L.P., a Delaware limited partnership, or any successor thereto, or other Persons admitted as a general partner pursuant to the terms of this Agreement.

(t)  "Gross Asset Value" means, with respect to any asse... .ne adjusted basis of the asset for federal income tax purposes, except as follows:

(i)      The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be its fair market value, as reasonably determined by the contributing Partner and the Partnership.

(ii)     The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective fair market values, as reasonably determined by the General Partner, as of the following times:

(A)  the acquisition of an additional Interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution;

(B)  the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership Property or money in consideration for an Interest in the Partnership if the General Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and

(C)  notwithstanding anything in subclause 1.7(t)(ii)(B) above to the contrary, on the liquidation of the Partnership within the meaning of Treasury Regulation 1.704-1(b)(2)(ii)(g).

(iii)  The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution.

(iv)  If the Gross Asset Value of an asset has been determined or adjusted pursuant to clause 1.7(t)(i) or 1.7(t)(ii) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(u)  "Initial Limited Partner" means Barry S. Nussbaum Company, a Texas corporation, in its capacity as the initial limited partner of the Partnership.

(v) "Interest" means the entire ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all of the terms and provisions of this Agreement. "General Partner Interest" means the Interest held by a General Partner in its capacity as a General Partner, and "Limited Partner Interest" means the Interest held by a Partner in its capacity as a Limited Partner.

(w) "IRS" refers to the Internal Revenue Service.

(x) "Limited Partner" initially refers to the Initial Limited Partner. Upon the admission of additional Persons as limited partners of the Partnership pursuant to the terms of this Agreement, "Limited Partner" shall mean any one of such Persons or to such Person's permitted successors and assigns, and "Limited Partners" shall mean all of such Persons.

(y) "Property Management Agreement" means the Property Management Agreement attached hereto as Exhibit F to be entered into between the Partnership and the Property Manager.

(z) "Major Capital Event" means (i) the sale, exchange, condemnation, casualty loss or other disposition (whether voluntary or involuntary) of all or any part of the Project or any interest therein, excluding dispositions of personal property and equipment in the ordinary course of business, or (ii) recovery of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds), or (iii) the placement of Financing upon the Project.

(aa) "Majority in interest of the Limited Partners" means Limited Partners holding collectively more than fifty percent (50%) of the Limited Partner Percentage Interests.

(bb) "Notice Date" has the meaning set forth in Section 7.5.

(cc) "Partners" refers collectively to the General Partner and the Limited Partners. Reference to a "Partner" shall be a reference to any one of the Partners.

(dd) "Partnership" refers to the limited partnership created under this Agreement and by the Certificate of Limited Partnership filed with the Office of the Delaware Secretary of State pursuant to the Act.

(ee) "Percentage Interest" means a Partner's interest in Profits and Losses which are set forth on Exhibit A and, upon formation of the Partnership, shall be as follows:

| | |
|---|---|
| General Partner | fifty percent (50%) |
| Limited Partners (as a group) | fifty percent (50%) |

(ff) "Person" refers to an individual, partnership, trust, estate, association, corporation, pension, profit sharing or other employee benefit plan, or other entity, as well as guardian, trustee, executor, administrator, committee, trustee in bankruptcy, receiver, assignee for the benefit of creditors, conservator or other Person acting in a fiduciary capacity.

(gg) "Priority Return" or "10% Priority Return" means a sum equivalent to ten percent (10%) per annum, cumulative but not compounded (but prorated for any partial year) of the Adjusted Capital Contribution of a Limited Partner, from time to time during the period to which the Priority Return relates, commencing on the first date such Limited Partner is admitted to the Partnership.

(hh) "Private Placement Memorandum" shall mean the Private Placement Memorandum, as amended, pursuant to which the Limited Partner Interests were sold.

(ii) "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)   Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses as if it were taxable income;

(ii)   Any expenditures of the Partnership described in Code section 705(a)(2)(B) or treated as Code section 705(a)(2)(B) expenditures pursuant to Treasury Regulation 1.704-1(b)(2)(iv)(i), shall be taken into account in computing such taxable income or loss as if they were deductible items;

(iii)   Gain or loss resulting from any disposition of Partnership Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(iv)   In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, the Partnership shall compute such deductions based on the book value of Partnership property, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

(v)   Any items which are specifically allocated pursuant to pursuant to a Section 754 election, a recharacterization of a guaranteed payment as a distribution, a qualified income offset, minimum gain chargeback, nonrecourse deduction special allocation or a gross income allocation shall not be taken into account in computing Profits or Losses.

(vi)   Notwithstanding anything in this Agreement to the contrary, Profits and Losses shall be adjusted as necessary to ensure compliance with Treasury Regulation 1.704-1(b) or other applicable Treasury Regulations.

(jj) "Project" has the meaning assigned to such term in Section 1.3.

(kk) "Promissory Note" means any promissory note payable to the Partnership issued by a Limited Partner.

(ll) "Property" means all real and personal property acquired or held by the Partnership and any improvements thereto, and shall include both tangible and intangible property.

(mm) "Property Manager" means Barry S. Nussbaum Company, Inc., a Texas corporation, in its capacity as the property manager under the Management Agreement and/or the Asset Management Agreement as provided in Section 7.3(d).

(nn) "Regulatory Allocations" has the meaning set forth in Section 4.3(f) of Exhibit C.

(oo) "Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the General Partner in its sole discretion to provide for capital expenditures, contingent or unforeseen liabilities or obligations of the Partnership, maturing obligations, working capital, to pay taxes, insurance, debt service, repairs, improvements, replacements or renewals, and for other costs or expenses incident to the ownership or operation of the Property.

(pp) "Sale and Residual Proceeds" means the net cash proceeds received by the Partnership in connection with a Major Capital Event (including interest paid on account of any promissory notes or other contractual obligations received by the Partnership in consideration for a sale of all or a portion of the Project) that are not reinvested in Property or otherwise retained by the Partnership for the continuation of its business.

(qq) "State Law" means the securities or "blue sky" laws of all applicable states.

(rr) "Substituted Limited Partners" means the Persons admitted to the Partnership as Limited Partners pursuant to the provisions of Article 8 of this Agreement; and "Substituted Limited Partners" means any one of them.

(ss) "Target Final Balances" has the meaning set forth in Section 12.9.

(tt) "Tax-Exempt Use Property" has the meaning set forth in Section 4.11(a) of Exhibit C.

(uu) "Tax Matters Partner" refers to the General Partner.

(vv) "Taxable Limited Partners" has the meaning set forth in Section 4.11(c) of Exhibit C.

(vv) "Tenant Notes" means, collectively, the notes payable from each of BNC Frances Trails LLC and BNC Frances Oaks LLC for their respective shares of the cost of the improvements and for the loans in the total amount of approximately $614,000 being made to them by the Partnership.

(ww) "Treasury Regulation" means the Income Tax Regulations promulgated under the Code, as published and in force as of the date hereof, and corresponding provisions of succeeding Regulations.

EXHIBIT C

SPECIAL TAX PROVISIONS

4.4  Prior to making any allocations under Section 4.1 above, the following allocations shall be made:

(a)  Except as otherwise provided in Sections 4.4(b) and 4.4(c), in the event any Limited Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to each such Limited Partner in proportion to its respective deficit in its Adjusted Capital Account Balance in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit in its Adjusted Capital Account Balance of such Limited Partner as quickly as possible.  It is intended that this Section 4.4(a) qualify and be construed as a "qualified income offset" within the meaning of Treasury Regulation 1.704-(b)(2)(ii)(d)(3) and shall be interpreted consistently therewith.

(b)  Nonrecourse Deductions (as defined in Treasury Regulation section 1.704-2(b)(1)), for any fiscal year, or portion thereof, shall be allocated among the Partners in proportion to their respective Percentage Interests.  Except as provided in Section 4.4(c) below, if there is a net decrease in Partnership Minimum Gain for a Partnership fiscal year, each Partner shall be allocated, before any other allocation of Partnership items for such fiscal year, items of gross income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, the amount of such Partner's share of the net decrease in Partnership Minimum Gain during such year.  The income allocated pursuant to this Section 4.4(b) in any fiscal year shall consist first of gains recognized from the disposition of Property subject to one or more nonrecourse liabilities, and any remainder shall consist of a pro rata portion of other items of income or gain of the Partnership.

(c)  Notwithstanding any other provisions of this Section 4.4 to the contrary, if there is a net decrease in "Partnership Minimum Gain" (as defined in Treasury Regulation section 1.704-2(d)), including for this purpose minimum gain attributable to "Partner Nonrecourse Debt" (as defined in Treasury Regulation sections 1.704-2(k) and 1.704-2(b)(4)), each Partner shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to the greater of (i) such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treasury Regulation sections 1.704-2(f) and 1.704-2(i) (or any corresponding provisions of any successor Regulations thereto) that is allocable to the disposition of Partnership Property (including the Project) subject to one or more Nonrecourse Liabilities (as defined in Treasury Regulation section 1.704-2(b)(3)) or Partner Nonrecourse Debt, or (ii) such Partner's Adjusted Capital Account Deficit at the end of such fiscal year in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  This Section 4.4(c) shall be applied separately with respect to Partnership Minimum Gain attributable to Partner Nonrecourse Debt and other Partnership Minimum Gain.  The items to be so allocated shall be determined in accordance with Treasury Regulation sections 1.704-2(f), 1.704-2(g), 1.704-2(i)(4), 1.704-2(i)(5) and 1.704-2(j)(2)(ii).  This Section 4.4(c) is intended to comply with

the minimum gain chargeback requirement in such Treasury Regulations and shall be interpreted consistently therewith.

(d)  Any item of Partnership loss, deduction or expenditures described in section 705(a)(2)(B) of the Code that is attributable to a Partner Nonrecourse Debt shall be allocated to those Partners that bear the economic risk of loss for such Partner Nonrecourse Debt, and among such Partners in accordance with the ratios in which they share such economic risk determined in accordance with Treasury Regulation 1.704-2(i).  If there is a net decrease in any Partner Nonrecourse Debt Minimum Gain of the Partnership during a Partnership fiscal year, each Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of such year shall be allocated items of gross income and gain in the manner and to the extent provided in Treasury Regulation sections 1.704-2(i)(4) and 1.704-2(i)(5).

(e)  Notwithstanding anything herein to the contrary, (i) to the extent Losses otherwise allocable to a Limited Partner pursuant to Section 4.1 would cause any Limited Partner to have a deficit in its Adjusted Capital Account Balance at the end of any fiscal year, such Losses shall not be allocated to such Limited Partner and instead shall be allocable to the General Partner, and (ii) in the event any Partner has a deficit in its Adjusted Capital Account Balance at the end of any Fiscal Year, each such Partner shall be specially allocated items of income and gain in the amount of such excess as quickly as possible.

(f)  The allocations set forth in Sections 4.4(a), 4.4(b), 4.4(c) and 4.4(e) above (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation 1.704-1(b).  Notwithstanding any other provision of this Article 4 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gains, loss and deduction among the General Partner and Limited Partner so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each General Partner and Limited Partner shall be equal to the net amount that would have been allocated to each such General Partner and Limited Partner if the Regulatory Allocations had not occurred.

## Prohibited Allocations

4.5  Notwithstanding anything to the contrary in this Agreement, it is the intent of the Partnership that (i) the allocations contained in this Article 4 shall be deemed to have "substantial economic effect" within the meaning of Treasury Regulation 1.704-1(b).  In the event that the Code or any Treasury Regulation promulgated thereunder requires allocations of items of income, gain, loss, deduction or credit different from those set forth in this Agreement, upon the advice of tax counsel, the General Partner is hereby authorized to make new allocations in reliance upon the Code, the Treasury Regulations and such advice of tax counsel.  Such new allocations shall be deemed to be made pursuant to the fiduciary obligation of the General Partner to the Partnership and the Limited Partner, and no such new allocation shall give rise to any claim or cause of action by any Limited Partner, whether or not the General Partner benefits from such reallocation.

## Priority; Distributions and Allocations

4.6   Except as otherwise provided herein, no Partner shall have priority over any other Partner, either as to the return of capital or as to profits, losses or distributions.

## Amounts Withheld

4.7   All amounts required to be withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to the Partnership or the Partners shall be treated as amounts distributed to such Partners pursuant to this Article 4 for all purposes under this Agreement. The General Partner may allocate any such amounts among the Partners in any manner that is in accordance with applicable law.

## Deductible Payments Treated as Distributions

4.8   In the event that any amount claimed by the Partnership to constitute a guaranteed payment as defined in Section 707(c) of the Code or a payment to a Partner not acting in its capacity as a Partner under Section 707(a) of the Code is treated for federal income tax purposes as a distribution made to a Partner in its capacity as a member of the Partnership, then:

(a)   The Capital Account of the Partner who is deemed to have received such distribution shall be reduced to reflect the distribution;

(b)   The Partner who is deemed to have received such distribution shall be allocated an amount of Partnership gross income equal to such payment; and

(c)   For purposes of this Article 4, Profits and Losses shall be determined after making the allocation required under this Section.

## Change In Partner's Interest

4.9   If any Interest in the Partnership is sold, assigned or transferred during any accounting period or a Partner's Percentage Interest increases or decreases, Profits, Losses, each item thereof and all other items attributed to such Interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Tax Matters Partner. All distributions on or before the date of such transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Partnership shall recognize such transfer not later than the end of the calendar month during which it is given notice of such transfer, provided that if the Partnership does not receive a notice stating the date such Interest was transferred and such other information as the Tax Matters Partner may reasonably require within 30 days after the end of the accounting period during which the transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Partnership, on the last day of the accounting period during which the transfer occurs, was the owner of the Interest. The Tax

Matters Partner and the Partnership shall incur no liability for making allocations and distributions in accordance with the provisions of this Section 4.8.

## Recapture

4.10 Notwithstanding anything to the contrary in this Article 4 allocating Profits and Losses:

(a)  To the extent permitted by applicable income tax law, all Profits treated as ordinary income attributable to the recapture of depreciation or cost recovery deductions shall be allocated between the Partners in the same ratio as prior allocations to such Partners of the depreciation or cost recovery deductions subject to recapture (taking into account any basis adjustments made to the Partnership's assets under Section 754 of the Internal Revenue Code of 1986, as amended (or any corresponding provision of succeeding law)).

(b)  To the extent permitted by applicable income tax law, all tax credits that are recaptured shall be allocated between the Partners in the same ratio as prior allocations to such Partners of the tax credit subject to recapture.

(c)  To the extent permitted by applicable income tax law, all income allocated pursuant to Sections 4.10(a) and 4.10(b) above shall have the same character under the passive loss rules as the deductions giving rise to such allocations.

## Code Section 704(c); Mandatory Allocations

4.11 Notwithstanding the foregoing, (i) in the event Code Section 704(c) or Code section 704(c) principles applicable under Treasury Regulation 1.704-1(b)(2)(iv) require allocations of income or loss of the Partnership in a manner different than that set forth above, the provisions of Code section 704(c) and the regulations thereunder shall control such allocations among the Partners; and (ii) all deductions and losses of the Partnership which are attributable to any loan made to the Partnership by a Partner (or which are treated as such by Treasury Regulation 1.704-1(b)(2)(iv)(h) shall be allocated to such Partner as so required by Treasury Regulation 1.704-1(b)(2)(iv)(g).

## Tax Exempt Partners

4.12 (a)  The provisions of this Section 4.11 shall apply to the extent that Section 168(h)(6) causes any portion of the Partnership's Property to be depreciated over a recovery period longer than the shortest recovery period permitted to be utilized for such Partnership Property under Section 168 of the Code by a partnership of which no partners are "tax-exempt entities" as defined in Section 168(h)(2) of the Code ("Exempt Limited Partners"). The portion of the Partnership Property subject to the provisions of Section 168(h)(6) shall be referred to as "Tax-Exempt Use Property."

(b)  Except as provided in subparagraph 4.11(d) below, all cost recovery

deductions for each taxable year attributable to Tax-Exempt Use shall be allocated to Exempt Limited Partners and shall be allocated to each Exempt Limited Partner in the ratio in which the Interest owned by such Exempt Limited Partner bears the total Interests owned by all Exempt Limited Partners.

(c)   Except as provided in subparagraph 4.11(d) below, all cost recovery deductions in any taxable year not allocated pursuant to subparagraph 4.11(b) above, shall be allocated to Limited Partners other than Exempt Limited Partners ("Taxable Limited Partners"), and shall be allocated to each Taxable Limited Partner in the ratio in which the Interests owned by such Taxable Limited Partner bears to the total Interests owned by all Taxable Limited Partners.

(d)   For purposes of determining the portion of the Partnership's cost recovery deductions to be allocated pursuant hereto, in the event that an Interest is assigned from an Exempt Limited Partner to a Taxable Limited Partner, or from a Taxable Limited Partner to an Exempt Limited Partner, and such assignment does not increase or decrease the portion of the Partnership's Property classified as Tax-Exempt Use Property:

(i)   If the assignment is from an Exempt Limited Partner to a Taxable Limited Partner, the depreciation deductions allocable to Exempt Limited Partners pursuant to subparagraph 4.11(b) above, from and after the effective date of such assignment, shall not include such percentage of the cost recovery deductions attributable to the Tax-Exempt Use Property of the Partnership obtained by dividing the Interest so assigned by the Exempt Limited Partner to the Taxable Limited Partner by the aggregate Interests owned by all Exempt Limited Partners immediately prior to the effective date of such assignment;

(ii)   If the assignment is from a Taxable Limited Partner to an Exempt Limited Partner, the cost recovery deductions allocable to Exempt Limited Partners pursuant to subparagraph 4.11(b) above, from and after the effective date of such assignment, shall also include such percentage of the cost recovery deductions attributable to property of the Partnership which is not Tax-Exempt Use Property, obtained by dividing the Interest so assigned by the Taxable Limited Partner to the Exempt Limited Partner by the aggregate Interests owned by all Taxable Limited Partners immediately prior to the effective date of such assignment.

### Allocation In the Event of Section 754 Election

4.13  Upon an adjustment to the adjusted tax basis of any Company asset pursuant to Code section 734(b) or Code section 743(b) the Capital Accounts of the Partners shall be adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m).

### Allocation Provisions Binding

4.14  The Partners are aware of the income tax consequences of the allocations made by this Article 4 and hereby agree to be bound by the provisions of this Article 4 in reporting their shares of Partnership income and loss for income tax purposes.

[ADDITIONAL EXHIBITS AVAILABLE UPON REQUEST]

FIRST AMENDMENT

# FIRST AMENDMENT TO
# LIMITED PARTNERSHIP AGREEMENT OF
# BNC FRANCES VILLAS, L.P.,
# AND CONSENT

THIS FIRST AMENDMENT TO LIMITED PARTNERSHIP AGREEMENT OF BNC FRANCES VILLAS, L.P. AND CONSENT (this "**Amendment**") is made and entered into effective as of June 14, 2006 (the "Effective Date") by and among the Partners of BNC Frances Villas, L.P., a Delaware limited partnership (the "**Partnership**"). Capitalized terms used and not otherwise defined in this Amendment have the same respective meanings given to such terms in the Partnership Agreement (as defined herein).

## RECITALS:

WHEREAS, the Partners of the Partnership have entered into that certain Limited Partnership Agreement, dated effective as of October 20, 2000 (the "**Partnership Agreement**"), in accordance with the Delaware Revised Uniform Limited Partnership Act, as the same may be amended from time to time (the "**Act**"); and

WHEREAS, the Partners of the Partnership wish to amend the Partnership Agreement to assure that the Partnership will meet certain single purpose entity requirements and wish to authorize and consent to the loan refinancing terms as set forth herein.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed:

1.  Recitals True. The above recitals are true and correct and incorporated herein.

2.  SPE Provisions.  Section 1.3 of the Partnership Agreement is hereby amended and restated in its entirety as follows:

"**1.3   Purpose of Partnership**. Notwithstanding any other term or provision of this Agreement to the contrary, until that certain loan (the "**Loan**") from CIBC Inc. ("**Lender**") to the Partnership, to be evidenced by a promissory note (the "**Note**") and secured by a deed of trust encumbering the multi-family residential real estate property owned by the Partnership, located at 900 Frances Way in the City of Richardson, State of Texas and known as the Frances Villas Apartments (the "**Property**"), is paid and performed in full, the Partnership will comply with and shall be controlled by the following provisions:

(a)     The sole purpose of the Partnership has been, is and will be, to acquire, own, hold, maintain, and operate the Property, together with such other activities as may be necessary or advisable in connection with the ownership and operation of the Property.  The Partnership has not engaged, and does not and shall not engage, in any business, and it has and shall have no purpose, unrelated to the Property. The Partnership has not owned, does not own and shall not acquire, any

- 1 -

real property or own assets other than those related to the Property and/or otherwise in furtherance of the limited purposes of the Partnership.

(b)     Neither the Partnership, nor any general partner, manager or managing member (a "**Controlling Entity**") of the Partnership, as applicable, shall have the authority to perform any act in respect of the Partnership in violation of any (i) applicable laws or regulations or (ii) any agreement between the Partnership and Lender (including, without limitation, the loan documents evidencing, securing or governing the Loan).

(c)     The Partnership shall not:

(i)     make any loans to the holder (directly or indirectly) of any equity interests in the Partnership (collectively, the "**Equity Holders**"), any Affiliate (as hereinafter defined) of the Partnership or of any Equity Holders;

(ii)     except as expressly permitted by Lender in writing, sell, encumber (except with respect to Lender) or otherwise transfer or dispose of all or substantially all of the properties of the Partnership (a sale or disposition will be deemed to be "all or substantially all of the properties of the Partnership" if the sale or disposition includes the Property or if the total value of the properties sold or disposed of in such transaction and during the twelve months preceding such transaction is 66-2/3% or more in value of the Partnership's total assets as of the end of the most recently completed the Partnership fiscal year);

(iii)     except as expressly permitted by Lender in writing, or as permitted by Clause (e) below, incur, assume, or guaranty any other indebtedness;

(iv)     to the fullest extent permitted by law, dissolve, wind-up, or liquidate the Partnership;

(v)     merge or consolidate with, or acquire all or substantially all of the assets of, an Affiliate of the Partnership or any other person or entity;

(vi)     change the nature of the business conducted by the Partnership; or

(vii)     except as permitted by Lender in writing, amend, modify or otherwise change the Organizational Documents (as defined below) of the Partnership (which approval, after a Secondary Market Transaction (as hereinafter defined) with respect to the Loan, may be conditioned upon Lender's receipt of confirmation from each of the applicable Rating Agencies (as hereinafter defined) that such amendment, modification or change would not result in the qualification, withdrawal or downgrade of any securities rating).

(d)     The Partnership shall not, and no Equity Holder or other person or entity on behalf of the Partnership shall, without the prior written affirmative vote of one hundred percent (100%) of the members, partners or stockholders of the Partnership: (i) institute proceedings to be adjudicated bankrupt or insolvent; (ii) consent to the institution of bankruptcy or insolvency proceedings against it; (iii) file a petition seeking, or consenting to, reorganization or relief under any applicable federal or state law relating to bankruptcy; (iv) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Partnership or a substantial part of its property; (v) make any assignment for the benefit of creditors; (vi) admit in writing its inability to pay its debts generally as they become due or declare or effect a moratorium on its debts; or (vii) take any action in furtherance of any such action (each of the actions described in the foregoing clauses (i) through (vii), with respect to any individual or entity, are referred to herein as a "**Bankruptcy Action**").

(e)     Except for any unsecured loans from the Partners in the Partnership in such amounts and on such terms as may be agreed to by Lender in writing in its sole discretion, the Partnership shall have no indebtedness or incur any liability other than (i) unsecured debts to any Partner and liabilities for trade payables and accrued expenses incurred in the ordinary course of its business of operating the Property; provided, however, that such unsecured indebtedness or liabilities (A) are in amounts that are normal and reasonable under the circumstances, but in no event to exceed three percent (3%) of the original principal amount of the Loan, and (B) are not evidenced by a note and are paid when due, but in no event for more than sixty (60) days from the date that such indebtedness or liabilities are incurred, and (ii) the Loan.  No indebtedness other than the Loan shall be secured (senior, subordinated or pari passu) by the Property.

(f)     The following provisions shall apply only when the Partnership is a limited liability company or a partnership.  A Bankruptcy Action by or against any partner or member of the Partnership, as applicable, shall not cause such partner or member of the Partnership, as applicable, to cease to be a partner or member of the Partnership and upon the occurrence of a Bankruptcy Action, the Partnership shall continue without dissolution.  Additionally, to the fullest extent permitted by law, if any partner or member of the Partnership, as applicable, ceases to be a partner or member of the Partnership, as applicable, such event shall not terminate the Partnership and the Partnership shall continue without dissolution.

(g)     The Partnership shall at all times observe the applicable legal requirements for the recognition of the Partnership as a legal entity separate from any Equity Holders or Affiliates of the Partnership or of any Equity Holder, including, without limitation, as follows:

      (i)     The Partnership shall either (A) maintain its principal executive office and telephone and facsimile numbers separate from that of any Affiliate of the Partnership or of any Equity Holder and shall

- 3 -

conspicuously identify such office and numbers as its own, or (B) shall allocate by written agreement fairly and reasonably any rent, overhead and expenses for shared office space. Additionally, the Partnership shall use its own separate stationery, invoices and checks which reflects its name, address, telephone number and facsimile number.

(ii)    The Partnership shall maintain correct and complete financial statements, accounts, books and records and other entity documents separate from those of any Affiliate of the Partnership or of any Equity Holder or any other person or entity. The Partnership shall prepare unaudited quarterly and annual financial statements, and the Partnership's financial statements shall substantially comply with generally accepted accounting principles.

(iii)   The Partnership shall maintain its own separate bank accounts, payroll and correct, complete and separate books of account.

(iv)    The Partnership shall file or cause to be filed its own separate tax returns.

(v)    The Partnership shall hold itself out to the public (including any of its Affiliates' creditors) under the Partnership's own name and as a separate and distinct entity and not as a department, division or otherwise of any Affiliate of the Partnership or of any Equity Holder.

(vi)    The Partnership shall observe all customary formalities regarding the existence of the Partnership, including holding meetings and maintaining current and accurate minute books separate from those of any Affiliate of the Partnership or of any Equity Holder.

(vii)   The Partnership shall hold title to its assets in its own name and act solely in its own name and through its own duly authorized officers and agents. No Affiliate of the Partnership or of any Equity Holder shall be appointed or act as agent of the Partnership, other than as a property manager or leasing agent with respect to the Property.

(viii)  Investments shall be made in the name of the Partnership directly by the Partnership or on its behalf by brokers engaged and paid by the Partnership.

(ix)    Except as required by Lender, the Partnership shall not guarantee, pledge or assume or hold itself out or permit itself to be held out as having guaranteed, pledged or assumed any liabilities or obligations of any Equity Holder or any Affiliate of the Partnership, nor shall it make any loan, except as permitted in the loan documents evidencing, securing or governing the Loan.

(x)    The Partnership is and will be solvent.

- 4 -

(xi)    Assets of the Partnership shall be separately identified, maintained and segregated. The Partnership's assets shall at all times be held by or on behalf of the Partnership and if held on behalf of the Partnership by another entity, shall at all times be kept identifiable (in accordance with customary usages) as assets owned by the Partnership. This restriction requires, among other things, that (A) funds of the Partnership shall be deposited or invested in the Partnership's name, (B) funds of the Partnership shall not be commingled with the funds of any Affiliate of the Partnership or of any Equity Holder, (C) the Partnership shall maintain all accounts in its own name and with its own tax identification number, separate from those of any Affiliate of the Partnership or of any Equity Holder, and (D) funds of the Partnership shall be used only for the business of the Partnership.

(xii)    The Partnership shall maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate of the Partnership or of any Equity Holder.

(xiii)    The Partnership shall pay or cause to be paid its own liabilities and expenses of any kind, including but not limited to salaries of its employees, only out of its own separate funds and assets.

(xiv)    The Partnership shall at all times be adequately capitalized to engage in the transactions contemplated at its formation.

(xv)    The Partnership shall not do any act which would make it impossible to carry on the ordinary business of the Partnership.

(xvi)    All data and records (including computer records) used by the Partnership or any Affiliate of the Partnership in the collection and administration of any loan shall reflect the Partnership's ownership interest therein.

(xvii)    No funds of the Partnership shall be invested in securities issued by, nor shall the Partnership acquire the indebtedness or obligation of, an Affiliate of the Partnership or of an Equity Holder.

(xviii)    The Partnership shall maintain an arm's length relationship with each of its Affiliates and may enter into contracts or transact business with its Affiliates only on commercially reasonable terms that are no less favorable to the Partnership than is obtainable in the market from a person or entity that is not an Affiliate of the Partnership or of any Equity Holder.

(xix)    The Partnership shall correct any misunderstanding that is known by the Partnership regarding its name or separate identity.

101685.000090/595137.05

(h)     Any indemnification obligation of the Partnership to the holder of any equity interest in the Partnership shall (i) be fully subordinated to the Loan, and (ii) not constitute a claim against the Partnership or its assets until such time as the Loan has been indefeasibly paid in accordance with its terms and otherwise has been fully discharged.

(i)     No general partner of the Partnership may be an individual. Each general partner of the Partnership shall at all times have as its sole purpose to act as the general partner of the Partnership, and shall be engaged in no other business or have any other purpose. Additionally, any additional or substitute general partner of the Partnership shall have organizational documents that (i) include covenants substantially similar to the foregoing provisions of this Section 1.3, inclusive of all single purpose/bankruptcy remote provisions, and (ii) are acceptable to Lender.

(j)     As used in this Section 1.3:

(i)     the term "**Affiliate**" means any person or entity which directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with a specified person or entity. For purposes of the definition of "Affiliate", the terms "control", "controlled", or "controlling" with respect to a specified person or entity shall include, without limitation, (A) the ownership, control or power to vote ten percent (10%) or more of (1) the outstanding shares of any class of voting securities or (2) beneficial interests, of any such person or entity, as the case may be, directly or indirectly, or acting through one or more persons or entities, (B) the control in any manner over the general partner(s) or the election of more than one director or trustee (or persons exercising similar functions) of such person or entity, or (C) the power to exercise, directly or indirectly, control over the management or policies of such person or entity.

(ii)     The term "**Constituent Entity**" means, with respect to any entity, (A) with respect to any limited partnership, (1) any general partner of such limited partnership and (2) any limited partner of such partnership which owns (or is owned by any person or entity owning, holding or controlling, directly or indirectly) the right to receive 50% or more of the income, distributable funds or losses of such partnership; (B) with respect to any general partnership or joint venture, any partner or venturer in such general partnership or joint venturer; (C) with respect to any corporation, (3) any officer or director of such corporation, and (4) any person or entity which owns or controls 50% or more of any class of stock of such corporation; (D) with respect to any limited liability company, (5) any manager of such limited liability company, (6) any managing member of such limited liability company, or the sole member of any limited liability company having only one (1) member, and (7) any non-managing member of such limited liability company which owns (or is owned by any person or entity owning, holding or controlling, directly or indirectly) the right to

- 6 -

receive 50% or more of the income, distributable funds or losses of such limited liability company; (E) any person or entity which controls any entity described in any of foregoing clauses (A) through (D) of this Section 1.3(j)(ii); and (F) any entity which is a "Constituent Entity" with respect to an entity which is a "Constituent Entity" of the subject entity. For all purposes of this Section 1.3 unless expressly noted, the terms "**control**" and "**controlled by**" shall have the meanings assigned to such terms in Rule 405 under the Securities Act of 1933, as amended. For the purposes of clause (E) of this Section 1.3(j)(ii), if entity "B" is a Constituent Entity of entity "A", then any Constituent Entity of "B" shall be deemed to be a "Constituent Entity of any entity of which "A" is a Constituent Entity.

(iii)    "**Organizational Documents**" shall mean, with respect to any entity, the documents customarily used to form an entity and provide for its governance, as the same may be amended from time to time, including, without limitation, (A) with respect to a corporation, the articles of incorporation or certificate of incorporation or charter, and the by-laws; (B) with respect to a limited liability company, the articles of organization and the operating agreement; (C) with respect to a limited partnership, the certificate of limited partnership and the limited partnership agreement; and (D) with respect to a general partnership, the agreement of partnership.

(iv)    A "**Secondary Market Transaction**" shall be (1) any sale of the loan documents evidencing, securing or governing the Loan to one or more investors as a whole loan, (2) a participation of the Loan to one or more investors, (3) a securitization of the Loan, (4) any other sale or transfer of the Loan or any interest therein to one or more investors.

(v)    "**Rating Agency**" shall mean any nationally-recognized statistical rating organization that has been designated by Lender to provide, or that provides, a rating on the Partnership, the Loan or any securities evidencing an interest in, inter alia, a trust or other entity which is the holder of the Note."

3.    Authorization to Refinance Loan.  The Partnership is hereby authorized to refinance the loan secured by the Property, substantially upon the terms and conditions set forth in Paragraph 4 below.  The Partners agree that the General Partner is authorized to execute and deliver all loan documentation, including the promissory note, deed of trust, assignment of rents and leases, financing statements and any and all other instruments, assignment instruments, documents, agreements, certificates and applications that may be required or it deems necessary or desirable in connection with the Loan (collectively, the "**Loan Documents**").  The Partners further agree that the General Partner is hereby authorized and directed to (i) negotiate and document any and all changes and modifications to the terms of the Loan or the Loan Documents, or any refinancing of the Loan, as are determined to be reasonable and appropriate by the General Partner, such

- 7 -

determination to be conclusively evidenced by the General Partner's execution of such documentation, and (ii) make any and all further amendments to the Partnership Agreement with respect to the Loan, or with respect to any future Financings, as are determined to be reasonable and appropriate by the General Partner, such determination to be conclusively evidenced by the General Partner's execution of such amendments. The foregoing provision is deemed to be added to and made a part of Section 1.8 (Purchase Agreement; Tenant in Common Arrangement; Loan) of the Partnership Agreement.

4.      <u>Financing</u>.   The fourth (4th) and fifth (5th) full paragraphs of Section 1.8 of the Partnership Agreement are hereby deleted and replaced with the following:

"It is anticipated that the Loan will be an aggregate principal amount of $7,250,000 and otherwise on the following terms:

- RATE: Interest only at floating rate of 2.5% above one month LIBOR.

- TERM: 3 years, with 1-year extension available for one-half point.

- PREPAYMENT: Locked out for first 3 months, then open to prepayment at anytime.

- CIBC FEE: 1%.

- BROKER FEE: 1%.

- EXIT FEE: 1% unless CIBC gets new loan from sale or refinance, then exit fee waived.

- RECOURSE: 25% against principal, plus carve-outs from partial exculpation.

The Loan will include such other terms and provisions as may be negotiated by the General Partner pursuant to the provisions of this Section 1.8."

5.      <u>General Partner</u>.  The Limited Partnership Agreement of the General Partner will be amended to include provisions similar to the provisions set forth in Paragraph 2 of this Amendment.  Such amendments are hereby acknowledged and approved by the Partners, and the Partners further acknowledge and agree that, pursuant to this Amendment, Section 7.7 of the Limited Partnership Agreement, to the extent contrary, is qualified hereby.

6.      <u>Further Amendments to Partnership Agreement</u>.

(a)     Section 5.8 of the Partnership Agreement is hereby deleted in its entirety.

(b)     Section 7.4(a)(i) of the Partnership Agreement is hereby amended and restated in its entirety as follows:

- 8 -

"The sale, exchange, lease or other transfer of any asset of the Partnership having a value in excess of Four Hundred Thousand Dollars ($400,000);"

(c)   The following sentence is hereby added to the end of Section 12.11 of the Partnership Agreement:

"Notwithstanding anything in this Article 12 to the contrary, the Partnership shall not be dissolved in violation of Section 1.3 hereof."

(d)   The reference to "Lender" in Section 15.1(d) of the Partnership Agreement, and all other references to "Lender" as set forth in the Partnership Agreement, shall be deemed to mean the "Lender" as defined in Section 1.3. The reference to "Bank Loan" in Section 15.1(d) of the Partnership Agreement is hereby amended to read "Loan", and all references to "Loan" as set forth in the Partnership Agreement shall be deemed to mean the "Loan" as defined in Section 1.3.

(e)   All references in the Partnership Agreement to "Project" are hereby amended to read "Property".

(f)   Subject to the unanimous consent and approval of this Amendment by all Partners, the last sentence of Section 14.2 of the Partnership Agreement is hereby deleted in its entirety.

7.   Miscellaneous

(a)   This Amendment may be executed in two or more counterparts and via facsimile, each of which shall be considered an original instrument, but all of which together shall be considered one and the same agreement. With the exception of the amendment set forth in Section 6(f) above, which requires the unanimous consent of all Partners, this Amendment is made and shall be effective on the Effective Date hereof upon the Partnership's receipt of executed counterparts from the General Partner and a Majority in interest of the Limited Partners.

(b)   Except as and to the extent amended by this Amendment, the Partnership Agreement shall remain in full force and effect in accordance with its terms. This Amendment shall be construed as one with the Partnership Agreement, and the Partnership Agreement shall, where the context requires, be read and construed throughout so as to incorporate this Amendment.

(c)   This Amendment has been prepared by Procopio, Cory, Hargreaves & Savitch, LLP, counsel to the General Partner. Each Limited Partner is advised to seek the advice of its own independent legal counsel in connection with the execution of this Amendment.

(d)   The Partners acknowledge and agree that all costs and expenses incurred by the Partnership and the General Partner in connection with the negotiation of the Loan and the preparation of all agreements, instruments, certificates and other documents related thereto, including, without limitation, this Amendment, are

- 9 -

expenses of the Partnership and shall be paid by the Partnership in accordance with Section 6.10 of the Partnership Agreement.

(e)    To facilitate the timing requirements for obtaining the Loan, the Partners hereby waive any and all obligations to give prior notice or other time period requirements associated with the consideration and execution of this Amendment and all related documentation.

IN WITNESS WHEREOF, the undersigned Partners have approved this Amendment as of the date first above written.

GENERAL PARTNER:

BNC FRANCES, L.P.,
a Delaware limited partnership

By:    BNC INVESTMENTS LLC, a Delaware
       limited liability company
Its:   Sole General Partner

By: _____
      Barry S. Nussbaum, Manager

[SIGNATURE PAGES FOR LIMITED PARTNERS FOLLOW]

101685.000090/595117.05

LIMITED PARTNERS:

_____ Tᴛᴇᴇ
GELBART FAMILY TRUST

_____
SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST

_____
GABRIEL B. WISDOM

_____
NOONAN AND ZWICKEL PARTNERSHIP

_____
BARRY OWEN MOORES

TEAM WEALTH INVESTORS, L.P.

By: _____
Name:
Title:

_____
JACK ZEMER

LIMITED PARTNERS:

_Gelbart Family Trust_
GELBART FAMILY TRUST

_Samuel Gelbart &
Frances Gelbart as Trustees of Gelbart family Trust_
SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST


GABRIEL B. WISDOM


NOONAN AND ZWICKEL PARTNERSHIP


BARRY OWEN MOORES


TEAM WEALTH INVESTORS, L.P.


By: _____
Name:
Title:


JACK ZEMER.


- 11 -

101615.000090/593137.05

LIMITED PARTNERS:

_____

GELBART FAMILY TRUST

_____

SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST

_Gabriel B. Wisdom_

GABRIEL B. WISDOM

_____

NOONAN AND ZWICKEL PARTNERSHIP

_____

BARRY OWEN MOORES

TEAM WEALTH INVESTORS, L.P.

By: _____
Name:
Title:

_____

JACK ZEMER

- 11 -

LIMITED PARTNERS:

_____

GELBART FAMILY TRUST

_____

SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST

_____

GABRIEL B. WISDOM

_____

NOONAN AND ZWICKEL PARTNERSHIP

_____

BARRY OWEN MOORES

TEAM WEALTH INVESTORS, L.P.

By: _____
Name:
Title:

_____

JACK ZEMER

- 11 -

LIMITED PARTNERS:

_____
GELBART FAMILY TRUST

_____
SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST

_____
GABRIEL B. WISDOM

_____
NOONAN AND ZWICKEL PARTNERSHIP

_____
BARRY OWEN MOORES

TEAM WEALTH INVESTORS, L.P.

By: _____
Name:
Title:

_____
JACK ZEMER

- 11 -

LIMITED PARTNERS:


_____
GELBART FAMILY TRUST


_____
SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST


_____
GABRIEL B. WISDOM


_____
NOONAN AND ZWICKEL PARTNERSHIP


_____
BARRY OWEN MOORES


TEAM WEALTH INVESTORS, L.P.

By: _____
Name: *RICHARD GELBART*
Title: *PRESIDENT*


_____
JACK ZEMER

101685.000090/595137.05

LIMITED PARTNERS:

_____

GELBART FAMILY TRUST

_____

SAMUEL & FRANCES GELBART AS
TRUSTEES OF THE GELBART FAMILY
TRUST

_____

GABRIEL B. WISDOM

_____

NOONAN AND ZWICKEL PARTNERSHIP

_____

BARRY OWEN MOORES

TEAM WEALTH INVESTORS, L.P.

By: _____
Name:
Title:

_____

JACK ZEMER

SECOND AMENDMENT

## SECOND AMENDMENT TO
## LIMITED PARTNERSHIP AGREEMENT OF
## BNC FRANCES VILLAS, L.P.

THIS SECOND AMENDMENT TO LIMITED PARTNERSHIP AGREEMENT OF BNC FRANCES VILLAS, L.P. (this "**Amendment**") is made and effective as of June 18, 2006 (the "**Effective Date**") by and pursuant to the authority of BNC Frances, L.P., a Delaware limited partnership, the general partner ("**General Partner**") of BNC Frances Villas, L.P., a Delaware limited partnership (the "**Partnership**"). Capitalized terms used and not otherwise defined in this Amendment have the same respective meanings given to such terms in the Partnership Agreement (as defined herein).

### RECITALS:

WHEREAS, the Partners of the Partnership have entered into that certain Limited Partnership Agreement, dated effective as of October 20, 2000, as amended by that certain First Amendment to Limited Partnership Agreement of BNC Frances Villas, L.P. and Consent dated effective as of June 14, 2006 (the "**First Amendment**") (collectively, the "**Partnership Agreement**"), in accordance with the Delaware Revised Uniform Limited Partnership Act, as the same may be amended from time to time (the "**Act**"); ·

WHEREAS, the Partnership's current loan with GE Capital Commercial Mortgage Corporation, its current lender, is due and payable and the proposed new lender, CIBC Inc. ("**Lender**"), is estimating its loan to the Partnership to be in the aggregate amount of $7,250,000 (the "**Loan**") but is now requiring, in order to make such loan, that all third-party debts (other than trade payables and similar debts incurred in the ordinary course of business) be converted into equity interests in the Partnership;

WHEREAS, the Partners, pursuant to the First Amendment, have previously approved the Loan and authorized the General Partner to negotiate and document any and all changes and modifications to the terms of the Loan and related documents and to make any and all further amendments to the Partnership Agreement with respect to the Loan;

WHEREAS, the Partnership owes principal in the aggregate amount of $1,900,000 (the "**Debt**"), in the respective amounts set forth opposite each creditor's name as set forth in Table 1 below (the "**Respective Creditor Debt(s)**"), plus accrued, unpaid interest and exit fees thereon in the aggregate amount of $429,807 (the "**Premium**"), to the following creditors (the "**Creditors**"), in the following amounts:

[Table 1 begins on next page]

101685.000090/614119.04

Table 1

| Creditor | Respective Creditor Principal Debt(s) ("Principal") | Accrued and Unpaid Interest as of 6/18/06 by Creditor ("Interest") | Aggregate Principal Plus Interest by Creditor ("Total") | Exit Fee (if loan paid and fee paid) as of 6/18/06 by Creditor | Aggregate Interest Plus Exit Fee by Creditor ("Premium") |
|---|---|---|---|---|---|
| Jerry Ruyan | $600,000 | $105,900 | $705,900 | $60,000 | $165,900 |
| Zenvest LLC | $300,000 | $51,900 | $351,900 | $30,000 | $81,900 |
| Plaza Del Sol Real Estate Trust | $1,000,000 | $82,007 | $1,082,007 | $100,000 | $182,007 |

WHEREAS, the above-referenced debts of the Partnership are made pursuant to certain promissory notes with each of the Creditors, each dated on or about June or July of 2005 (the "Notes"), which Notes each carry an annual interest rate of 18% on the outstanding Principal balance owed thereunder;

WHEREAS, pursuant to those certain Debt Conversion Agreements by and between the Partnership and each of the Creditors of even date herewith (the "Conversion Agreements"), in the form(s) previously reviewed and approved by the General Partner, the Partnership and the Creditors desire to convert their respective Principal plus Premium (together, their "Conversion Amount") into limited partnership interests of the Partnership and cancel their Notes;

WHEREAS, under Article 4 of the Partnership Agreement distributions of Cash Receipts and Sale and Residual Proceeds by the Partnership are currently applied first to pay all outstanding debts and obligations of the Partnership, which includes the Notes;

WHEREAS, the Class A Limited Partners, as Creditors, currently possess a priority to Partnership distributions over all the Partners, as noted in the preceding recital;

WHEREAS, as a result of converting their Conversion Amount and canceling their Notes, the Creditors, pursuant to their Conversion Agreements (by which the Creditors are also entering into the Partnership Agreement, as amended hereby) will be designated "Class A Limited Partners" and hold Class A limited partnership interests in the Partnership;

WHEREAS, the Class A Limited Partners will possess, over all other Partners, a priority to distributions made by the Partnership to the extent of their Conversion Amount plus a 10% "Class A Priority Return" on their respective Total (reflected in Table 1), as set forth in this Amendment;

101685.000090/614119.04

WHEREAS, the Class A Limited Partners currently possess under the terms of their Notes the right to earn 18% on the outstanding Principal balance owed under their Notes;

WHEREAS, the Class A Limited Partners will not have the right to vote on any Partnership matters under the terms of the Partnership Agreement, as amended hereby; and

WHEREAS, the cancellation of the Notes and conversion of the Conversion Amount into Class A limited partnership interests, the addition of the Class A Limited Partners to the Partnership, and the amendment of the Partnership Agreement to provide the Class A Limited Partners with their priority return, without providing the Class A Limited Partners with the right to vote on any Partnership matters, is structured to allow the Partnership to obtain the Loan and convert and cancel the outstanding obligations to the Creditors under the Notes, as required by Lender, while substantially maintaining the relative rights, preferences and privileges of the existing Limited Partners, vis-à-vis the Creditors, on an as-converted basis.

## Amendment

NOW, THEREFORE, the Partnership Agreement is hereby amended as set forth below:

1.  **Admission of Class A Limited Partners.** In order to obtain the Loan, as required by Lender, each of the Conversion Agreements is hereby approved and the Partnership is hereby authorized to execute, deliver and perform the Conversion Agreements in accordance with their respective terms. Furthermore, and notwithstanding anything in the Partnership Agreement to the contrary, each of Jerry Ruyan, Zenvest LLC, and Plaza Del Sol Real Estate Trust is, subject to and conditioned upon such party's execution and delivery of its respective Conversion Agreement, hereby admitted to the Partnership as a Class A Limited Partner as of the Effective Date of this Amendment. For purposes hereof, a "Class A Limited Partner" shall mean each of Jerry Ruyan, Zenvest LLC, and Plaza Del Sol Real Estate Trust, respectively, and the "Class A Limited Partners" shall mean all of them, collectively, together with such additional terms, conditions, rights, preferences, privileges, restrictions and obligations applicable to such Class A Limited Partners as holders of Class A Limited Partner Interests in the Partnership, as set forth in the Partnership Agreement, as amended hereby, and in each case subject to and conditioned upon such party's execution and delivery of its respective Conversion Agreement. Subject to and upon admission to the Partnership, each Class A Limited Partner shall be credited with an initial Capital Account and Capital Contribution balance equal to their respective Principal, as set forth below:

| Class A Limited Partner | Principal/initial Capital Contribution |
|---|---|
| Jerry Ruyan | $600,000 |
| Zenvest LLC | $300,000 |
| Plaza Del Sol Real Estate Trust | $1,000,000 |

- 3 -

The foregoing provisions are hereby added to and made a part of Section 1.8 of the Partnership Agreement, and the Limited Partnership Agreement is amended hereby to include the same.

2.    Allocation of Profits.  Section 4.1 of the Partnership Agreement is hereby amended so that the Class A Limited Partners are included in the reference to Limited Partners under Section 4.1(a)(i) (Profits allocated to extent of prior Losses) but are not included in any other Profit allocations under Section 4.1(a).

3.    Allocation of Losses.  Sections 4.1(b)(iii), (iv) and (v) of the Partnership Agreement are hereby amended and restated to read in their entirety as follows:

"(iii)    Third, to the Limited Partners (other than the Class A Limited Partners) in the ratio of their Percentage Interests, until the positive Adjusted Capital Account Balances of such Limited Partners are reduced to zero;

(iv)    Fourth, to the Class A Limited Partners on a pro-rata basis until the positive Capital Account balances of the Class A Limited Partners are reduced to zero; and

(v)    Finally, the balance of Losses, if any, shall thereafter be allocated to the General Partner."

4.    Distributions.  Section 4.2 of the Partnership Agreement is hereby amended and restated to read in its entirety as follows:

"4.2    Application and Distribution of Cash Receipts and Sale and Residual Proceeds.  Cash Receipts and Sale and Residual Proceeds shall be applied or distributed, as the case may be, in the following order of priority:

(a)    To pay all outstanding debts and obligations of the Partnership (to the extent that such debts and liabilities are currently due), including debts owed to any Partner or Affiliate thereof;

(b)    To establish or add to any Reserves;

(c)    To distribute any Cash Receipts or Sale and Residual Proceeds not disbursed or reserved in accordance with the foregoing provisions, if any, to the Class A Limited Partners as follows:

(i)    First, to each Class A Limited Partner on a pro-rata basis until each Class A Limited Partner has received an amount equal to (A) its cumulative 10% Class A Priority Return as of the end of the calendar month preceding the month during which such distribution is made, less (B) the sum of all 10% Class A Priority Return distributions previously made to such Class A Limited Partner pursuant to this Section 4.2(c)(i);

- 4 -

(ii)    Second, to each Class A Limited Partner on a pro-rata basis until each Class A Limited Partner has received an amount equal to (A) such Class A Limited Partner's Premium, less (B) the sum of all distributions previously made to such Class A Limited Partner pursuant to this Section 4.2(c)(ii); and

(iii)    Third, to each Class A Limited Partner, pro rata, until each of the Class A Limited Partners has received an amount equal to such Class A Limited Partner's Adjusted Capital Contribution as of the date on which such distribution is made.

All payments made to the Class A Limited Partners pursuant to Section 4.2(c)(i) and (c)(ii) above (i.e., all payments comprising all or any portion of the 10% Class A Priority Return and return of Premium) are and shall be deemed guaranteed payments (e.g., treated like interest) pursuant to and in accordance with Section 707(c) of the Code.

(d)    After application, reserve or distribution of Cash Receipts or Sale and Residual Proceeds made pursuant to the foregoing provisions of this Section 4.2, the balance of any Cash Receipts or Sale and Residual Proceeds, if any, shall be distributed to the Partners, excluding the Class A Limited Partners, as follows:

(i)    First, to each such Partner on a pro-rata basis until each such Partner has received an amount equal to (A) its cumulative 10% Priority Return as of the end of the calendar month preceding the month during which such distribution is made, less (B) the sum of all Priority Return distributions previously made to such Partner pursuant to this Section 4.2(d)(i);

(ii)    Second, to each such Partner, pro rata, until each of such Partners has received an amount equal to such Partner's Adjusted Capital Contribution as of the date on which such distribution is made; and

(iii)    Thereafter, to distribute any Cash Receipts or Sale and Residual Proceeds not disbursed or reserved in accordance with the foregoing provisions of this Section 4.2(d) to such Partners in proportion to their respective Percentage Interests.  All references to Percentage Interests hereunder shall refer to the Percentage Interests as of the date of such distribution.

Any Cash Receipts or Sale and Residual Proceeds available for distribution to the Partners shall be distributed to the Partners at such times as are determined in the discretion of the General Partner.  All references to Percentage Interests under this Article 4 shall refer to the Percentage Interests as of the date of such distribution."

5.    Special Tax Provisions. Section 4.3 of the Partnership Agreement is hereby amended and restated to read in its entirety as follows:

"4.3    Special Tax Provisions.  Sections 4.4 through Section 4.14 are set forth on Exhibit C attached hereto and incorporated herein (and each shall apply to all Partners, including the Class A Limited Partners)."

101685.000090/614119.04

6.    Further Amendments to Partnership Agreement.

(a)    "10% Class A Priority Return" is hereby added as a defined term to the Partnership Agreement and means a sum equivalent to ten percent (10%) per annum of the respective "Total" of a Class A Limited Partner (as defined and set forth opposite each Class A Limited Partner's name below) beginning as of June 18, 2006, and it is cumulative but not compounded (but prorated for any partial year).

| Class A Limited Partner | Total |
|---|---|
| Jerry Ruyan | $705,900 |
| Zenvest LLC | $351,900 |
| Plaza Del Sol Real Estate Trust | $1,082,007 |

(b)    "Premium" is hereby added as a defined term to the Partnership Agreement and means the amount set forth opposite each Class A Limited Partner's name, as set forth below:

| Class A Limited Partner | Premium |
|---|---|
| Jerry Ruyan | $165,900 |
| Zenvest LLC | $81,900 |
| Plaza Del Sol Real Estate Trust | $182,007 |

(c)    Except as otherwise provided in Sections 2, 3, 4 and 5 above (i.e., except as otherwise provided in Article 4 of the Partnership Agreement as amended hereby), and notwithstanding any other term or provision in the Partnership Agreement to the contrary, all references in the Partnership Agreement to "Limited Partner" or "Limited Partners", or to "Partner" or "Partners", are hereby amended to include the Class A Limited Partners, except as set forth below:

(i)    The Class A Limited Partners shall not be entitled to vote on any Partnership matters, and all provisions and references in the Partnership Agreement requiring the vote, approval, election, confirmation, ratification,

101683.000090/614119.04

consent or other authorizing action or agreement of the "Limited Partners" or "Partners", including the right to receive notice of or attendance at, or to call, a meeting of the Limited Partners or Partners for purposes of voting on or otherwise approving a Partnership matter, shall exclude the Class A Limited Partners;

(ii)     To the extent the Act provides that certain rights of limited partners to vote on certain partnership matters may not be eliminated or varied by agreement (i.e., by the Partnership Agreement, as amended hereby), each of the Class A Limited Partners, by and upon entering into the Partnership Agreement, hereby grants the General Partner its irrevocable proxy to vote on any such matters on its behalf, to the extent allowed by the Act, and appoints the General Partner its attorney-in-fact for such purposes in accordance with Section 15.1 of the Partnership Agreement;

(iii)    The defined term "Majority in interest of the Limited Partners" and all references in the Partnership Agreement to a Majority in interest of the Limited Partners shall exclude the Class A Limited Partners;

(iv)    The defined term "Percentage Interest" and all references in the Partnership Agreement to Percentage Interest shall exclude the Class A Limited Partners as holders of the Class A Limited Partner Interests.

(v)     The defined term "Priority Return" or "10% Priority Return" and all referenced in the Partnership Agreement to "Priority Return" or "10% Priority Return", or to the Limited Partners in connection with the same, shall exclude the Class A Limited Partners; and

(vi)    Notwithstanding anything in the Partnership Agreement to the contrary, no Substituted Limited Partner of a Class A Limited Partner Interest shall be entitled to vote on any Partnership matters.

(d)     The second sentence of Section 2.4 of the Partnership Agreement is hereby amended and restated to read in its entirety as follow:

"Thereafter, the Partnership intends to sell and issue a minimum of Two Million Dollars ($2,000,000) and a maximum of Two Million Three Hundred Thousand Dollars ($2,300,000) of Limited Partner Interests (other than the Class A Limited Partner Interests) and, in addition, such amount of Class A Limited Partner Interests as are determined to be reasonable and appropriate by the General Partner."

(e)     The first sentence of Section 3.1 of the Partnership Agreement is hereby amended and restated to read in its entirety as follows:

"Subject to the issuance of the Class A Limited Partner Interests as provided herein, the Partnership shall have an initial cash capitalization of not less than Two Million Dollars ($2,000,000) and not more than Two Million Three Hundred Thousand Dollars ($2,300,000), all of which shall be contributed by the Partners

- 7 -

(other than the Class A Limited Partners) in cash in the proportions set forth on Exhibit A."

(f)    In light of the amendment previously made to Section 14.2 of the Partnership Agreement pursuant to Section 6(f) of the First Amendment, Section 7.4(b) (Voting Rights of Limited Partners; Approval of Certain Amendments) of the Partnership Agreement is hereby deleted in its entirety.

(g)    The defined term "Adjusted Capital Contribution" is hereby amended and restated to read in its entirety as follows:

"'Adjusted Capital Contribution' means, as of any day, a Partner's Capital Contributions adjusted as follows:

(i)    Increased by the amount of any Partnership liabilities which, in connection with distributions pursuant to Sections 4.2(c)(iii), 4.2(d)(ii) and 12.7(c) hereof, are assumed by such Partner or are secured by any Partnership Property distributed to such Partner, and

(ii)    Reduced by (i) the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to Sections 4.2(c) or (d) hereof, and (ii) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

In the event any Partner transfers all or any portion of its Interest in accordance with the terms of this Agreement, its transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Interest."

7.    Miscellaneous

(a)    This Amendment may be executed in two or more counterparts and via facsimile, each of which shall be considered an original instrument, but all of which together shall be considered one and the same agreement. This Amendment is made and shall be effective on the Effective Date hereof; provided that, at least one (1) of the Creditors elects to convert its Conversion Amount by executing and delivering its Conversion Agreement to the Partnership in accordance with the terms thereof, pursuant to which such Creditor shall become a Class A Limited Partner of the Partnership.

(b)    Except as and to the extent amended by this Amendment, the Partnership Agreement shall remain in full force and effect in accordance with its terms. This Amendment shall be construed as one with the Partnership Agreement, and the Partnership Agreement shall, where the context requires, be read and construed throughout so as to incorporate this Amendment.

(c)     The Partners acknowledge and agree that all costs and expenses incurred by the Partnership and the General Partner in connection with the negotiation of the Loan and the preparation of all agreements, instruments, certificates and other documents related thereto, including, without limitation, this Amendment, are expenses of the Partnership and shall be paid by the Partnership in accordance with Section 6.10 of the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has approved this Amendment as of the date first above written.

GENERAL PARTNER:

BNC FRANCES, L.P.,
a Delaware limited partnership

By:    BNC INVESTMENTS LLC, a Delaware
       limited liability company
Its:    Sole General Partner

By: _____
      Barry S. Nussbaum, Manager

- 9 -

CERTIFICATE OF LIMITED PARTNERSHIP

*State of Delaware*

*Office of the Secretary of State*          PAGE   1

---

    I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "BNC FRANCES

VILLAS, L.P.", FILED IN THIS OFFICE ON THE TWENTIETH DAY OF

OCTOBER, A.D. 2000, AT 9 O'CLOCK A.M.

 

*Edward J. Freel, Secretary of State*

AUTHENTICATION: 0747479

3305213  8100

001530384

DATE: 10-20-00

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/20/2000
001530354 - 3305213

# STATE *of* DELAWARE
## CERTIFICATE *of* LIMITED PARTNERSHIP
### *of*
### BNC FRANCES VILLAS, L.P.

The undersigned, desiring to form a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act, Title 6 Delaware Code, Chapter 17, hereby certifies as follows:

FIRST:   The name of the limited partnership is BNC Frances Villas, L.P.

SECOND:   The address of the limited partnership's registered office in the State of Delaware and the name of its registered agent for service of process at such address are:

CorpAmerica, Inc.
30 Old Rudnick Lane
Dover, DE  19901

THIRD:   The name and mailing address of each general partner of the limited partnership is as follows:

BNC FRANCES, L.P.
13151 Emily Road, Suite 250
Dallas, Texas  75240

IN WITNESS WHEREOF, the undersigned general partner has executed this Certificate of Limited Partnership of BNC Frances Villas, L.P. as of October 19, 2000.

BNC FRANCES, L.P.,
a Delaware limited partnership

By: BNC INVESTMENTS LLC,
    a Delaware limited liability company,
    its sole general partner

By: __/s/ Barry S. Nussbaum_____
Barry S. Nussbaum, Manager

101555 000005254507.1

Promissory Note:

| | |
|---|---|
| <u>Borrower:</u> | BNC Frances Villas, L.P. a Delaware limited partnership |
| Borrower's Mailing Address: | 13151 Emily Road, Suite 250<br>Dallas, Texas 75240-8995 |
| <u>Lender:</u> | Zenvest LLC |
| <u>Place for Payment:</u> | 940 Southwood(Suite 200),<br>Incline Village, CA.  89451 |
| <u>Principal Amount:</u> | Three Hundred Thousand ($300,000) |
| <u>Promissory Note Date:</u> | July 7, 2005 |
| <u>Annual Interest Rate:</u> | 18%, computed as Simple Interest and not to be compounded.  Interest shall be payable to the extent that cash flow is available from the operation of the Property for the payment of interest. |
| <u>Maturity Date:</u> | December 30, 2006 |

<u>Annual Interest Rate on Matured, Unpaid Amounts:</u>  18%, computed as Simple Interest and not to be compounded. In addition, Borrower shall pay a one time exist fee equal to 10% of the amount funded, prorated on an annual basis, due upon payoff of the note. For example if the loan is paid off in six months, 5% of the amount funded shall be due as an exit fee. Exit fee is capped at 10% over the life of the loan.

<u>Terms of Payment:</u> (principal and interest): Payable in full on  December 30, 2006, or upon  the sale of the collateral described in Exhibit "A" hereto.

Both Principal and Interest shall be payable in full at maturity.  Borrower reserves the right to prepay all or any portion of the principal balance, without penalty.

<u>Security for Payment:</u>      Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due at the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower is responsible for all obligations represented by this Promissory Note ("Note").

Borrower also promises to pay reasonable attorney's fees and court and other costs if this Note is placed in the hands of an attorney to collect or enforce the Note after breach. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. These expenses and interest will become part of the Note.

Interest on the debt evidenced by this Note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this Note and all other instruments concerning the debt.

1

Lender may transfer this Note, and the rights and privileges of Lender under this Note shall inure to the benefit of the Lender's successors and assigns.

Time is of the essence of this Note. This Note shall be interpreted, construed, and enforced in accordance with the laws of the State of Texas, without regard to conflicts of laws principles. Where the context so requires references to any gender shall include the others and, when the context requires, singular nouns and pronouns include the plural, and vice versa. If any term, covenant, condition, agreement, representation, or warranty of the Note or the application thereof to any person or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant, condition, agreement, representation or warranty of this Note shall be valid and enforced to the fullest extent permitted by law.

If any term or provision contained herein shall be held by any court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable, then this Note shall be read as if such invalid, illegal, or otherwise unenforceable provision were not included, except that interest shall continue to accrue at the highest interest rate permissible by law, and this loan shall be payable on or before the Maturity Date shown herein.

Any dispute or controversy arising out of, under, or in connection with, or in relation to this Note, or the breach hereof, shall be determined and settled by arbitration to be held before one impartial arbitrator in Dallas, Texas, in accordance with then applicable commercial arbitration rules of the American Arbitration Association. In the event the parties cannot agree to the appointment of an arbitrator, an arbitrator shall be appointed in accordance with the Texas Rules of Civil Procedure. Any arbitration shall allow for production of relevant documents and depositions, and sanctions, at the discretion of the arbitrator, for failure to comply with any such discovery requests.

Venue for any litigation to enforce any provision of this Note shall be in Dallas County, Texas.

(SIGNATURE PAGE TO FOLLOW)

BNC FRANCES VILLAS, L.P.
a Delaware limited partnership

     By:     BNC Frances, L.P.
                A Delaware limited partnership,
                its sole general partner

           By:     BNC Investments, LLC,
             a Delaware limited liability company
                  its sole general partner

                By:   _____
                        Barry S. Nussbaum, Sole Manager


BNC FRANCES OAKS LLC,
a Delaware limited liability company

     By:     BNC Frances Oaks Investments, LLC,
                a Delaware limited liability company
                Its sole manager

           By:   _____
                Barry S. Nussbaum, Manager


BNC FRANCES TRAILS LLC,
a Delaware limited liability company

     By:     BNC Frances Trails LLC,
                 a Delaware limited liability company
                Its sole manager
           By:   _____
                Barry S. Nussbaum, Manager

## EXHIBIT A

### LEGAL DESCRIPTION

BEING SITUATED IN THE WD REED SURVEY, ABSTRACT NO. 1260, CITY OF RICHARDSON, DALLAS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A SET 6/8 INCH IRON ROD AT THE SOUTHEAST INTERSECTION OF FRANCES WAY (60 FOOT RIGHT-OF-WAY) AND SOUTH BOWSER ROAD (80 FOOT RIGHT-OF-WAY);

THENCE NORTH 89 DEGREES 51 MINUTES 20 SECONDS EAST ALONG THE SOUTH LINE OF FRANCES WAY 871.95 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER AT THE POINT OF BEGINNING OF CURVE;

THENCE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1402.40 FEET THROUGH A CENTRAL ANGLE OF 09 DEGREES 16 MINUTES 11 SECONDS A DISTANCE OF 226.89 FEET TO A SET 5/8 INCH IRON ROD FOR CORNER;

THENCE SOUTH 00 DEGREES 18 MINUTES 00 SECONDS WEST ALONG THE WEST LINE OF BRIARCREST DRIVE (60 FOOT RIGHT-OF-WAY) 339.18 FEET TO A POINT FOR CORNER, FROM SAID POINT, THE END OF A WALL BEARS NORTH 47 DEGREES 26 MINUTES 42 SECONDS WEST, A DISTANCE OF 0.4 FEET;

THENCE NORTH 89 DEGREES 42 MINUTES 10 SECONDS WEST ALONG THE NORTH LINE OF A 15 FOOT ALLEY IN BLOCK A, COLLEGE PARK NORTH, AN ADDITION TO THE CITY OF RICHARDSON, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 7345, AT PAGE 1066 OF THE DEED RECORDS OF DALLAS COUNTY, TEXAS, 282.27 FEET TO A POINT FOR CORNER, FROM SAID POINT A WALL CORNER BEARS NORTH 23 DEGREES 15 MINUTES 46 SECONDS WEST, A DISTANCE OF 1.4 FEET;

THENCE SOUTH 18 DEGREES 33 MINUTES 50 SECONDS WEST 251.26 FEET TO A POINT FOR CORNER FROM SAID POINT A WALL BEARS NORTH 00 DEGREES 26 MINUTES 56 SECONDS WEST, A DISTANCE OF 1.7 FEET;

THENCE SOUTH 63 DEGREES 46 MINUTES 40 SECONDS WEST 28.18 FEET TO A POINT FOR CORNER FROM SAID POINT A WALL CORNER BEARS NORTH 16 DEGREES 08 MINUTES 06 SECONDS WEST, A DISTANCE OF 0.8 FEET;

THENCE NORTH 71 DEGREES 00 MINUTES 00 SECONDS WEST, 85.41 FEET TO A SET 5/8 INCH IRON ROD FOR THE BEGINNING POINT OF CURVE;

101695.000006/521222.02

THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 953.25 FEET A CENTRAL ANGLE OF 24 DEGREES 58 MINUTES 00 SECONDS A DISTANCE OF 415.38 FEET TO A SET "X" IN WALL AT THE END OF CURVE;

THENCE SOUTH 84 DEGREES 02 MINUTES 00 SECONDS WEST AND CONTINUING ALONG THE NORTH LINE OF THE 15 FOOT ALLEY 404.97 FEET TO A POINT FOR CORNER. FROM SAID POINT, THE END OF A WALL BEARS NORTH 38 DEGREES 33 MINUTES 29 SECONDS EAST, A DISTANCE OF 0.4 FEET;

THENCE IN A NORTHEASTERLY DIRECTION ALONG THE SOUTHEAST LINE OF SOUTH BOWSER ROAD (80 FOOT RIGHT-OF-WAY) ALONG A CURVE TO THE RIGHT WHOSE CHORD BEARS NORTH 16 DEGREES 35 MINUTES 05 SECONDS EAST, A CHORD DISTANCE OF 269.86 FEET. SAID CURVE HAVING A RADIUS OF 390.00 FEET, A CENTRAL ANGLE OF 43 DEGREES 37 MINUTES 50 SECONDS, AN ARC DISTANCE OF 296.98 FEET TO A SET 5/8 INCH IRON ROD AT POINT OF REVERSE CURVE;

THENCE ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 470.00 FEET, A CENTRAL ANGLE OF 38 DEGREES 30 MINUTES 00 SECONDS, A DISTANCE OF 315.82 FEET TO A SET 5/8 INCH IRON ROD AT END OF CURVE;

THENCE NORTH 00 DEGREES 06 MINUTES 00 SECONDS WEST 0.87 FEET TO THE POINT OF BEGINNING AND CONTAINING 13.5891 ACRES (591,940 SQUARE FEET) OF LAND; MORE OR LESS.

101695 000006/61233.03

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Western Case Management Center*

November 6, 2009

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 877-528-0880 facsimile: 559-490-1919
internet: http://www.adr.org/

**VIA FACSIMILE AND
REGULAR MAIL**

Cynthia G. Iliff, Esq.
California Business Law Group, PC
Symphony Towers
750 B Street, Suite 1620
San Diego, CA 92101

**VIA REGULAR MAIL ONLY**

Daniel S. Levinson
990 Highland Drive, Suite 206
Solana Beach, CA 92075

Roger Artz
Plaza Del Sol Real Estate Trust
3545 Aero Court
San Diego, CA 92123

Re: 73 148 Y 03300 09 GLO
    Zenvest LLC
    and
    BNC Frances Villas, L.P. and BNC Frances, LP
    and BNC Investments LLC and BNC Frances Oaks LLC
    and BNC Frances Trails LLC and Barry Nussbaum
    and Richard Gelbert and Suzanne Stubblefield
    and
    Roger Artz Trustee of Plaza Del Sol Real Estate

Dear Counsel,

Thank you for choosing the American Arbitration Association (AAA). The AAA is committed to providing you with the highest level of service in order to facilitate the resolution of your dispute as quickly and efficiently as possible.

As Manager of ADR Services for the American Arbitration Association, I will be your primary contact for this matter and am here to serve as your resource during the administration of your case. Please do not hesitate to contact me directly with any questions, issues, or concerns. Please note, my staff will be assisting me throughout the administration of the case to ensure that it is handled efficiently and expeditiously. Accordingly, there may be times when you are contacted, on my behalf, by a member of my staff. My staff is comprised of Brandy Shourds, Case Manager, Heather Pope, Case Manager and Mark Saucedo, Case Assistant.

The AAA acknowledges receipt on October 30, 2009, of a Demand for Arbitration dated October 29, 2009, for a dispute arising out of a contract between the above-captioned parties. In accordance with the Commercial Arbitration Rules, Claimant should have sent a copy of the Demand for Arbitration to all other parties.

This matter is currently being administered under the Commercial Arbitration Rules as amended and in effect on June 1, 2009, unless the parties agree otherwise. Please find a copy of the Commercial Arbitration Rules on our website at www.adr.org

Pursuant to Commercial Arbitration Rule 4, Respondent may file an answering statement with Claimant and the AAA in duplicate **within fifteen (15) days** of this letter. If Respondent wishes to file a counterclaim, please file two (2) copies, along with the supporting documents and the appropriate filing fee (using either the Standard Fee Schedule or the Pilot Flexible Fee Schedule), with the AAA and send a copy directly to Claimant by said date.

The Claimant filed using the Pilot Flexible Fee Schedule, thus the appointment process and other administrative procedures, as related to the claim, will not begin until Claimant has paid the Proceed Fee. Alternatively, if the Respondent files a counterclaim under the Standard Fee Schedule the AAA will immediately proceed with the continued administration of this arbitration including arbitrator appointment as related to the counterclaim. However, Claimant must still remit payment of the Proceed Fee within **90 days** from October 30, 2009 in order for Claimant's claim to be included in this proceeding. Under the Pilot Flexible Fee Schedule, claims and counterclaims are not put before the arbitrator without appropriate Proceed Fees having been advanced to AAA by the respective party.

Claimant may advance the Proceed Fee at any time **but must submit it within 90 days** of October 30, 2009. If the Proceed Fee is not paid and there is no counterclaim proceeding to hearing, the AAA will close the file administratively, return all documents submitted and mark this matter closed. Once the case is marked closed, it may only be reopened by filing a new Demand for Arbitration along with the appropriate filing fee. All filing fees under the Flexible Fee Schedule are nonrefundable. Please see the Refund Schedule under the Standard Fee Schedule if that Schedule applies.

Additionally, mediation is available to the parties throughout the arbitration process. As stated in the "Cost of the Mediation" section of the AAA's Mediation Procedures, the cost of the mediation is based on the hourly or daily rate published on the mediator's AAA profile. This rate covers both mediator compensation and an allocated portion for the AAA's services. In addition to local mediators, the Association has a select group of mediators that serve on the Association's National Panel of Mediators. If, at any point, you would like to mediate this matter please contact me.

We look forward to working with the parties. If you have any questions or concerns, please do not hesitate to contact the undersigned at any time via phone or email.

Sincerely,

/s/

Geneva L. O'Day
Manager of ADR Services
559 490 1882 direct dial
212 484 4177 facsimile
genevaoday@adr.org

 American Arbitration Association
*Dispute Resolution Services Worldwide*

# Next Steps in *Pilot Flexible Fee Schedule* Cases

Thank you for choosing our *Pilot Flexible Fee Schedule* in this case. Either the *Pilot Fee Schedule* or the Standard Fee Schedule is available for any counterclaim the Respondent may file, at its option. Under the *Pilot Fee Schedule* there are three payments of fees: Initial Filing Fee, Proceed Fee, and if a hearing occurs, a Final Fee. Under the Standard Fee Schedule, there are two payments of fees: an Initial Filing Fee, and if a hearing occurs, a Case Service Fee. The Schedules are available on www.adr.org.

**Answer and/or Counterclaim**
In accordance with the Rules, any Answer or Counterclaim and any objections to the locale requested must be filed within 15 days of notice from the AAA. These responses must be filed with the AAA and sent to the Claimant. Forms for an Answer or Counterclaim are available at www.adr.org/ASCR.

After the period for the Answer or Counterclaim, the filing phase of the arbitration is completed. Payment of either a Standard Fee or the *Proceed Fee* will begin the arbitrator selection and appointment process, scheduling hearings and other administrative procedures.

**Appointment of Arbitrator(s)**
- A party may pay the full Proceed Fee at any time within ninety (90) days of filing the claim and the AAA will begin the arbitrator selection process, pursuant to the Rules.
- If a Respondent has paid the *Filing and Proceed Fee* for a Counterclaim (or files under the Standard Fee Schedule), the AAA will begin the arbitrator selection process immediately, regardless of whether the Claimant has advanced its *Proceed Fee* under the *Pilot Fee Schedule*.
- Claims or Counterclaims are only presented to the arbitrators when the respective and appropriate fees are paid.
- Unless your contract states otherwise, all AAA administrative fees may be allocated by the arbitrator(s) in the award, but are advanced by the party filing a claim or a counterclaim.
- **AAA Enhanced Neutral Selection Services (for claims over $500,000):** The AAA provides, upon request, additional listing, resume, screening and interview procedures for selection and appointment of appropriate AAA Roster members. If you wish to use these procedures, you should let your case manager know and pay the proceed fee to initiate them. You can learn more about these services by reviewing them at www.adr.org/ENSP.
- **Reduced Proceed Fees:** Jointly, and using forms available from the AAA, the Claimant and Respondent may directly select and appoint an arbitrator, or a panel of arbitrators, without the AAA issuing a list of arbitrators. This joint-selection and appointment process includes obtaining any disclosures of conflicts, resolution of any challenges and notifying the AAA of the appointed arbitrator(s), along with the completed Oath and Appointment forms. The Proceed Fee will be reduced by 50% where the parties jointly appoint their arbitrator(s). Ask your case manager for these forms if the parties have mutually agreed to select and appoint the arbitrator(s).

**Procedural Issues, Conferences and Hearings**
Locale and other issues will be resolved when either the *Proceed* or Standard Fees are paid. Conferences, preliminary and final hearings with the arbitrators will be scheduled once the arbitrator is appointed.

**Mediation**
We will gladly assist the parties with appointment of a mediator and scheduling mediation sessions. Contact your case manager about AAA Mediation; you can also review potential mediators on www.AAAMediation.com. Where an AAA mediation is taking place, the time for the Proceed Fee payment for the arbitration is tolled until seven days after the mediation is completed or the remainder of the 90-day time period, whichever is longer.

%JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Zenvest LLC | BNC Frances Villas L.P.; BNC Frances L.P.; BNC Investments LLC; BNC Frances Oaks LLC; BNC Frances Trails LLC; et al |

**(b)** County of Residence of First Listed Plaintiff   **Michigan**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **San Diego, California**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Duane S. Horning, California Business Law Group P.C.
750 B Street, Suite 1620, San Diego, CA 92101 Tel. 619-325-1555

Attorneys (If Known)

**'09 CV 2670 WQH JMA**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ❏ 1  U.S. Government Plaintiff
- ❏ 3  Federal Question (U.S. Government Not a Party)
- ❏ 2  U.S. Government Defendant
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | **PERSONAL INJURY** | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 362 Personal Injury - Med. Malpractice | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 460 Deportation |
| ❏ 151 Medicare Act | ❏ 365 Personal Injury - Product Liability | ❏ 650 Airline Regs. | ❏ 830 Patent | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ❏ 320 Assault, Libel & Slander | ❏ 368 Asbestos Personal Injury Product Liability | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 330 Federal Employers' Liability | ❏ 660 Occupational Safety/Health | | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 340 Marine | **PERSONAL PROPERTY** | ❏ 690 Other | ❏ 810 Selective Service |
| ☒ 190 Other Contract | ❏ 345 Marine Product Liability | ❏ 370 Other Fraud | **LABOR** | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 350 Motor Vehicle | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | ❏ 875 Customer Challenge 12 USC 3410 |
| ❏ 196 Franchise | ❏ 355 Motor Vehicle Product Liability | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** |
| **REAL PROPERTY** | ❏ 360 Other Personal Injury | ❏ 385 Property Damage Product Liability | ❏ 730 Labor/Mgmt.Reporting & Disclosure Act | ❏ 861 HIA (1395ff) |
| ❏ 210 Land Condemnation | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 510 Motions to Vacate Sentence | ❏ 790 Other Labor Litigation | ❏ 863 DIWC/DIWW (405(g)) |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | **Habeas Corpus:** | ❏ 791 Empl. Ret. Inc. Security Act | ❏ 864 SSID Title XVI |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | ❏ 865 RSI (405(g)) |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | **FEDERAL TAX SUITS** |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - Employment | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | ❏ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ❏ 446 Amer. w/Disabilities - Other | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - Alien Detainee | ❏ 871 IRS—Third Party 26 USC 7609 |
| | ❏ 440 Other Civil Rights | ❏ 555 Prison Condition | ❏ 465 Other Immigration Actions | |
| | | | | ❏ 890 Other Statutory Actions |
| | | | | ❏ 891 Agricultural Acts |
| | | | | ❏ 892 Economic Stabilization Act |
| | | | | ❏ 893 Environmental Matters |
| | | | | ❏ 894 Energy Allocation Act |
| | | | | ❏ 895 Freedom of Information Act |
| | | | | ❏ 900 Appeal of Fee Determination Under Equal Access to Justice |
| | | | | ❏ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from another district (specify)
- ❏ 6  Multidistrict Litigation
- ❏ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
9 U.S.C. section 4      28:1332 Div

Brief description of cause:
Petition to Compel Arbitration under Federal Arbitration Act

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23      DEMAND $      CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):      JUDGE                DOCKET NUMBER

DATE   11/24/2009

SIGNATURE OF ATTORNEY OF RECORD
Duane S. Horning

**FOR OFFICE USE ONLY**

RECEIPT #  2643    AMOUNT  350.      APPLYING IFP          JUDGE          MAG. JUDGE

11/25/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS007643
Cashier ID: sramirez
Transaction Date: 11/25/2009
Payer Name: ca bus law group
----------------------------------
CIVIL FILING FEE
  For: zenvest v. BNC frances villas
  Case/Party: D-CAS-3-09-CV-002670-001
  Amount:        $350.00
----------------------------------
CHECK
  Check/Money Order Num: 3780
  Amt Tendered:  $350.00
----------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00


There will be a fee of $45.00
charged for any returned check.
```